**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

LEON E. LEE,                    )

                                    )

             Plaintiff,       )

                                      )

      v.                    )      Case No. 6:14-cv-01084-MLB-KMH

                                      )

LOANDEPOT.COM, LLC,      )

                                      )

            Defendant.     )

**DECLARATION OF JOSHUA C. DICKINSON IN SUPPORT OF
MOTION TO STAY**

I, Joshua C. Dickinson, declare as follows:

1.      I am a partner with the law firm of Spencer Fane Britt & Browne LLP, counsel to Defendant loanDepot.com, LLC in the above-captioned case.  I have personal knowledge of the matters referred to in this Declaration.

2.      Attached hereto as "**Exhibit A-1**" is a copy of a correspondence between several Members of Congress and the then Federal Communications Commission ("FCC") Chair that the FCC posted on its website, http://apps.fcc.gov/ecfs/comment/view?id=6017468750, on September 27, 2013.

3.      Attached hereto as "**Exhibit A-2**" is a copy (with quoted portions highlighted) of a correspondence between the Acting Chairwoman of the FCC, Mignon Clyburn and the FCC Acting Chief of the Consumer and Governmental Affairs, Kris Anne Monteith, and Members of Congress that the FCC posted on its website, http://apps.fcc.gov/ecfs/comment/-view?id=6017468750, on September 27, 2013.

4.      Attached hereto as "**Exhibit A-3**" is a copy (with quoted portions highlighted) of In the Matter of Communication Innovators' Petition for Declaratory Ruling, CG Docket No. 02-278 (June 7, 2012), available at http://apps.fcc.gov/ecfs/document/view?id=7021922047.

**EXHIBIT A**

5.      Attached hereto as "**Exhibit A-4**" (with quoted portions highlighted) of <u>In the Matter of YouMail, Inc.'s Petition for Expedited Declaratory Ruling</u>, CG Docket No. 02-278 (Apr. 19, 2013), available at <u>http://apps.fcc.gov/ecfs/document/view?id=7022288462</u>.

6.      Attached hereto as "**Exhibit A-5**" is a copy of the FCC Public Notice, Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Declaratory Ruling from Communication Innovators, CG Docket No. 02-278 (Oct. 16, 2012), available at <u>http://hraunfoss.fcc.gov/edocs_public/attachmatch/DA-12-1653A1.pdf</u>.

7.      Attached hereto as "**Exhibit A-6**" is a copy of the FCC Public Notice, Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Declaratory Ruling from YouMail, Inc., CG Docket No. 02-278 (June 25, 2013), available at <u>http://apps.fcc/gov/ecfs/document/view?id=7520925055</u>.

8.      Attached hereto as "**Exhibit A-7**" is a copy of <u>In the Matter of TextMe, Inc. Petition for Declaratory Ruling</u>, CG Docket No. 02-278 (Mar. 18, 2014), available at <u>http://apps.fcc.gov/ecfs/document/view?id=7521094163</u>.

9.      Attached hereto as "**Exhibit A-8**" is a copy of the FCC Public Notice, Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Declaratory Ruling filed by TextMe, Inc., CG Docket No. 02-278 (Apr. 7, 2014), available at <u>http://apps.fcc.gov/ecfs/comment/view?id=6017611106</u>.

10.      Attached hereto as "**Exhibit A-9**" is a true and correct copy of the Motion to Stay Pending Outcome of Petitions Before FCC (sans attachments) filed in the case captioned <u>Hurrle v. Real Time Resolutions, Inc.,</u> No. 13-05765 (W.D. Wash.).

OM 278974.1

I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

EXECUTED THIS 22ND DAY OF MAY, 2014 IN OMAHA, NEBRASKA.

s/ Joshua C. Dickinson

OM 278974.1

# Congress of the United States
## Washington, DC 20515

June 19, 2013

0619

Mignon L. Clyburn
Acting Chairwoman, Federal Communications Commission
445 12th Street, SW
Washington, D.C.  20554

Dear Chairwoman Clyburn:

In line with the mission of the Federal Communications Commission (FCC) to promote jobs, technological innovation, and enhance consumer privacy, we write to request clarification of the applicability of the Telephone Consumer Protection Act ("TCPA") to predictive dialers.  Specifically, we encourage the FCC to expeditiously consider the Communication Innovators ("CI") Petition for Declaratory Ruling and issue a ruling on the merits.

Congress passed the TCPA more than twenty years ago to protect consumers against unwanted telemarketing calls and to prevent callers from endangering public safety by tying up blocks of telephone lines.  Unfortunately, the FCC's 2003 and 2008 TCPA autodialer decisions have created significant confusion for companies that use predictive dialers to initiate live calls for non-telemarketing purposes, including for a variety of communications that may not have been anticipated by the FCC.  This confusion and regulatory uncertainty has resulted in a surge in TCPA class action litigation, with plaintiffs' attorneys seeking millions of dollars from a wide array of leading, established companies.

The CI Petition for Declaratory Ruling seeks to resolve the existing confusion over the use of predictive dialers for non-telemarketing purposes.  It asks the FCC to clarify, consistent with the text of the TCPA and Congressional intent, that predictive dialers which: (1) are not used for telemarketing purposes; and (2) do not have the current ability to generate and dial random or sequential numbers, are not "autodialers" under the TCPA and the FCC's TCPA rules.

PRINTED ON RECYCLED PAPER

EXHIBIT A-1

We urge the FCC to expeditiously consider this Petition and promptly issue a ruling on the merits.  Thank you in advance for your time and attention to this matter.  We look forward to your response.

Sincerely,

Duncan Hunter
Member of Congress

Scott Peters
Member of Congress

Juan Vargas
Member of Congress

cc:
Commissioner Jessica Rosenworcel
Commissioner Ajit Pai

The Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

RICHARD HURRLE, individually and on behalf )
of all others similarly situated,            )
                                             )   No. C13-05765BHS
                      Plaintiff,             )
                                             )   MOTION TO STAY PENDING
       v.                                    )   OUTCOME OF PETITIONS
                                             )   BEFORE FCC
REAL TIME RESOLUTIONS, INC.,                 )
                                             )   **Note on Motion Calendar:**
                      Defendant.             )   **January 17, 2014**
                                             )
                                             )
_____)

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

**EXHIBIT A-9**

## **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................................ 2

      A.    Mr. Hurrle's Allegations. ....................................................................... 2

      B.    The Pending Petitions for FCC Declaratory Rulings. .......................... 3

            1.    *In re Communication Innovators* ............................................... 3

            2.    *In re GroupMe* ............................................................................. 5

            3.    *In re YouMail* ............................................................................... 5

III.  Argument .......................................................................................................... 6

      A.    The Court Should Stay this Action Under the Primary Jurisdiction Doctrine Pending FCC Guidance that May Dispose of Plaintiff's Claims. ............................................. 6

            1.    Mr. Hurrle's Claims Require Resolving Whether the TCPA Applies to Non-Telemarketing Calls and What Constitutes an ATDS. ........................................ 7

            2.    Congress Granted the FCC Primary Jurisdiction to Resolve Whether the TCPA Applies to Non-Telemarketing Calls and What Constitutes an ATDS. .............. 8

            3.    Regulating Non-Telemarketing Calls and Defining What Constitutes an ATDS Requires Agency Expertise and National Uniformity. .................................. 9

      B.    The Court Should Stay this Action Pursuant to the Court's Inherent Authority. ...... 11

IV.   CONCLUSION ................................................................................................ 12

MOTION TO STAY
(C13-05765BHS) — i
DWT 23009642v4 0099035-000001

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alea London Ltd. v. Am. Home Servs., Inc.,*
    638 F.3d 768 (11th Cir. 2011) ...................................................................... 11

*Barahona v. T-Mobile US, Inc.,*
    628 F. Supp. 2d 1268 (W.D. Wash. 2009) ............................................. 10, 11

*Blair v. CBE Grp., Inc.,*
    2013 WL 5677026 (S.D. Cal. Oct. 17, 2013) ................................................ 9

*Cayanan v. Citi Holdings, Inc.,*
    928 F. Supp. 2d 1182 (S.D. Cal. 2013) ...................................................... 10

*Charvat v. EchoStar Satellite, LLC,*
    630 F.3d 459 (6th Cir. 2010) ...................................................... 6, 8, 10, 11

*Clark v. Time Warner Cable,*
    523 F.3d 1110 (9th Cir. 2008) ........................................................... 6, 11

*Coppock v. Citigroup, Inc.,*
    2013 WL 1192632 (W.D. Wash. Mar. 22, 2013) ......................................... 10

*Daniels-Hall v. Nat'l Educ. Ass'n,*
    629 F.3d 992 (9th Cir. 2010) ....................................................................... 3

*Davel Commc'ns, Inc. v. Qwest Corp.,*
    460 F.3d 1075 (9th Cir. 2006) ..................................................................... 6

*Fried v. Sensia Salon, Inc.,*
    2013 WL 6195483 (S.D. Tex. Nov. 27, 2013) ....................................... 8, 11

*Frontier Tel. of Rochester, Inc. v. USA Datanet Corp.,*
    386 F. Supp. 2d 144 (W.D.N.Y. 2005) ....................................................... 12

*Glauser v. Twilio, Inc.,*
    2012 WL 259426 (N.D. Cal. Jan. 27, 2012) ............................................... 11

*Hunt v. 21st Mortg. Corp.,*
    2013 WL 5230061 (N.D. Ala. Sept. 17, 2013) ........................................... 10

*Iniguez v. CBE Grp.,*
    __ F. Supp. 2d. __, 2013 WL 4780785 (E.D. Cal. Sept. 5, 2013) ................. 9

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

*Jamison v. First Credit Servs., Inc.*,
   290 F.R.D. 92 (N.D. Ill. 2013) ........................................................................ 10

*Landis v. N. Am. Co.*,
   299 U.S. 248 (1936) ........................................................................................ 12

*Leyva v. Certified Grocers of Cal., Ltd.*,
   593 F.2d 857 (9th Cir. 1979) ......................................................................... 12

*Mais v. Gulf Coast Collection Bureau, Inc.*,
   __ F. Supp. 2d. __, 2013 WL 1899616 (S.D. Fla. May 8, 2013) ..................... 9

*Malta v. Fed. Home Loan Mortg. Corp.*,
   2013 WL 444619 (S.D. Cal. Feb. 5, 2013)..................................................... 10

*Manno v. Healthcare Revenue Recovery Grp., LLC*,
   289 F.R.D. 674 (S.D. Fla. 2013) ................................................................... 10

*Meyer v. Portfolio Recovery Assocs., LLC*,
   707 F.3d 1036 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 2361 (2013) ................... 9

*Meyer v. Receivables Performance Mgmt., LLC*,
   2013 WL 1914392 (W.D. Wash. May 8, 2013) .............................................. 10

*N. Cnty. Commc'ns Corp. v. Cal. Catalog & Tech.*,
   594 F.3d 1149 (9th Cir. 2010) ......................................................................... 6

*Nelson v. Santander Consumer USA, Inc.*,
   931 F. Supp. 2d 919 (W.D. Wis.),
   *vacated in its entirety by* 2013 WL 5377280 (W.D. Wis. June 7, 2013) ............ 10

*O'Connor v. Diversified Consultants, Inc.*,
   2013 WL 2319342 (E.D. Mo. May 28, 2013) ................................................... 9

*Rogers v. Medicredit, Inc.*,
   2013 WL 4496278 (E.D. Mo. Aug. 21, 2013) ................................................. 9

*In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*,
   7 FCC Rcd. 8752 (1992) .................................................................................. 7

*In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*,
   10 FCC Rcd. 12391 (1995) .............................................................................. 7

*In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*,
   18 FCC Rcd. 14014 (2003) ........................................................................ 7, 8, 9

*In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*,
   23 FCC Rcd. 559 (2008) .................................................................................. 8

MOTION TO STAY
(C13-05765BHS) — iii
DWT 23009642v4 0099035-000001

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

*Satterfield v. Simon & Schuster, Inc.*,
　　569 F.3d 946 (9th Cir. 2009) .................................................................................. 8

*S. Cent. Bell Tel. Co. v. La. Pub. Serv. Comm'n*,
　　744 F.2d 1107 (5th Cir. 1984), *vacated on other grounds*, 476 U.S. 1166 (1986) ............... 9

*Selby v. Deutsche Bank Trust Co. Ams.*,
　　2013 WL 1315841 (S.D. Cal. Mar. 28, 2013) .................................................... 10

*United States v. DISH Network, LLC*,
　　2011 WL 475067 (C.D. Ill. Feb. 4, 2011) ......................................................... 11

*United States v. W. Pac. R.R. Co.*,
　　352 U.S. 59 (1956) ........................................................................................... 11

**Federal Statutes**

Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ........................... 1, 2, 7, 8

**Rules**

Fed. R. Civ. P. 26(f) ........................................................................................... 12

**Regulations**

47 C.F.R. § 64.1200 ............................................................................................. 9

**Other Authorities**

*In re Rules & Regs. Implementing the TCPA*, 68 Fed. Reg. 44144 (July 25, 2003) ................... 4

*In re Rules & Regs. Implementing the TCPA*, 73 Fed. Reg. 6041 (Feb. 1, 2008) ....................... 4

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

## I.    INTRODUCTION

1       Plaintiff Richard Hurrle alleges defendant Real Time Resolutions, Inc. violated the

2   Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*, by allegedly using an

3   automatic telephone dialing system ("ATDS") to call his cell phone without his prior express

4   consent.  According to Mr. Hurrle, Real Time, a specialty home loan servicer, placed these calls

5   to "demand[] payment" on a second mortgage.  Compl. ¶ 17 [Dkt. 1].  Mr. Hurrle's Complaint

6   will turn on two issues currently pending before the FCC in three Petitions for Declaratory

7   Ruling:  (1) whether the TCPA applies to non-telemarketing calling activity (such as the debt-

8   collection calls about which Mr. Hurrle complains); and (2) whether dialing equipment must

9   have a current capacity to generate and dial random or sequential numbers to be an ATDS (not a

10  mere theoretical capacity if modified by hardware or software).  An FCC ruling that the TCPA

11  does not encompass non-telemarking calling activity could dispose of Mr. Hurrle's Complaint.

12  And if the FCC concludes dialing equipment must have the current capacity to generate and dial

13  random or sequential numbers, rather than a mere theoretical capacity (which even consumer

14  smartphones have), that too would gut Mr. Hurrle's claim.  The Court should stay this case either

15  under the primary jurisdiction doctrine or pursuant to the Court's inherent authority pending the

16  FCC's rulings on these petitions.

17      The present circumstances meet the standard for staying the case under the primary

18  jurisdiction doctrine.  *First*, Mr. Hurrle's allegations require resolving whether the TCPA applies

19  to non-telemarketing calls, and whether equipment lacking the current capacity to generate and

20  dial random or sequential numbers falls within the TCPA's ambit.  *Second*, the FCC has primary

21  jurisdiction to determine, and in fact will determine, these very issues.  *Third*, regulating non-

22  telemarking calls to cell phones and defining what comprise ATDSs requires agency expertise

23  and national uniformity.

24      But regardless of the primary jurisdiction doctrine, the Court should invoke its inherent

25  power to stay this action to avoid burdening the parties and the Court with further proceedings

26  regarding claims the FCC's imminent rulings might dispose of entirely, particularly where doing

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

1    so will not prejudice Mr. Hurrle.

2                    **II.    FACTUAL BACKGROUND**

3         **A.    Mr. Hurrle's Allegations.**

4         In his Complaint, Mr. Hurrle alleges Real Time called his cell phone without his consent

5    to "demand[] payment" for a second mortgage he had obtained. Compl. ¶ 17. He alleges Real

6    Time "is a 'specialty servicer' of residential real estate mortgage loans, specializing in servicing

7    loans that are in default." *Id.* ¶ 6. Without pleading any supporting factual allegations,

8    Mr. Hurrle baldly concludes Real Time placed these calls to his cell phone using "an automatic

9    telephone dialing system as defined by the TCPA." *Id.* ¶ 18.

10        According to Mr. Hurrle, these alleged calls violated the TCPA's restrictions on placing

11   telemarketing calls to cell phones using ATDSs. *Id.* ¶¶ 28-35. Mr. Hurrle acknowledges

12   Congress "enacted the [TCPA] in response to a growing number of consumer complaints

13   regarding certain telemarketing practices." *Id.* ¶ 7. The TCPA prohibits "any person ... [from]

14   mak[ing] any call (other than a call made for emergency purposes or made with the prior express

15   consent of the called party) using an automatic telephone dialing system or an artificial or

16   prerecorded voice ... to any telephone number assigned to a ... cellular telephone service." 47

17   U.S.C. § 227(b)(1)(A)(iii). It defines an ATDS as "equipment which has the capacity—(A) to

18   store or produce telephone numbers to be called, using a random or sequential number generator;

19   and (B) to dial such numbers." *Id.* §§ 227(a)(1)(A), (B). Real Time's dialing equipment lacks

20   the present capacity to "store or produce numbers to be called, using a random or sequential

21   number generator ... and to dial such numbers" as required for its equipment to comprise an

22   ATDS. *See id.*; Payson Decl. ¶ 2.

23        Based on these allegations, Mr. Hurrle seeks to represent a nationwide class of "[a]ll

24   persons within the United States who received a non-emergency telephone call from Real Time

25   Resolutions, Inc. to a cellular telephone through the use of an automatic telephone dialing system

26   and who did not provide prior express consent for such calls, at any time from August 30, 2009

27   to the date of trial." Compl. ¶ 20. Mr. Hurrle requests injunctive relief, treble damages for each

MOTION TO STAY
(C13-05765BHS) — 2
DWT 23009642v4 0099035-000001

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

1   putative class member "for each and every call" that violates the TCPA, and attorneys' fees and

2   costs. *Id.* ¶¶ 31, 34, G.

3       **B.      The Pending Petitions for FCC Declaratory Rulings.**

4           Mr. Hurrle contends the Court should hold callers liable for debt-related calls, even

5   though such calls are not telemarketing, and even if the dialing equipment lacks a present

6   capacity to store or produce random or sequential numbers for dialing. *Id.* ¶¶ 10-11, 17-18.  Real

7   Time's counsel explained to Mr. Hurrle's counsel that Real Time's dialing equipment lacks such

8   capacity. Payson Decl. ¶ 2.  Three petitions for declaratory rulings currently before the FCC ask

9   the agency to decide whether the TCPA applies to non-telemarketing calling activities, and

10  whether equipment that lacks the current capacity for random or sequential number generation

11  constitutes an ATDS.  *See* Payson Decl. Exs. A, E & G (*In re Commc'n Innovators' Pet. for*

12  *Declaratory Ruling*, CG Dkt. No. 02-278 (June 7, 2012) ("CI Petition"); *In re GroupMe,*

13  *Inc./Skype Commc'ns S.A.R.L.'s Pet. for Expedited Declaratory Ruling & Clarification*, CG Dkt.

14  No. 02-278 (Mar. 1, 2012) ("GroupMe Petition"); *In re YouMail, Inc.'s Pet. for Expedited*

15  *Declaratory Ruling*, CG Dkt. No. 02-278 (Apr. 19, 2013) ("YouMail Petition")).[1]  As a result,

16  Real Time's counsel asked Mr. Hurrle's counsel to agree to a stay pending the FCC's

17  determination on those rulings. Payson Decl. ¶ 2.  Mr. Hurrle's counsel declined.  *Id.*

18      **1.      *In re Communication Innovators***

19          On June 7, 2012, Communication Innovators ("CI") filed a Petition for Declaratory

20  Ruling with the FCC, seeking a declaration that "the Commission clarify, consistent with the text

21  of the TCPA and Congressional intent, that predictive dialers that (1) are not used for

22  telemarketing purposes and (2) do not have the current ability to generate and dial random or

23  sequential numbers, are not 'automatic telephone dialing systems' . . . under the TCPA and the

24

25

26  [1] The Court may take judicial notice of information made "publicly available by government entities" and whose
authenticity no party disputes, such as declaratory ruling petitions filed with the FCC, and subsequent filings by the
FCC and other parties on the same docket. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010)

27  (citing Fed. R. Evid. 201)).

MOTION TO STAY                                                      Davis Wright Tremaine LLP
(C13-05765BHS) — 3                                                         LAW OFFICES
DWT 23009642v4 0099035-000001                                              Suite 2200
                                                                       1201 Third Avenue
                                                                     Seattle, WA 98101-3045
                                                          206.622.3150 main · 206.757.7700 fax

1   Commission's TCPA rules." Payson Decl. Ex. A (CI Pet. at 1) (footnote omitted).[2]

2          In requesting this ruling, the CI Petition points out that the TCPA does not define

3   "capacity," and urges the FCC to "clarify that the definition of an autodialer under the TCPA

4   reflects equipment that has a *present* capacity, such as having the current ability to generate and

5   dial random or sequential numbers without additional modifications to the equipment." *Id.* at 17.

6   It argues the FCC "should not interpret capacity as encompassing any conceivable hardware or

7   software modification to a device that would permit it to generate, store, and dial numbers

8   randomly or in sequence." *Id.*  As the CI Petition notes, interpreting "capacity" broadly to

9   include "any conceivable hardware or software modification" would potentially bring "mobile

10  phones, smart phones, tablets, e-readers, and personal computers" within the TCPA's scope, as

11  each can "theoretically be modified ... to randomly or sequentially generate and dial telephone

12  numbers." *Id.*

13         The CI Petition also asks the FCC to "distinguish between telemarketing and

14  informational calls when it clarifies the meaning of capacity." *Id.*  In particular, the CI Petition

15  contends "today's predictive dialers—many of which have no current capacity to dial random or

16  sequential numbers—are used for a number of innovative non-telemarketing purposes that

17  simultaneously bring benefits to consumers and businesses" such as "allowing businesses with a

18  legitimate need to contact a large number of specific accountholders or other consumers to do so

19  accurately, efficiently, and cost-effectively." *Id.* at 18-19.

20         Communication Innovators filed its Petition on June 7, 2012.  About four months later,

21  the FCC issued a public notice, seeking comment on the Petition. *See* Payson Decl. Ex. B (FCC

22  Pub. Notice, Consumer and Governmental Affairs Bureau Seeks Comment on Petition for

23  Declaratory Ruling from Communication Innovators (Oct. 16, 2012)).  The deadline for

24  comments and reply comments closed in November 2012, over a year ago. *Id.*  Numerous

---

25

26  [2] The FCC has interpreted the TCPA's definition of ATDS to include equipment that dials lists of number without
    human intervention. *In re Rules & Regs. Implementing the TCPA*, 73 Fed. Reg. 6041, 6042 (Feb. 1, 2008).  The
    FCC calls this equipment "predictive dialers." *In re Rules & Regs. Implementing the TCPA*, 68 Fed. Reg. 44144,
27  44161 (July 25, 2003).

MOTION TO STAY                                              Davis Wright Tremaine LLP
(C13-05765BHS) — 4                                               LAW OFFICES
DWT 23009642v4 0099035-000001                                     Suite 2200
                                                            1201 Third Avenue
                                                          Seattle, WA 98101-3045
                                                    206.622.3150 main · 206.757.7700 fax

1    consumer and industry groups commented, most of which generally supported CI's Petition. *See*

2    Payson Decl. Ex. C (Reply Comments of Communication Innovators, CI Pet., CG Docket No.

3    02-278 (Nov. 30, 2012)) (discussing various comments filed at pp. 2, 3, 7, 8, 10, 12, 13 & 15).

4    While the formal comment period has now passed, interested parties have continued to submit

5    letters to the Commission and regularly visit with Commission staff urging prompt action.

6        Recently, the FCC has indicated that it may issue a decision regarding the CI Petition

7    imminently.  On September 27, 2013, the FCC released an exchange of correspondence between

8    several Members of Congress and the then-FCC Chair (and the Acting Chief of the Consumer

9    and Governmental Affairs Bureau), in which the Commission stated that "[a] draft order to

10   resolve the [CI] Petition is under consideration by the Commission, and Communication

11   Innovators has met with the staff recently to discuss the matter." *See* Payson Decl. Ex. D.  The

12   letter from Congress (signed by three Members) to the then-FCC Chair was dated June 19, 2013,

13   and the FCC's response, though not released until September 27, 2013, was dated September 10,

14   2013.  This recent flurry of activity regarding the CI Petition bolsters the assumption that the

15   FCC will issue directly relevant guidance soon.

16          **2.**    *In re GroupMe*

17       In its Petition for Declaratory Ruling, filed on March 1, 2012, GroupMe also requested

18   "that the Commission issue a ruling defining 'capacity' to encompass only equipment that, *at the*

19   *time of use*, could, in fact, have autodialed random or sequential numbers without human

20   intervention and without first being technologically altered."  Payson Decl. Ex. E (GroupMe Pet.

21   at 14).  On July 24, 2012, the FCC issued a public notice seeking comment on GroupMe's

22   petition.  *Id.* Ex. F (FCC Pub. Notice, Consumer and Governmental Affairs Bureau Seeks

23   Comment on Petition for Expedited Declaratory Ruling from GroupMe, Inc. (July 24, 2012)).

24   The deadline for comments was August 30, 2012, and for reply comments, September 10, 2012.

25          **3.**    *In re YouMail*

26       YouMail, Inc., filed its Petition for Declaratory Ruling on April 19, 2013.  Like

27   Communication Innovators and GroupMe, YouMail asks that "the Commission affirmatively

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

1  state that only equipment that has a <u>current</u> capacity to store and produce telephone numbers to

2  be called using a random or sequential number generator—and is currently being used for that

3  purpose—should be considered an ATDS." Payson Decl. Ex. G (YouMail Pet. at 11).  On June

4  25, 2013, the FCC issued a public notice seeking comment on YouMail's petition.  *See* Payson

5  Decl. Ex. H (FCC Pub. Notice, Consumer and Governmental Affairs Bureau Seeks Comment on

6  Petition for Expedited Declaratory Ruling from YouMail, Inc. (June 25, 2013)).  The deadline

7  for comments was July 25, 2013, and for reply comments, August 9, 2013.  YouMail's proposed

8  interpretation of the term "capacity" as current capacity received "widespread support from the

9  majority of commenters." *Id.* Ex. I (Reply Comments of YouMail, Inc. at 2 (Aug. 9, 2013)).

## III.   ARGUMENT

**A.   The Court Should Stay This Action Under the Primary Jurisdiction Doctrine
Pending FCC Guidance That May Dispose of Plaintiff's Claims.**

Under the primary jurisdiction doctrine, courts may stay proceedings or dismiss a

complaint without prejudice pending resolution of "'an issue within the special competence of an

administrative agency.'" *N. Cnty. Commc'ns Corp. v. Cal. Catalog & Tech.*, 594 F.3d 1149,

1162 (9th Cir. 2010) (quoting *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir.

2008)).  Courts invoke the primary jurisdiction doctrine "to advance regulatory uniformity," "to

answer a question … within the agency's discretion," and "to benefit from technical or policy

considerations within the agency's … expertise." *Charvat v. EchoStar Satellite, LLC*, 630 F.3d

459, 466 (6th Cir. 2010) (invoking primary jurisdiction doctrine in TCPA case) (internal

quotation marks omitted).  The Ninth Circuit instructs that courts may stay a case pending an

agency determination "where there is (1) the need to resolve an issue that (2) has been placed by

Congress within the jurisdiction of an administrative body having regulatory authority

(3) pursuant to the statute that subjects an industry or activity to a comprehensive regulatory

scheme that (4) requires expertise or uniformity in administration." *Davel Commc'ns, Inc. v.*

*Qwest Corp.*, 460 F.3d 1075, 1086-87 (9th Cir. 2006) (internal quotation marks omitted).  This

case satisfies all of these factors.  The Court should stay this action pending the FCC's likely

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

imminent ruling on the pending petitions.

### 1. Mr. Hurrle's Claims Require Resolving Whether the TCPA Applies to Non-Telemarketing Calls and What Constitutes an ATDS.

To prove his TCPA claim, at a minimum, Mr. Hurrle must show Real Time used an ATDS to call his cell phone without his consent. 47 U.S.C. § 227(b)(1)(A)(iii). Mr. Hurrle agrees Congress passed the TCPA to curb telemarketing activities. Compl. ¶ 7. Mr. Hurrle alleges Real Time called his cell phone without his consent to "demand[] payment" for a second mortgage. *Id.* ¶¶ 17-18. Although he claims Real Time used an ATDS, he does not allege Real Time's calling equipment has the current capacity to store or produce randomly or sequentially generated numbers, yet he claims these alleged calls violated the TCPA. *Id.* The FCC's declaratory ruling on the Petitions will resolve whether debt-related calls (i.e., non-telemarketing calls) and calls placed from a dialer that lacks a current capacity to store or produce randomly or sequentially generated numbers fall within the TCPA's prohibitions.

Originally, the FCC determined that debt-collection calls not directed to random or sequential numbers did not fall within the TCPA's definition of an ATDS. *See In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*, 7 FCC Rcd. 8752 ¶ 39 (1992). In that ruling, the FCC also recognized Congress passed the TCPA to protect consumers from unrestricted telemarketing practices, not non-telemarketing calling activities. *Id.* ¶ 9. A few years later, the FCC confirmed the TCPA does not prohibit certain non-telemarketing calls because such calls "are not directed to randomly or sequentially generated telephone numbers, but instead are directed to the specifically programmed contact numbers." *In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391 ¶ 19 (1995).

In 2003, however, the FCC ruled that some predictive dialers that do not use a random or sequential number generator are ATDSs under the TCPA. *In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014 ¶ 133 (2003). In particular, the FCC ruled "to be considered an 'automatic telephone dialing system,' the equipment need only have the *capacity* to store or produce telephone numbers." *Id.* ¶ 132. The FCC reached this conclusion

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

1  out of concern that technological changes had influenced telemarketers to use predictive dialers

2  to call lists of numbers rather than to call random or sequential numbers. *Id.* The FCC

3  reaffirmed this position in a 2008 ruling. *In re Rules & Regs. Implementing the Tel. Consumer*

4  *Prot. Act of 1991*, 23 FCC Rcd. 559 (2008). But neither the TCPA nor the FCC has defined

5  what "capacity" means—whether it includes non-telemarketing calls and calls placed from

6  equipment that lacks the current "capacity" to store or produce randomly or sequentially

7  generated numbers. 47 U.S.C. § 227(a)(1)(A).[3]

8       Resolving Mr. Hurrle's claims will require answering these questions. Mr. Hurrle cannot

9  state a TCPA claim against Real Time unless he can prove Real Time used an ATDS and placed

10  prohibited calls. *See id.* § 227(b)(1)(A)(iii). The Petitions place these questions, which raise

11  first impression issues, squarely before the FCC.

12           **2.**    **Congress Granted the FCC Primary Jurisdiction to Resolve Whether**
13                   **the TCPA Applies to Non-Telemarketing Calls and What Constitutes**
                 **an ATDS.**

14       Congress explicitly gave the FCC the power to implement and construe the TCPA. *Id.*

15  § 227(b)(2). Specifically, the TCPA empowers the FCC to prescribe regulations under the Act,

16  *see id.* §§ 227(b)(2), (c)(1), (c)(2), to exempt calls from the requirements of the Act, *see id.*

17  §§ 227(b)(2)(B), (b)(2)(C), to intervene in suits filed by state attorneys general, *see id.*

18  § 227(g)(3), and to enforce the Act and its accompanying regulations. *See also Charvat*, 630

19  F.3d at 466-67 (same). "Congress vested the FCC with considerable authority to implement"

20  and construe the TCPA. *Id.* at 466 (citing 47 U.S.C. § 227(b)(2)). Consistent with that authority,

21  the FCC has created a complex regulatory scheme that governs telemarketing. It has done so by

22  adopting new regulations as technologies and business practices evolve. *See, e.g., In re Rules &*

23  *Regs. Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014 ¶¶ 132-133; *Fried*

24  *v. Sensia Salon, Inc.*, 2013 WL 6195483, at *5 (S.D. Tex. Nov. 27, 2013) ("The FCC has

25  regulatory power over this [telemarketing] industry and can respond to changes in the industry

26  [3] While the Ninth Circuit has considered the TCPA's use of the word "capacity," it has not defined that word as used
under the TCPA. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009); *Meyer v. Portfolio*
27  *Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 2361 (2013).

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

1  through regulations, reports and orders, declaratory rulings, and other available tools."; staying

2  case). In fact, the FCC has enacted rules and rules revisions regarding the permissible scope of

3  automated telephoning activity under the TCPA dozens of times since 1992. *See* 47 C.F.R.

4  § 64.1200 (rule-making history).

5        Given the specific role Congress conferred on the FCC under the TCPA, the FCC

6  occupies the best position to determine whether non-telemarketing activity falls within the

7  TCPA's sphere and what "capacity" means under the TCPA. Resolving these questions will

8  require the FCC to reconcile its prior rulings, as well as to interpret the TCPA. A ruling from the

9  FCC (1) declaring non-telemarketing calling activity as outside the TCPA's domain (either

10  generally or because it does not meet the TCPA's definition of an ATDS), or (2) declaring that

11  "capacity" under the TCPA means current capacity (not a theoretical capacity if modified), could

12  dispose of Mr. Hurrle's claims.

13          **3.**     **Regulating Non-Telemarketing Calls and Defining What Constitutes**
                **an ATDS Requires Agency Expertise and National Uniformity.**

14

15        In enacting the TCPA, Congress intended to "promote a uniform regulatory scheme

16  under which telemarketers would not be subject to multiple, conflicting regulations. . . . [and] to

17  avoid burdensome compliance costs for telemarketers." *In re Rules & Regs. Implementing the*

18  *Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014 ¶ 83 (2003). "[T]hrough the application of

19  the doctrine of primary jurisdiction, the courts and the FCC should be able to prevent …

20  significant inconsistent application of FCC rules . . . ." *S. Cent. Bell Tel. Co. v. La. Pub. Serv.*

21  *Comm'n*, 744 F.2d 1107, 1118 (5th Cir. 1984), *vacated on other grounds*, 476 U.S. 1166 (1986).

22        Here, because whether the TCPA applies only to telemarketing activity and what

23  "capacity" means present first impression issues, a risk of "significant inconsistent application of

24  FCC rules" on these issues exists. *Id.* Indeed, plaintiffs have filed numerous TCPA class actions

25  regarding collection calls just this year alone.[4] The sheer "volume of [pending] lawsuits

26  _____

27  [4] *See, e.g., Blair v. CBE Grp., Inc.*, 2013 WL 5677026 (S.D. Cal. Oct. 17, 2013); *Iniguez v. CBE Grp.*, __ F. Supp.
2d. __, 2013 WL 4780785 (E.D. Cal. Sept. 5, 2013); *Rogers v. Medicredit, Inc.*, 2013 WL 4496278 (E.D. Mo. Aug.
21, 2013); *O'Connor v. Diversified Consultants, Inc.*, 2013 WL 2319342 (E.D. Mo. May 28, 2013); *Mais v. Gulf
Coast Collection Bureau, Inc.*, __ F. Supp. 2d. __, 2013 WL 1899616 (S.D. Fla. May 8, 2013); *Meyer v. Receivables*

MOTION TO STAY
(C13-05765BHS) — 9
DWT 23009642v4 0099035-000001

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

1  heightens the risk that individuals and companies will be subject to decisions pointing in

2  opposite directions." *Charvat*, 630 F.3d at 466.

3      And in fact courts have disagreed over what "capacity" means under the TCPA.  For

4  instance, in *Hunt v. 21st Mortgage Corp.*, 2013 WL 5230061, at *3-4 (N.D. Ala. Sept. 17, 2013),

5  the court concluded that "to meet the TCPA definition of an 'automatic telephone dialing

6  system,' a system must have a ***present*** capacity, at the time the calls were being made, to store or

7  produce and call numbers from a number generator." (Italicized emphasis added.)  In reaching

8  this conclusion, the court refused to interpret "capacity" as broadly encompassing equipment

9  with a theoretical capacity to store or produce randomly or sequentially generated numbers

10 because "in today's world, the possibilities of modification and alteration are virtually limitless."

11 *Id.* at *4.  As the court explained, it is "virtually certain that software could be written, without

12 much trouble, that would allow iPhones" to fall under the auspices of the TCPA.  *Id.*  Such a

13 limitless definition of capacity would mean that "roughly 20 million American iPhone users

14 [would be] subject to the mandates of § 227(b)(1)(A)."  *Id.*  Meanwhile, the court in *Nelson v.*

15 *Santander Consumer USA, Inc.*, 931 F. Supp. 2d 919, 928-29 (W.D. Wis. 2013), *vacated in its*

16 *entirety by* 2013 WL 5377280 (W.D. Wis. June 7, 2013), interpreted ATDS broadly to

17 encompass any equipment that could store or produce randomly or sequentially generated

18 numbers when paired with the appropriate hardware or software.

19     That courts have disagreed over what "capacity" means and what calling activity or

20 equipment meets the definition of an ATDS further demonstrates that staying this case pending

21 the FCC's ruling on the Petitions will ensure much-needed uniformity.  *See Barahona v. T-*

22 *Mobile US, Inc.*, 628 F. Supp. 2d 1268, 1272 (W.D. Wash. 2009) ("In view of the disparity

23 between the cases cited by the parties, the Court finds that the interest of uniformity weighs

24 heavily in favor of deferring to the expertise of the FCC under the primary jurisdiction

25 *Performance Mgmt., LLC*, 2013 WL 1914392 (W.D. Wash. May 8, 2013); *Selby v. Deutsche Bank Trust Co. Ams.*,
   2013 WL 1315841 (S.D. Cal. Mar. 28, 2013); *Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92 (N.D. Ill. 2013);
26 *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674 (S.D. Fla. 2013); *Coppock v. Citigroup, Inc.*,
   2013 WL 1192632 (W.D. Wash. Mar. 22, 2013); *Cayanan v. Citi Holdings, Inc.*, 928 F. Supp. 2d 1182 (S.D. Cal.
27 2013); *Malta v. Fed. Home Loan Mortg. Corp.*, 2013 WL 444619 (S.D. Cal. Feb. 5, 2013).

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

1   doctrine."); *Charvat*, 630 F.3d at 466 (staying case under primary jurisdiction doctrine because,

2   among other things, the TCPA and its regulations control "services nationally, creating the

3   possibility of conflicting decisions in different state and federal jurisdictions"). This uniformity

4   principle applies with particular force here, as the TCPA is a "strict liability" statute, subjecting

5   defendants to potentially staggering monetary damages that could be based on a faulty reading of

6   the statute. *See Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 776 (11th Cir. 2011).

7   Permitting the FCC to speak first will avoid liability findings that may later turn out to be

8   incorrect. *See United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956) (allowing agency to

9   decide issue first ensures "the limited functions of review by the judiciary are more rationally

10   exercised").

11                               * * * * *

12          At bottom, Mr. Hurrle's Complaint requires resolving questions that are pending before

13   the agency Congress charged with regulatory authority over Mr. Hurrle's sole TCPA cause of

14   action. The TCPA subjects automated telephone calling to a comprehensive regulatory scheme

15   that requires the FCC's expertise for uniform administration. The Court should therefore stay

16   this action under the primary jurisdiction doctrine until the FCC issues its ruling on the pending

17   Petitions, as many courts have done in similar circumstances.[5]

18   **B.     The Court Should Stay This Action Pursuant to the Court's Inherent
19            Authority.**

20          Regardless of the primary jurisdiction doctrine, the Court should stay this case pursuant

21   _____
     [5] *See, e.g., Clark*, 523 F.3d at 1114-16 (affirming stay under primary jurisdiction doctrine where claim raised first

22   impression issues within FCC's special competence would decide threshold liability questions); *Charvat*, 630 F.3d
     at 465-68 (referring case to FCC under primary jurisdiction doctrine to determine if DISH Network was liable under

23   TCPA for sales calls made by independent contractor retailers; court cited benefits of uniformity, discretion, and
     expertise in making referral, stating that the "agency's views are the logical place for the judiciary to start") (internal

24   quotation marks omitted); *Glauser v. Twilio, Inc.*, 2012 WL 259426, at *2 (N.D. Cal. Jan. 27, 2012) (resolving,
     among other things, "who qualifies as an auto-dialer subject to the TCPA" necessary to claims before the court and

25   within FCC's jurisdiction); *Barahona*, 628 F. Supp. 2d at 1271 (staying case under primary jurisdiction doctrine
     where, among other things, Congress placed regulation of cell phone services in FCC's special competence); *Fried*,

26   2013 WL 6195483, at *4 (staying case under primary jurisdiction doctrine because "the FCC is in the best position
     to opine, in the first instance, on the technical and potentially far-reaching issues implicated in Plaintiffs' claims,

27   namely, whether the use of [the] systems [at issue] … violates the TCPA"); *United States v. DISH Network, LLC*,
     2011 WL 475067, at *3 (C.D. Ill. Feb. 4, 2011) (citing primary jurisdiction doctrine in staying TCPA claims against
     DISH Network pending FCC ruling in *Charvat*).

MOTION TO STAY
(C13-05765BHS) — 11
DWT 23009642v4 0099035-000001

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

1  to its inherent authority.

2      A trial court may, with propriety, find it is efficient for its own docket and the
   fairest course for the parties to enter a stay of an action before it, pending
3   resolution of independent proceedings which bear upon the case. This rule …
   does not require that the issues in such proceedings are necessarily controlling of
4   the action before the court.

5  *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863-64 (9th Cir. 1979) (citing, *inter alia*,

6  *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936)).  Absent a stay, Real Time may be forced to

7  incur the burden and expense of defending claims that the FCC's guidance may reveal to lack

8  merit.  And given the early stage of this case (the parties only yesterday held their Rule 26(f)

9  conference) and the likelihood of an imminent FCC ruling, Mr. Hurrle cannot show he would

10  suffer prejudice by a short stay. *See Frontier Tel. of Rochester, Inc. v. USA Datanet Corp.*, 386

11  F. Supp. 2d 144, 151 (W.D.N.Y. 2005) (granting a stay where it appeared FCC decision

12  "[would] be forthcoming in a matter of months").

13                    **IV.   CONCLUSION**

14      For the foregoing reasons, the Court should stay this case under the primary jurisdiction

15  doctrine or pursuant to its inherent authority until the FCC rules on the pending Petitions.

16      Respectfully submitted this 12th day of December, 2013.

17                    DAVIS WRIGHT TREMAINE LLP
                    Attorneys for Defendant Real Time Resolutions,
18                    Inc.

19

20                    By: *s/Kenneth E. Payson*
                    Kenneth E. Payson, WSBA #26369
21                    Rebecca J. Francis, WSBA #41196
                    1201 Third Avenue, Suite 2200
22                    Seattle, Washington  98101-3045
                    Telephone: (206) 622-3150
23                    Fax: (206) 757-7700
                    E-mail:  kenpayson@dwt.com
24                            rebeccafrancis@dwt.com

25

26

27

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I caused to be electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

| | |
|---|---|
| Beth E Terrell: | bterrell@tmdwlaw.com, bkinsey@tmdwlaw.com, docketrequests@tmdwlaw.com, enordby@tmdwlaw.com, filing@tmdwlaw.com, jchase@tmdwlaw.com |
| Michael Duane Daudt: | mdaudt@tmdwlaw.com, bkinsey@tmdwlaw.com, docketrequests@tmdwlaw.com, enordby@tmdwlaw.com, filing@tmdwlaw.com, jchase@tmdwlaw.com |
| Justin M Baxter: | justin@baxterlaw.com, danae@baxterlaw.com, kachelle@baxterlaw.com |
| Alexander H Burke: | aburke@burkelawllc.com |

DATED this 12th day of December, 2013.

s/Kenneth E. Payson
Kenneth E. Payson, WSBA #26369
Davis Wright Tremaine LLP
1201 Third Avenue, Suite 2200
Seattle, WA  98101-3045
Telephone: (206) 622-3150
Fax: (206) 757-7700
E-mail: kenpayson@dwt.com

MOTION TO STAY
(C13-05765BHS) — 13
DWT 23009642v4 0099035-000001

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax



**FEDERAL COMMUNICATIONS COMMISSION**

September 10, 2013

Mignon L. Clyburn
Acting Chairwoman

The Honorable Duncan Hunter
U.S. House of Representatives
223 Cannon House Office Building
Washington, DC  20515

Dear Congressman Hunter:

Thank you for your letter regarding Communication Innovators' Petition for Declaratory Ruling.  I appreciate your interest in this matter and am pleased to provide the enclosed letter on this issue from the Acting Chief of the FCC's Consumer and Governmental Affairs Bureau.

If you have any additional questions or need any further assistance, please do not hesitate to contact me.

Sincerely,

Mignon L. Clyburn

Enclosure

445 12th Street S.W. Washington, D.C. 20554  (202) 418-1000

EXHIBIT A-2



Federal Communications Commission
Washington, D.C. 20554

Control No. 1300619

September 10, 2013

The Honorable Duncan Hunter
U.S. House of Representatives
223 Cannon House Office Building
Washington, D.C. 20515

Dear Congressman Hunter:

Thank you for your letter regarding the Petition for Declaratory Ruling filed with the Federal Communications Commission (Commission) by Communication Innovators on June 7, 2012. The Petition seeks clarification that predictive dialers that are not used for marketing purposes and that do not have the current ability to generate and dial random or sequential numbers do not fall within the definition of "automatic telephone dialing system" as used in the Telephone Consumer Protection Act (TCPA), which is codified as 47 U.S.C. § 227. In your letter, you encourage the Commission to consider the Petition and issue a ruling on the merits.

A draft order to resolve the Petition is under consideration by the Commission, and Communication Innovators has met with the staff recently to discuss the matter. We take seriously the issues raised in the Petition and the potential impact on consumers, and expect the Commission to resolve it soon.

I appreciate your interest in this important matter. Should you have additional questions or concerns, please do not hesitate to contact me.

Sincerely,

Kris Anne Monteith
Acting Chief
Consumer and Governmental Affairs Bureau



**FEDERAL COMMUNICATIONS COMMISSION**

September 10, 2013

Mignon L. Clyburn
Acting Chairwoman

The Honorable Scott Peters
U.S. House of Representatives
241 Rayburn House Office Building
Washington, DC 20515

Dear Congressman Peters:

Thank you for your letter regarding Communication Innovators' Petition for
Declaratory Ruling. I appreciate your interest in this matter and am pleased to provide
the enclosed letter on this issue from the Acting Chief of the FCC's Consumer and
Governmental Affairs Bureau.

If you have any additional questions or need any further assistance, please do not
hesitate to contact me.

Sincerely,

Mignon L. Clyburn

Enclosure

445 12ᵗʰ Street S.W. Washington, D.C. 20554  (202) 418-1000



Federal Communications Commission
Washington, D.C. 20554

Control No.   1300619

September 10, 2013

The Honorable Scott Peters
U.S. House of Representatives
2410 Rayburn House Office Building
Washington, D.C. 20515

Dear Congressman Peters:

Thank you for your letter regarding the Petition for Declaratory Ruling filed with the
Federal Communications Commission (Commission) by Communication Innovators on
June 7, 2012.  The Petition seeks clarification that predictive dialers that are not used for
marketing purposes and that do not have the current ability to generate and dial random
or sequential numbers do not fall within the definition of "automatic telephone dialing
system" as used in the Telephone Consumer Protection Act (TCPA), which is codified as
47 U.S.C. § 227.  In your letter, you encourage the Commission to consider the Petition
and issue a ruling on the merits.

A draft order to resolve the Petition is under consideration by the Commission, and
Communication Innovators has met with the staff recently to discuss the matter.  We take
seriously the issues raised in the Petition and the potential impact on consumers, and
expect the Commission to resolve it soon.

I appreciate your interest in this important matter.  Should you have additional questions
or concerns, please do not hesitate to contact me.

Sincerely,

Kris Anne Monteith
Acting Chief
Consumer and Governmental Affairs Bureau



**FEDERAL COMMUNICATIONS COMMISSION**

September 10, 2013

Mignon L. Clyburn
Acting Chairwoman

The Honorable Juan Vargas
U.S. House of Representatives
1605 Longworth House Office Building
Washington, DC  20515

Dear Congressman Vargas:

Thank you for your letter regarding Communication Innovators' Petition for Declaratory Ruling.  I appreciate your interest in this matter and am pleased to provide the enclosed letter on this issue from the Acting Chief of the FCC's Consumer and Governmental Affairs Bureau.

If you have any additional questions or need any further assistance, please do not hesitate to contact me.

Sincerely,

Mignon L. Clyburn

Enclosure

445 12th Street S.W. Washington, D.C. 20554  (202) 418-1000



Federal Communications Commission
Washington, D.C. 20554

Control No.   1300619

September 10, 2013

The Honorable Juan Vargas
U.S. House of Representatives
1605 Longworth House Office Building
Washington, D.C. 20515

Dear Congressman Vargas:

Thank you for your letter regarding the Petition for Declaratory Ruling filed with the
Federal Communications Commission (Commission) by Communication Innovators on
June 7, 2012. The Petition seeks clarification that predictive dialers that are not used for
marketing purposes and that do not have the current ability to generate and dial random
or sequential numbers do not fall within the definition of "automatic telephone dialing
system" as used in the Telephone Consumer Protection Act (TCPA), which is codified as
47 U.S.C. § 227. In your letter, you encourage the Commission to consider the Petition
and issue a ruling on the merits.

A draft order to resolve the Petition is under consideration by the Commission, and
Communication Innovators has met with the staff recently to discuss the matter. We take
seriously the issues raised in the Petition and the potential impact on consumers, and
expect the Commission to resolve it soon.

I appreciate your interest in this important matter. Should you have additional questions
or concerns, please do not hesitate to contact me.

Sincerely,

/Kris Anne Monteith
Acting Chief
Consumer and Governmental Affairs Bureau

**Before the**
**Federal Communications Commission**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of )  | |
| ) | |
| Petition for Declaratory Ruling Regarding ) | CG Docket No. _____ |
| Non-Telemarketing Use of Predictive Dialers ) | |
| ) | |
| Rules and Regulations Implementing the ) | CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 ) | |

**FILED/ACCEPTED**

JUN − 7 2012

Federal Communications Commission
Office of the Secretary

**PETITION FOR DECLARATORY RULING**

Communication Innovators

David Thomas
Executive Director
1341 G Street, NW
Suite 1100
Washington, DC 20005
(202) 585-0258

June 7, 2012

EXHIBIT A-3

**TABLE OF CONTENTS**

Page

I. SUMMARY........................................................................ - 2 -

II. THE TCPA'S AUTODIALER PROVISION ONLY APPLIES TO EQUIPMENT
THAT HAS THE CURRENT ABILITY TO GENERATE AND DIAL
RANDOM OR SEQUENTIAL NUMBERS, AND IT IS PRIMARILY
FOCUSED ON ABUSIVE TELEMARKETING CALLS. ............................... - 5 -

    A. The Text of the TCPA Autodialer Provision Excludes Predictive Dialers
That Do Not Have the Current Ability to Generate and Dial Random or
Sequential Numbers............................................................... - 5 -

    B. The Legislative History Confirms that the TCPA's Autodialer Provision
Was Enacted to Curtail Unwanted *Telemarketing* Calls. ................... - 6 -

    C. Commission Precedent Demonstrates That Predictive Dialers Should Not
Be Subject to the TCPA's Autodialer Restriction Unless They Have the
Current Ability to Generate and Dial Random or Sequential Numbers. ......... - 9 -

III. THE COMMISSION'S INTERPRETATION OF "AUTODIALER" HAS
CAUSED SIGNIFICANT CONFUSION AND AN ARRAY OF UNINTENDED
CONSEQUENCES THAT LIMIT INNOVATION, HARMING CONSUMERS
AND BUSINESSES ALIKE. .......................................................... - 10 -

    A. The Commission's 2003 TCPA Order and 2008 Declaratory Ruling Have
Created Substantial Uncertainty for Businesses Using Predictive Dialers....... - 10 -

    B. The Uncertainty from the 2003 and 2008 Decisions Has Created an Array
of Unintended Consequences that Harm Consumers and Businesses Alike. .... - 14 -

IV. TO ADDRESS THE EXISTING CONFUSION, THE COMMISSION SHOULD
CLARIFY WHAT CONSTITUTES AN "AUTODIALER" UNDER THE TCPA. .... - 16 -

V. CHANGED CIRCUMSTANCES AND THE BENEFITS OF PREDICTIVE
DIALER USE FOR INNOVATIVE, NON-TELEMARKETING PURPOSES
WARRANT A CLARIFICATION. ..................................................... - 18 -

    A. TODAY'S INNOVATIVE PREDICTIVE DIALING TECHNOLOGY
PROVIDES SIGNIFICANT BENEFITS TO CONSUMERS AND
BUSINESSES........................................................................ - 19 -

    B. MANY OF TODAY'S PREDICTIVE DIALERS DO NOT HAVE THE
ABILITY TO GENERATE AND DIAL RANDOM OR SEQUENTIAL
TELEPHONE NUMBERS........................................................... - 21 -

    C THE NUMBER OF WIRELESS-ONLY HOUSEHOLDS CONTINUES
TO CLIMB, MAKING IT DIFFICULT TO PROVIDE TIME-
SENSITIVE INFORMATION TO A GROWING PORTION OF
CONSUMERS....................................................................... - 22 -

VI. CONCLUSION .................................................................... - 24 -

Before the
**Federal Communications Commission**
**Washington, DC  20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Petition for Declaratory Ruling Regarding | ) | CG Docket No. _____ |
| Non-Telemarketing Use of Predictive Dialers | ) | |
| | ) | |
| Rules and Regulations Implementing the | ) | CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 | ) | |

## PETITION FOR DECLARATORY RULING

Communication Innovators ("CI"),[1] pursuant to Section 1.2 of the Federal

Communications Commission's ("Commission") rules,[2] hereby respectfully submits this Petition

for Declaratory Ruling to eliminate significant confusion regarding the applicability of the

Commission's Telephone Consumer Protection Act ("TCPA") rules[3] to "predictive dialers" used

to provide informational, non-telemarketing calls to consumers.  Specifically, CI requests that

the Commission clarify, consistent with the text of the TCPA and Congressional intent, that

predictive dialers that (1) are not used for telemarketing purposes and (2) do not have the current

ability to generate and dial random or sequential numbers, are not "automatic telephone dialing

systems" ("autodialers") under the TCPA[4] and the Commission's TCPA rules

---

[1] CI is a 501(c)(4) organization that seeks to maximize the pace of telecommunications
innovation and its benefit for American consumers and businesses  CI and its member
technology companies strongly endorse efforts by the President, the Commission, and many in
Congress to minimize the burden imposed on innovators and entrepreneurs by outdated,
unnecessary, or inefficient regulations.

[2] 47 C.F.R. § 1.2.

[3] *See id.* § 64.1200.

[4] *See* 47 U.S.C. § 227.

Page - 8

## I.   SUMMARY

Congress enacted the TCPA specifically to curb aggressive telemarketing practices that were found to be an invasion of privacy, a risk to public safety, and that improperly shifted marketing costs to consumers   As the Commission recognized for more than a decade, the TCPA was not intended to restrict businesses from placing informational and other non-telemarketing calls to their customers and accountholders, including on their wireless telephones. Nor did Congress intend to restrict the use of technologies such as predictive dialers – innovative equipment that dials specifically programmed contact numbers and enables company representatives to provide important, timely informational calls to consumers accurately, efficiently, and cost-effectively.[5]

In 2003, however, the Commission determined that certain predictive dialers are autodialers under the TCPA, irrespective of whether such equipment uses a statutorily required random or sequential number generator   In finding that certain predictive dialers are autodialers, the Commission's stated concern was that the telemarketing industry had evolved to the point where calling lists of numbers using a predictive dialer was more cost-effective than calling arbitrary (*i.e.*, random or sequential) numbers, so it was necessary to take steps to prevent telemarketers from circumventing the TCPA's restrictions on automated calls.  The Commission's 2003 decision did not discuss the use of predictive dialers in non-telemarketing contexts, and it did not address whether the Commission was simply determining that devices with the unused capacity to generate and dial random or sequential numbers are autodialers under the statute, or whether it was reading the requirement of a random or sequential number

---

[5] Predictive dialers help live representatives dial telephone numbers in a manner that "predicts" the time when a consumer will answer the phone and a representative of the caller will be available to take the call.

- 2 -

generator out of the statutory definition altogether.  In 2008, the Commission reiterated that certain predictive dialers that did not make use of a random or sequential number generator are autodialers, but provided no additional clarity as to the rationale for including these devices. Combined, these decisions have created significant confusion for companies that use predictive dialers to place live calls for non-telemarketing purposes.[6]

Expanding the definition of autodialer to include equipment that does not have the current ability to generate and dial random or sequential numbers and is not used for telemarketing purposes would be contrary to both the text of the TCPA and Congressional intent. It would be contrary to the text because the statute requires that, to be an autodialer, equipment must have "the capacity . . . to store or produce telephone numbers to be called, using a random or sequential number generator."[7]  It would be contrary to Congressional intent because non-telemarketing calls to accountholders and other consumers made using these predictive dialers do not jeopardize consumer privacy, threaten public safety, or shift marketing costs to consumers. Moreover, the Commission's current expansive interpretation – and the resulting confusion – has led to unintended consequences that harm consumers and businesses alike.  The current skyrocketing TCPA class litigation environment is also hindering innovation, diverting time and resources away from consumer-facing operations, chilling critical account communications, and creating substantial costs that inevitably are passed on to consumers.

---

[6] The Commission may issue a declaratory ruling terminating a controversy or removing uncertainty.  47 C.F.R. § 1.2.

[7] As discussed below, the confusion has also led GroupMe, Inc. to seek clarification from the Commission over the meaning of the term "capacity" in the autodialer definition.  *See infra* Section III.A.

- 3 -

Predictive dialer usage and technology have also changed significantly over the past decade, further warranting a declaratory ruling on this issue.[8]  Today's predictive dialers do not and cannot generate and dial random or sequential numbers, and the companies that rely on them are often not telemarketers.  Rather, the predictive dialers in use today are complex and innovative equipment and technologies used by a wide array of non-telemarketing businesses that need to connect their live representatives with consumers quickly and efficiently.  Their use benefits both consumers and businesses by, among other things, increasing productivity, performing critical regulatory compliance functions, and ensuring that consumers are not subject to improper calls.  Thus, it advances Chairman Genachowski's goal of "harnessing the power of communications technology to grow our economy, create jobs, enhance U.S. competitiveness, empower consumers, and unleash broad opportunity and a higher quality of life for all Americans."[9]

Importantly, clarifying that predictive dialers may be used to place non-telemarketing calls without being considered "autodialers" would not lead to an increase in calls or costs to consumers  The same callers can already contact consumers on their mobile devices using manual dialing, and they have no incentive to place unnecessary informational calls.  Thus, it is only *how* some calls are made that would change, not whether the calls can be made or the number of calls that can be placed

In addition, there has been a significant shift in consumer calling demographic patterns over the last decade due in part to a significant decrease in the cost of a wireless telephone call,

---

[8] The Commission is "especially mindful of the need to clarify [its] rules in light of technological changes."  *See. e g , Closed Captioning of Video Programming*, Declaratory Ruling, 23 FCC Rcd 16674 (2008).

[9] Remarks of FCC Chairman Julius Genachowski, Georgetown Center for Business and Public Policy, Georgetown University, Washington, DC, 1 (Nov. 7, 2011) ("Genachowski Remarks")

- 4 -

as approximately one-third of all households now have only wireless telephone numbers and consumers can easily "port" their wireline number to their wireless device. Now that wireless service is so inexpensive and accessible that it has replaced traditional (landline) telephone service for one-third of the U.S. population, such unnecessary restrictions on predictive dialer use are counterproductive and can prevent consumers from receiving important, time-sensitive notifications from companies that they do business with, and are thus counterproductive.

In light of these changed circumstances and the growing benefits of informational calls to wireless consumers, the Commission should clarify that companies may use predictive dialers to place non-telemarketing calls to wireless telephone numbers without triggering the TCPA's autodialer restrictions, particularly when such dialers do not have the current ability to generate and dial random or sequential numbers.

## II.   THE TCPA'S AUTODIALER PROVISION ONLY APPLIES TO EQUIPMENT THAT HAS THE CURRENT ABILITY TO GENERATE AND DIAL RANDOM OR SEQUENTIAL NUMBERS, AND IT IS PRIMARILY FOCUSED ON ABUSIVE TELEMARKETING CALLS.

### A.   The Text of the TCPA Autodialer Provision Excludes Predictive Dialers That Do Not Have the Current Ability to Generate and Dial Random or Sequential Numbers.

The TCPA and the Commission's TCPA rules define an "automatic telephone dialing system" ("autodialer") as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."[10] Under this definition, the phrase "using a random or sequential number generator"

---

[10] 47 U.S.C. § 227(a)(1); 47 C.F.R. § 64.1200(f)(1). The TCPA prohibits the use of an autodialer to place any call, absent an emergency or the prior express consent of the called party, "(i) to any emergency telephone line (including any '911' line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency); (ii) to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or (iii) to any telephone

- 5 -

modifies "to store or produce telephone numbers to be called." In addition, the phrase "to dial

such numbers" refers to dialing numbers that have been randomly or sequentially generated.

Thus, under the plain language of the TCPA, predictive dialers that do not have the *ability* to

generate and dial random or sequential numbers are excluded from the definition of an

autodialer.

**B.      The Legislative History Confirms that the TCPA's Autodialer Provision Was Enacted to Curtail Unwanted *Telemarketing* Calls.**

Congress enacted the TCPA in response to an increasing number of consumer complaints

regarding "the use of automated equipment to engage in telemarketing."[11]  The legislation was

created to address the explosion of unwanted automated telephone advertising and solicitations

made possible by automatic dialing machines that could generate and dial random or sequential

telephone numbers and bombard parties with "computerized" solicitations.[12]

Congress recognized that, in addition to being annoying and intrusive, computerized

telephone sales calls threatened public health and safety.  For example, telemarketers could use

autodialers to generate random or sequential telephone numbers and "dial numbers in sequence,

---

number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call[.]" 47 U.S.C. § 227(b)(1)(A); 47 C F R. § 64.1200(a)(1).

[11] *See, e g*, Sen. Rep. No. 102-178, at 1 (1991), *reprinted in* 1991 U.S.C.C.A.N. 1968, 1969; 137 Cong. Rec. 35302 (1991) ("The compromise gives the public a fighting chance to start to curtail unwanted telemarketing practices.").

[12] *See, e g*, TCPA, Pub. L. No. 102-243, 105 Stat. 2394, 2395 (finding that "automated or prerecorded calls are a nuisance and an invasion of privacy"); 137 Cong. Rec. 35304 (1991) (explaining that the legislation "target[s] that abusive robotic use of [telemarketing] technology"); 137 Cong. Rec. 30818 (1991) ("[T]his legislation does not cover calls made by live persons. The intention of this bill is to deal directly with computerized calls."); 137 Cong. Rec. 18123 (1991) (stating that the bill was introduced to ban "computer voice" telemarketing calls).

thereby tying up all the lines of a business and preventing outgoing calls."[13]  Such telemarketing

activities also tied up the emergency lines of police, fire, and medical services and prevented real

emergency calls from getting through.[14]  In addition, when unwanted telemarketing calls were

placed to cell phones or paging services, they imposed costs on the called party.

The TCPA's primary purpose was and remains protecting individuals from telemarketing

activity and ensuring the smooth transmission of emergency communications; it "targets calls

that are the source of consumer complaints – telemarketing calls placed to the home."[15]  It was

not intended to prohibit businesses from using predictive dialers to place non-telemarketing calls

that deliver account-related information to their customers and accountholders.[16]  In fact, the

legislative history recognizes that there are certain classes of helpful calls that consumers do not

mind receiving, and that Congress did not pass the legislation to prohibit, such as a bank

contacting a customer about his or her credit card.[17]  Real world examples abound where such

calls are, in fact, helpful to the average consumer:

- Data breach and identity theft notifications;
- Fraudulent activity warnings and updates;
- Parcel delivery notifications;

---

[13] *See, e g*, S. Rep. No. 102-178, at 1-2 (1991), *reprinted in* 1991 U.S.C.C.A.N. 1968, 1969;
H.R. Rep. No. 102-317, at 10 (1991) ("Telemarketers often program their systems to dial
sequential blocks of telephone numbers, which have included those of emergency and public
service organizations, as well as unlisted telephone numbers.").

[14] *See, e. g.*, 137 Cong. Rec 35303 (1991); 137 Cong. Rec. 30821 (1991).

[15] *See* 137 Cong Rec. 18123 (1991).

[16] *See, e g*, 137 Cong. Rec. 35302 (1991) (describing the TCPA as allowing the FCC to exempt
certain types of calls, including calls "to leave messages with consumers to call a debt collection
agency to discuss their student loan . . . ."); *id.* at 35304 ("Calls informing a costumer that a bill
is overdue, or a previously unstocked item is now available at a store are clearly not burdensome,
and should not be prohibited.").

[17] *See* 137 Cong. Rec. 30817-18 (1991).

- 7 -

- Appointment reminders, including from hospitals, healthcare providers, or repair technicians;
- Calls inquiring about missed payments and advising of the prospect of interrupted service or coverage;
- Service outage or interruption reports;
- School closing announcements;
- Product recall and safety notifications; and
- Urgent employee communications.

Consistent with this approach, the Commission affirmed in the recent Robocall Report and Order that it did not want to "impede" or "unnecessarily restrict" purely informational calls when implementing the TCPA.[18]

To the extent that Congress was concerned about some non-telemarketing calls – those made through autodialers with the capacity to generate and dial random or sequential numbers – Congress was clearly focused on extensive wide-reaching "scattershot" calls, not specific and targeted calls to accountholders. As discussed below, predictive dialers used for non-telemarketing purposes reduce the number of improper calls received by consumers and improve regulatory compliance.

Members of Congress also distinguished live calls from intrusive autodialed telemarketing calls lacking human-to-human interaction in passing the TCPA. Representative Cooper, for example, expressed hope that "the FCC [would] regard robotic calls by machines such as autodialers and computer-generated voices to be a much greater threat to the privacy of our homes than calls by live operators."[19] Predictive dialers can connect the called party to a live

---

[18] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, FCC 12-21 ¶ 21 (rel. Feb. 15, 2012) ("Robocall Report and Order").

[19] *See* 137 Cong. Rec. 35304 (1991).

- 8 -

person so he or she has the opportunity to speak to the person, ask questions, and address the matter at hand.[20] This further underscores that Congress did not intend to restrict the use of predictive dialers to place non-telemarketing calls to wireless telephone numbers.

    **C.**    **Commission Precedent Demonstrates That Predictive Dialers Should Not Be Subject to the TCPA's Autodialer Restriction Unless They Have the Current Ability to Generate and Dial Random or Sequential Numbers.**

The Commission's original interpretation and implementation of the TCPA acknowledged that the use of predictive dialers to place non-telemarketing commercial calls should be regulated differently than unwanted, autodialed telemarketing communications made to random or sequential telephone numbers. Specifically, in 1992, the Commission appropriately stated that certain non-telemarketing uses of predictive dialers are not intended to be prohibited by the TCPA.[21] The Commission determined that debt collection calls, for example (which were not directed to random or sequential numbers), did not fall within the definition of autodialer.[22] It also stated that the TCPA's overall intent was to protect consumers from unrestricted telemarketing practices,[23] so the provisions were not intended to restrict the use of predictive dialers for non-telemarketing activities. In 1995, the Commission again confirmed that certain non-telemarketing calls are not prohibited by the TCPA's autodialer restriction because they "are

---

[20] *See id.*

[21] *See Rules and Regulations Implementing Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking, 7 FCC Rcd 2736 ¶ 15 (1992) ("1992 TCPA NPRM") (discussing the use of predictive dialers in the debt collection industry and noting the benefits of increased efficiency and better communication with the called party).

[22] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 7 FCC Rcd 8752 ¶ 39 (1992) (explaining that debt collection calls are not subject to the FCC's identification rules for artificial or prerecorded messages "because such calls are not autodialer calls (*i e*, dialed using a random or sequential number generator) . . . .").

[23] *See id.* ¶ 9.

not directed to randomly or sequentially generated telephone numbers, but instead are directed to the *specifically programmed contact numbers . . .*"[24]

In the Robocall Report and Order, the Commission imposed new requirements on telemarketing calls but declined to do so for informational calls. It recognized that consumers find informational calls and messages to be "highly desirable" and noted that it did not want to "discourage" the delivery of purely informational calls and messages.[25] It also stated that it was "employ[ing] the flexibility Congress afforded to address new and existing technologies."[26]

III.   **THE COMMISSION'S INTERPRETATION OF "AUTODIALER" HAS CAUSED SIGNIFICANT CONFUSION AND AN ARRAY OF UNINTENDED CONSEQUENCES THAT LIMIT INNOVATION, HARMING CONSUMERS AND BUSINESSES ALIKE.**

A.   **The Commission's 2003 TCPA Order and 2008 Declaratory Ruling Have Created Substantial Uncertainty for Businesses Using Predictive Dialers.**

As discussed above, in 1992 the Commission confirmed that (1) non-telemarketing use of a predictive dialer is not intended to be prohibited by the TCPA.[27] and that (2) certain non-telemarketing calls that are not made to randomly or sequentially generated telephone numbers do not fall within the TCPA's autodialer restriction.[28] However, in 2003, contrary to the TCPA's plain language, the legislative history, and its own precedent, the Commission ruled that some predictive dialers that do not use a random or sequential number generator are nonetheless

---

[24] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Memorandum Opinion and Order, 10 FCC Rcd 12391 ¶ 19 (1995) ("1995 TCPA Order") (discussing debt collection calls; emphasis added), *citing* Household International Petition for Reconsideration, CC Docket No. 92-90, at 6.

[25] Robocall Report and Order ¶ 29.

[26] *Id*

[27] 1992 TCPA NPRM ¶ 15.

[28] *See* Section II.C., *supra*

- 10 -

"autodialers" under the TCPA.[29]  The Commission held that "to be considered an autodialer, the equipment need only have the *capacity* to store or produce telephone numbers."[30]  The Commission was concerned that the telemarketing industry had evolved such that it was more cost-effective for telemarketers to use predictive dialers to call lists of numbers than to call random or sequential numbers.[31]  Thus, the Commission concluded that it was necessary to classify some predictive dialers as autodialers to "ensure that the prohibition on autodialed calls not be circumvented" by telemarketers who operate by automatically dialing "lists of numbers" instead of "creat[ing] and dial[ing] 10-digit numbers arbitrarily."[32]

In essence, the Commission's decision in the 2003 TCPA Order indirectly regulated the telemarketing *use* of predictive dialers by focusing on the underlying equipment *design*  However, by taking an indirect approach, and focusing only on one aspect of the equipment design (*i e*, a capacity to store or produce numbers rather than the capacity to generate and dial random or sequential numbers), the Commission did not address squarely whether predictive dialers that have no current "capacity" or ability to generate and dial random or sequential numbers also qualify as autodialers, particularly if such dialers are used for non-telemarketing purposes.  Nor did it explain whether such dialers raise similar concerns justifying the same treatment as predictive dialers used for telemarketing purposes.

It is not clear how this ruling squares with the statutory definition of autodialer or Congress's intent in passing the TCPA.  In the 2003 ruling, the Commission seemed to focus on

---

[29] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 18 FCC Rcd 14014 ¶ 133 (2003) ("2003 TCPA Order").

[30] *Id.* ¶ 132 (emphasis in original).

[31] *Id.*

[32] *Id* ¶ 133.

what it believed to be the equipment's potential capacity to generate and dial random or sequential numbers, noting that predictive dialing hardware "when paired with certain software, has the capacity to store or produce numbers and dial those numbers and dial those numbers at random, in sequential order, or from a database of numbers."[33] But then the Commission described the "basic function" of autodialer equipment as being the "capacity to dial numbers *without human intervention*"[34] – a concept that appears nowhere in the statute and is very different from the ability to "store or produce telephone numbers to be called," use "a random or sequential number generator," and dial numbers that have been randomly or sequentially generated.[35]

The Commission did not explain how focusing on the ability to dial numbers without human intervention was consistent with the text of the TCPA or with Congressional intent, especially if such numbers were not randomly or sequentially generated. Nor did it explain whether it was making a blanket rule that <u>all</u> predictive dialers and other equipment that dials numbers without human intervention fall within the statute, or whether it was simply finding that predictive dialers can be autodialers <u>if</u> they have the capacity to generate and dial random or sequential numbers. In addition, the Commission did not explain whether calls to the "specifically programmed contact numbers" of existing customers qualified as dialing numbers "without human intervention." This absence of clarity has generated significant confusion among businesses as to what types of predictive dialers and other equipment, if any, can be used to place non-telemarketing calls and, in particular, whether a predictive dialer that has *no ability*

---

[33] *Id.* ¶ 131.

[34] *Id* (emphasis added).

[35] 47 U.S.C. § 227(a)(1); 47 C.F.R. § 64.1200(f)(1).

- 12 -

to generate and dial random or sequential numbers, and which is not being used by telemarketers to circumvent the TCPA, falls within the statute.

In 2008, ACA International requested that the Commission clarify that a predictive dialer "meets the definition of autodialer only when it randomly or sequentially generates telephone numbers, not when it dials numbers from customer telephone lists."[36]   In response, the Commission reiterated its 2003 determinations and held that the autodialer restrictions apply when predictive dialers operate through calling lists.   However, it did not elaborate on or clarify the ambiguities created by the 2003 ruling, and thus did not answer the question of whether a predictive dialer that, without significant alteration, has *no ability* to generate and dial random or sequential numbers, and which is not being used by telemarketers to circumvent the TCPA, is nonetheless still subject to the TCPA's restrictions on autodialers.   Thus, further clarification is warranted.

It is also unclear whether calls to "specifically programmed contact numbers" of *existing* customers (discussed above as part of the 1995 TCPA Order) are part of the "lists of numbers" mentioned in the Commission's 2003 and 2008 decisions.   Specifically, the Commission's reference to "lists of numbers" appeared to be intended to address telemarketer's use of a list of non-customer phone numbers in place of the random or sequential dialing of phone numbers.

As further evidence of the confusion created by the Commission's 2003 and 2008 decisions, GroupMe, Inc  ("GroupMe") recently filed a Petition for Expedited Declaratory Ruling and Clarification requesting that the Commission clarify and limit the scope of the term "capacity" in the autodialer definition to encompass "only equipment that, at the time of use,

---

[36] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling, 23 FCC Rcd 559 (2008) ("2008 ACA Declaratory Ruling").

- 13 -

could, in fact, have employed the functionalities described in the TCPA without human intervention and without first being technologically altered."[37]  GroupMe offers a free service that allows a group creator to define a group of individuals who may exchange non-commercial text communications (and conference calls) to individuals that comprise the group.[38]

**B.    The Uncertainty from the 2003 and 2008 Decisions Has Created an Array of Unintended Consequences that Harm Consumers and Businesses Alike.**

The Commission's 2003 and 2008 decisions regarding autodialers have led to unintended consequences that harm consumers and businesses alike, including skyrocketing class action litigation for businesses and increased costs to consumers.  It also has curtailed the ability of companies to offer new products and services that consumers demand.  To prevent further harm, the Commission should confirm, at a minimum, that consistent with the statutory language, companies may use predictive dialers to place non-telemarketing informational calls to wireless telephone numbers when there is no current ability or "capacity" to generate and dial random or sequential numbers.

As the Commission is aware, the penalties for TCPA violations are substantial – up to $1,500 per call.  Plaintiffs' lawyers are aggressively filing larger and larger numbers of TCPA lawsuits based on alleged violations.  Specifically, there has been a surge in TCPA claims and class actions in recent years involving alleged autodialer, filed against a wide array of leading, established companies in the financial services industries and other sectors.  For example, conservative estimates indicate that at least 13 TCPA class actions involving autodialers were filed in 2008, at least 36 in 2009, and at least 60 in 2010.  In 2011, there were at

---

[37] *See Petition for Expedited Declaratory Ruling and Clarification*, GroupMe, Inc., CG Docket No. 02-278 (filed Mar. 1, 2012).

[38] *See id.* at 2.

- 14 -

least 90 TCPA class actions filed involving autodialers [39]  Thus, TCPA class actions involving autodialers have risen a staggering 592% in the last few years alone.  And hundreds of TCPA cases overall (including non-class actions) have been filed since the Commission's 2008 ACA Declaratory Ruling.[40]

TCPA class actions are also increasingly targeting predictive dialer use in light of the confusion created by Commission's 2003 and 2008 TCPA decisions.  As shown in the chart below, by conservative estimates there has been an 800% increase in the number of predictive dialer class actions filed in the last few years.[41]  And the true number of such class actions is likely much higher.[42]



Under the current regulatory environment, almost every major financial institution using dialing technology to accurately and efficiently call accountholders is, or soon will be, a defendant in TCPA litigation.  And as the *Griffith* case demonstrates, the confusion and

---

[39] These statistics exclude cases focused on the TCPA's fax restrictions.  In addition, these statistics only include data from courts with records that are searchable online  As a result, the numbers provided likely underreport the true number of TCPA class actions that have been filed.

[40] One San Diego plaintiffs' firm alone has filed at least 32 class action complaints since 2008.

[41] As with the statistics above, these statistics exclude cases focused on the TCPA's fax restrictions and only include data from courts with records that are searchable online.

[42] TCPA complaints that only reference "autodialers" have been excluded, even though they often involve the alleged use of predictive dialers.

- 15 -

regulatory uncertainty created by the 2003 TCPA Order potentially subjects companies to

crippling liability for non-telemarketing calls, and for calls made using predictive dialer

equipment that has no ability to generate and dial random or sequential numbers.[43]

   The current wave of TCPA litigation harms both consumers and businesses and stifles

innovation. The lawsuits divert time and resources away from consumer-facing operations and

have a chilling effect on critical account communications. They also create substantial litigation

costs for defendants and increase costs for companies that want to place informational calls to

their own customers.[44] Unless the Commission confirms that companies may use predictive

dialers to place non-telemarketing calls to wireless telephone numbers, these TCPA class actions

will continue to have a significant detrimental impact on consumers and businesses, even where

there is no telemarketing activity involved. They will also continue to threaten jobs and the

viability of entire companies, increase costs for consumers, and hinder future consumer lending

and financial services efforts, all contrary to Chairman Genachowski's and the Administration's

goals of promoting economic growth, innovation, competitiveness, and job creation.[45]

**IV.   TO ADDRESS THE EXISTING CONFUSION, THE COMMISSION SHOULD
       CLARIFY WHAT CONSTITUTES AN "AUTODIALER" UNDER THE TCPA.**

   To address the confusion and remedy these problems, the Commission should issue a

declaratory ruling to clarify, consistent with the text of the TCPA and Congressional intent, that

predictive dialers that (1) are not used for telemarketing purposes and (2) do not have the current

---

[43] *Griffith v Consumer Portfolio Serv., Inc.*, Memorandum Opinion, Case No. 10-2697 (N.D. Ill.,
Aug. 16, 2011) (holding that irrespective of the statutory language, pursuant to the Commission's
2003 and 2008 decisions, predictive dialers fall within the TCPA's autodialer definition because
they "have the capacity to dial numbers without human intervention")

[44] *See, e.g.*, Reply Comments of the Federal Reserve Board Staff, CG Docket No. 02-278, 4
(filed June 8, 2010).

[45] *See* Genachowski Remarks at 2.

ability to generate and dial random or sequential numbers are not "automatic telephone dialing systems" ("autodialers") under the TCPA and the Commission's TCPA rules. In reaching this decision, the Commission should focus on the meaning of the term "capacity" in the autodialer definition and declare that, at least for informational calls, capacity refers to a present ability to generate and dial random or sequential numbers.

"Capacity" is not defined by the TCPA and thus the Commission as the expert agency can define this important term. The Commission should clarify that the definition of an autodialer under the TCPA reflects equipment that has a *present* capacity, such as having the current ability to generate and dial random or sequential numbers without additional modifications to the equipment. The Commission should not interpret capacity as encompassing any conceivable hardware or software modification to a device that would permit it to generate, store, and dial numbers randomly or in sequence. For example, mobile phones, smart phones, tablets, e-readers, and personal computers can all theoretically be modified with sufficient effort and ingenuity, using various third-party software or hardware configurations, to randomly or sequentially generate and dial telephone numbers. Such an unconstrained interpretation would make the statutory term capacity superfluous, contrary to elementary rules of statutory interpretation.

To continue protecting wireless consumers against unwanted automated telemarketing calls, the Commission can also distinguish between telemarketing and informational calls when it clarifies the meaning of capacity. The Commission has correctly recognized that changes in technology and industry practices must be taken into account under the TCPA,[46] and it could, for example, find that predictive dialers and other equipment used for *informational calls* only have

---

[46] 2003 TCPA Order ¶ 132 (internal citations omitted).

- 17 -

the required "capacity" to generate and dial random or sequential numbers when the capacity is actually *enabled* (*e.g* , installed as a functioning feature on the device without requiring further modifications to the device), while also finding that the requisite "capacity" for *telemarketing calls* includes the current ability to dial numbers from a list. The Commission made a similar distinction between telemarketing and informational calls when it amended its prior express consent requirements in the Robocall Report and Order.

## V.   CHANGED CIRCUMSTANCES AND THE BENEFITS OF PREDICTIVE DIALER USE FOR INNOVATIVE, NON-TELEMARKETING PURPOSES WARRANT A CLARIFICATION.

The Commission has correctly recognized that changes in technology and industry practices must be taken into account under the TCPA,[47] and the circumstances regarding predictive dialer use have changed significantly over the past decade. The growing use of predictive dialers to place telemarketing calls was a dispositive factor in the Commission's 2003 decision. However, today's predictive dialers – many of which have no current capacity to dial random or sequential numbers – are used for a number of innovative non-telemarketing purposes that simultaneously bring benefits to both consumers and businesses. There has also been a significant shift in consumer calling patterns over the last decade, resulting in approximately one-third of households now having only wireless telephone numbers. In light of these changed circumstances, the Commission should clarify that companies may use predictive dialers to place non-telemarketing calls to wireless telephone numbers without triggering the TCPA's autodialer restrictions, especially if the dialers also cannot generate and dial random or sequential numbers.

---

[47] *Id* (internal citations omitted).

## A.   TODAY'S INNOVATIVE PREDICTIVE DIALING TECHNOLOGY PROVIDES SIGNIFICANT BENEFITS TO CONSUMERS AND BUSINESSES.

The predictive dialers in use today are a far cry from the autodialing machines that telemarketers used in the early 1990s to bombard random households with pre-recorded sales pitches.  Today's predictive dialers provide significant benefits to both consumers and businesses by allowing businesses with a legitimate need to contact a large number of specific accountholders or other consumers to do so accurately, efficiently, and cost-effectively.  They are used to place a variety of non-telemarketing calls, including informational calls to: discuss time-sensitive account transactions; provide appointment or service reminders or cancellation notifications; prevent or review fraudulent account activity or potential identity theft; confirm or arrange payments; provide data security breach notifications;[48] notify policyholders in advance of an insurance termination or lapse;[49] make calls to employees regarding workplace closures, personnel benefits, and use of annual flexible spending account funds; and discuss other legitimate account-related issues with existing customers, accountholders, and other parties with whom a caller has an existing business relationship.[50]  Today's predictive dialers also help protect consumers against improper calls.  Many states, for example, have varying laws regarding what hours it is permissible to call consumers, the number of times it is permissible to call consumers, waiting periods for contacting consumers, the circumstances under which calls must cease, and whether or when consumers can be called at work, and predictive dialers can be

---

[48] *See, e g ,* Comments of the Financial Services Roundtable, The American Bankers Association, and The Consumers Bankers Association, CG Docket No. 02-278, 3 (filed May 21, 2010).

[49] *See id.* at 9.

[50] *See also* Robocall Report and Order ¶ 21 (stating that the Commission does not want to "unnecessarily impede" informational calls including, for example, "bank account balance, credit card fraud alert, package delivery, and school closing information").

programmed to accommodate these and other limitations.  For example, they can be programmed

to restrict calls to:

- Specific telephone numbers;
- Specific individuals or accountholders;
- Certain area codes or regions;
- Certain hours of the day;
- Certain days of the week;
- A limited number of attempts or contacts per telephone number, individual, or accountholder;
- A limited number of messages left per telephone number; and
- A minimum amount of time between calls to a particular telephone number, individual, or accountholder

Thus, predictive dialers also better protect consumer privacy and perform a critical

regulatory compliance function.  Limiting companies' ability to rely on predictive dialing

technology, on the other hand, means that more calls will have to be dialed manually.  As the

U.S Department of the Treasury has recognized in supporting exceptions to the autodialer

restrictions, manual dialing creates a heightened risk of human error, which harms both

consumers who may receive improper calls and companies that face liability for such calls under

myriad statutes and regulations[51] (including, in some cases, a strict liability standard such as

under the Federal Debt Collection Practices Act).  Predictive dialers also substantially increase

employee productivity.

Requiring companies to contact consumers manually for informational and other non-

telemarketing calls also increases communications and staffing costs, which could be particularly

---

[51] *See, e.g.*, Comments of the Financial Management Service of the Department of the Treasury, CG Docket No. 02-278, 2-3 (filed May 20, 2010) (stating that the restrictions on the use of autodialers should not apply to debt collection calls, and explaining that the use of autodialers helps collectors ensure compliance with the Fair Debt Collection Practices Act).

- 20 -

harmful to small businesses.  These increased costs divert critical resources away from innovative products and services.  Given how limited many companies' resources are in this economy, this diversion has a particularly severe negative impact (especially on small businesses).

In addition, clarifying that predictive dialers may be used to place non-telemarketing calls without being considered "autodialers" would not lead to an increase in calls to consumers. Callers already can contact consumers on their wireless telephone numbers using manual dialing, and they have no incentive to place unnecessary calls.  Thus, it is only *how* some calls are made that would change, not whether or how often the calls can be made.[52]

**B.     MANY OF TODAY'S PREDICTIVE DIALERS DO NOT HAVE THE ABILITY TO GENERATE AND DIAL RANDOM OR SEQUENTIAL TELEPHONE NUMBERS.**

Many of today's predictive dialers do not fall within the statutory autodialer definition because they cannot randomly or sequentially generate and dial telephone numbers.  In fact, representatives of seven leading manufacturers and marketers of predictive dialer equipment have submitted declarations stating that their respective predictive dialers:

- Do not have the capacity to store or generate telephone numbers using a random or sequential number generator;
- Have not been upgraded with separate software to provide the capacity to do so; and
- Cannot function without a list of telephone numbers provided by the user.[53]

---

[52] To the extent that the Commission has any concerns about a ruling being inappropriately applied to provide additional flexibility for companies to place telemarketing calls, CI notes that such calls would, at a minimum, be subject to the National Do Not Call Registry.

[53] Reply Comments of ACA International, CG Docket No. 02-278, Exhibit 1 (filed June 21, 2010) ("ACA Robocall NPRM Reply Comments"); *see also* Letter from Sen. Blunt to FCC Chairman Julius Genachowski, CG Docket No. 02-278 (dated June 28, 2011) (stating that "[t]he current generation of predictive dialers does not raise concerns about calling random numbers – the practice that Congress intended to prevent when it enacted the TCPA").

- 21 -

Several also declared that their predictive dialer equipment is not used for telemarketing, advertisements, or solicitations.[54] And most indicated that it would require "fundamentally changing the architecture of the hardware and software" to provide even the *capacity* to randomly or sequentially generate telephone numbers using a number generator.[55] Quite simply, this is not the type of equipment that Congress sought to regulate when it enacted the TCPA, and it is not the type of equipment that is encompassed in the statutory definition of autodialer.

### C. THE NUMBER OF WIRELESS-ONLY HOUSEHOLDS CONTINUES TO CLIMB, MAKING IT DIFFICULT TO PROVIDE TIME-SENSITIVE INFORMATION TO A GROWING PORTION OF CONSUMERS.

Another significant changed circumstance with respect to the TCPA's restriction on autodialed calls to wireless telephone numbers is the surge in the number of wireless subscribers and, in particular, the number of wireless-only households – a trend that shows no signs of slowing. When the TCPA was enacted in 1991, there were only an estimated 7 million wireless subscribers in the United States.[56] Today, there are more than 300 million wireless subscribers,[57] and almost one-third of all households <u>only</u> have wireless telephones (with that number expected to continue rising).[58] In addition, more than half of consumers aged 25-29 are living in wireless-

---

[54] ACA Robocall NPRM Reply Comments at Exhibit 1.

[55] *Id*

[56] Prepared Testimony of Michael Altschul, General Counsel, CTIA – The Wireless Association® before the House Subcommittee on Communications & Technology regarding the Mobile Informational Call Act of 2011, 1 (Nov. 4, 2011) ("Altschul Testimony").

[57] *Id* at 2.

[58] *See, e.g.*, CDC Study: Wireless Substitution. Early Release of Estimates From The National Health Interview Survey, July-December 2010, *available at* http://www.cdc.gov/nchs/data/nhis/earlyrelease/wireless201106.htm (last accessed Oct. 18, 2011).

only households.[59]  The cost of a wireless telephone call was also ten times higher when Congress enacted the TCPA than it is today, having dropped dramatically from approximately 44 cents per minute in 1993 to less than five cents per minute in recent years.[60]

Subjecting all calls made using predictive dialers to the autodialer restrictions thus significantly limits the ability of companies to provide service to their customers and contact their accountholders.  In particular, it hinders their ability to provide critical, time-sensitive notifications regarding identity theft, fraudulent account activity, service or appointment cancellations, or other transaction-related information.  Moreover, given that the percentage of wireless-only households is higher among low-income groups, restricting such informational calls could have a disproportionate negative impact on such individuals.[61]  And the fact that consumers can now easily "port" their wireline number to their wireless device further restricts the ability of companies to place such informational calls.  Although the Commission provides a very limited 15-day grace period for ported numbers,[62] that period would be too short for companies looking to place critical informational calls on even a monthly basis.

---

[59] Lance Whitney, *Over Half of Late-20s Crowd Own Cell Phones Only*, CNET (Dec. 22, 2010), *at* http://news.cnet.com/8301-1035_3-20026395-94.html.

[60] Altschul Testimony at 1, *citing Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services*, Fifteenth Report, 26 FCC Rcd 9664, Table 20 (2011) (indicating that the average revenue per minute for a wireless telephone call dropped from approximately 44 cents per minute in 1993 to five cents per minute in 2009) *and* Glen Campbell, Bank of America Merrill Lynch, 3Q Global Wireless Matrix, 2 (Sept. 28, 2011) (reporting that the average revenue per wireless minute was three cents, down from four cents at the end of 2010).

[61] *1 in 4 Homes Have Cell Phone, No Landline*, CBS NEWS (May 12, 2010), *at* http://www.cbsnews.com/stories/2010/05/12/tech/main6476743.shtml.

[62] 47 C.F.R. § 64.1200(a)(1)(iv)

- 23 -

Finally, the use of predictive dialers for non-telemarketing purposes creates *no* additional costs for wireless consumers because callers can already contact the same consumers on their wireless telephone numbers (through manual dialing), and they have no incentive to place unnecessary calls. Using predictive dialers merely changes the mechanics of how those consumers are reached in a way that reduces improperly dialed calls, better protects their privacy, and promotes regulatory compliance.

## VI.    CONCLUSION

For the foregoing reasons, the Commission should clarify and confirm that predictive dialers that (1) are not used for telemarketing purposes and (2) have no current ability to generate and dial random or sequential numbers are not considered "autodialers" under the TCPA.

Respectfully submitted,

David Thomas
Executive Director
Communication Innovators
1341 G Street, NW
Suite 1100
Washington, DC  20005
(202) 585-0258

June 7, 2012

- 24 -

Before the
**Federal Communications Commission**
Washington, DC 20554

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Rules and Regulations Implementing the | ) |
| Telephone Consumer Protection Act of 1991 | )   GC Docket No. 02-278 |
| | ) |
| Petition of YouMail, Inc. For Expedited | ) |
| Declaratory Ruling That YouMail's Service | ) |
| Does Not Violate the TCPA | ) |

**PETITION FOR EXPEDITED DECLARATORY RULING**

**YOUMAIL, INC.**

Lauren Lynch Flick
Andrew D. Bluth
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037

Its Attorneys

Dated: April 19, 2013

EXHIBIT A-4

### Summary

YouMail is a small, start-up technology company that offers smart phone users a software-based menu of advanced voicemail features. YouMail's service can function in the nature of a "virtual receptionist," responding to calls received by and voicemail messages left for the YouMail subscriber. Both the caller and the YouMail subscriber benefit from the virtual assistant's abilities, such as customizing greetings to different categories of callers, sending a text message in response to a voicemail left for a subscriber letting the caller know that the voicemail message was received and will be acted on, and even managing the types of abusive telemarketing calls from which the TCPA seeks to protect consumers. The virtual assistant empowers consumers and businesses to manage their telephone interactions with features that are highly customizable to best facilitate efficient one-to-one communications between the caller and the called party, ultimately cutting down on the number of misdirected, fruitless, and potentially privacy endangering phone communications consumers and businesses endure. The YouMail service has been embraced by professionals, tradespeople, large and small businesses, and everyday consumers.

However, as was the case in the Commission's recent <u>Soundbite</u> decision, YouMail has been the target of ruinous class action lawsuits premised on three arguments. First, class action plaintiffs' lawyers characterize YouMail's software that enables sending of the optional text confirming receipt of a caller's voicemail message as an Automatic Telephone Dialing System ("ATDS"). Next, these litigants argue that YouMail is the sender of the responsive text messages. Finally, the litigants argue that callers who leave voicemail messages do not consent to receiving a text message in response to their messages.

As the agency with expertise in defining what constitutes an ATDS, YouMail submits that the FCC should declare that YouMail's software, which was specifically designed to provide

only the types of virtual assistant services described here, lacks the current capacity to "store or produce numbers to be called using a random or sequential number generator" and therefore is not an ATDS under the TCPA. Litigants' focus on whether a system could, under any conceivable circumstance, be modified to be "capable" of randomly or sequentially dialing a telephone number needlessly embroils innovators in crippling class action litigation and retards their ability to provide consumers with the beneficial products made possible by the types of technological advances for which the Commission and Congress have set the stage.

Moreover, the Commission should continue to lead in reaching common sense decisions in interpreting the TCPA, as it did in its Soundbite decision. YouMail's experience demonstrates that callers who leave voicemail messages almost *universally* request a return communication in their voicemail messages. The text response the caller can receive from a YouMail subscriber is beneficial, providing the caller with valuable information, for example, the fact that a plumber they have tried to contact is at a worksite and will return calls within a certain timeframe. It is precisely the same benefit that the consumer receives from the confirmatory opt-out text at issue in Soundbite and a technological advance that empowers consumers which the Commission should promote. The Commission should recognize as well that YouMail is not the sender of the confirmatory text message. It is a system provider. The text message is part of the private conversation that begins with the caller leaving a voicemail message and the recipient opting to set up a text response to such a voicemail.

Finally, it is respectfully requested that the Commission expedite its consideration of this Petition as the pendency of class action litigation threatens the survival of YouMail, Inc. and the continuation of the many unchallenged services it provides its subscribers.

ii

## Table of Contents

Page

**Summary**..........................................................................................................................i

**I.  YouMail's Virtual Receptionist Is the Type of Innovative, Consumer-Friendly Technology Advance that Communications Policy Seeks to Foster**................................2

    A.  YouMail's Service Benefits Consumers Who Are YouMail Subscribers ..........................2

    B.  YouMail's Service Benefits Consumers Who Call YouMail Subscribers ........................4

    C.  YouMail Benefits a Wide Array of Subscribers Who Use the Service in a Wide Variety of Ways ..........................................................................................................5

    D.  Calling Parties Benefit From YouMail's Features...........................................................6

    E.  YouMail's Auto-reply Technology Empowers Consumers ............................................7

**II. YouMail's Auto-Reply Feature Does Not Violate the TCPA**............................................8

    A.  YouMail's System Is Not An ATDS ...............................................................................9

    B.  YouMail Does Not Initiate A Call Within The Meaning of the TCPA ..........................11

    C.  Callers Consent to Receiving Responsive Texts When Leaving Voicemail Messages....13

**Conclusion** ......................................................................................................................14

Before the
**Federal Communications Commission**
Washington, DC 20554

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Rules and Regulations Implementing the | ) | |
| Telephone Consumer Protection Act of 1991 | ) | GC Docket No. 02-278 |
| | ) | |
| Petition of YouMail, Inc. For Expedited | ) | |
| Declaratory Ruling That YouMail's Service | ) | |
| Does Not Violate the TCPA | ) | |

## PETITION FOR EXPEDITED DECLARATORY RULING

YouMail, Inc., ("YouMail"), by its attorneys and pursuant to 47 C.F.R. § 1.2 of the rules
and regulations of the Federal Communications Commission, hereby respectfully requests that
the Commission declare that the YouMail service does not violate the Telephone Consumer
Protection Act of 1991 ("TCPA")[1] and the Commission's rules and regulations implementing it.
YouMail is a start-up technology company offering smart phone users a software-based menu of
advanced voicemail features that can function in the nature of a "virtual receptionist" to enable
consumers and businesses to manage their telephone interactions across their many personal and
professional circles.  YouMail offers many consumer-friendly and common sense features, but as
was the case in the Commission's recent Soundbite[2] decision, finds itself the target of ruinous
class action lawsuits premised on arguments that callers do not consent to receiving a one-time
text confirming receipt of their voicemail message; that YouMail's software that enables sending
of those texts somehow constitutes an Automatic Telephone Dialing System ("ATDS"); and that
YouMail is the sender of those texts.

YouMail submits that, as the agency with the expertise in defining what constitutes an
ATDS, the FCC must set some boundaries as to when a system or service has the requisite

---

[1] Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991) codified at 47 U.S.C. §
227.

[2] 27 FCC Rcd 15391 (2012).

704182563v1

"capacity" to "store or produce numbers to be called using a random or sequential number generator." Without such guidance, innovative and beneficial products and practices which were never intended to be foreclosed by the TCPA will be needlessly prevented from coming to market. YouMail further submits that the confirmatory text messages that its subscribers can choose to send via the service are not initiated by YouMail in the first instance, and, in any event, constitute the same type of common sense, consumer-friendly messages that the Commission deemed consumers to consent to in the <u>Soundbite</u> decision.

Given the pendency of class action litigation addressing these very same interpretations of the TCPA, YouMail respectfully requests that the Commission expedite its consideration of this Petition. As a small start-up, YouMail's survival and the continuation of the many unchallenged services it provides its subscribers are at risk.

I.    **<u>YouMail's Virtual Receptionist Is the Type of Innovative, Consumer-Friendly Technology Advance that Communications Policy Seeks to Foster</u>**

YouMail provides a service that allows smartphone users to replace the default voicemail options provided by their wireless telephone providers with a fully customizable suite of advanced telephone answering functions. It cannot be stressed enough that, since these functions are inherently <u>answering</u> service functions, they are reactive to the caller's action of initiating a conversation with the YouMail subscriber by dialing the YouMail subscriber's telephone number and leaving a voicemail message. YouMail's features merely facilitate the conversation by serving as a "virtual receptionist."

A.    **YouMail's Service Benefits Consumers Who Are YouMail Subscribers**

A powerful, and free, function that YouMail offers its subscribers is its "smart greetings" function. This function allows the YouMail subscriber to create multiple personalized answering messages tailored to the calling party. For example, the subscriber can set up the service to greet callers by name when the system can identify the caller from the subscriber's contact list or the service's enhanced caller identification functions. In addition, the subscriber can establish multiple personalized outgoing answering messages based on who the calling party is. Thus, the

2

subscriber can set up a professional answering message for business contacts in its contact list, a very private message to the subscriber's spouse, and yet another message for friends. Smart greetings also empower YouMail subscribers to control threatening or harassing calls. An abusive partner can receive a message that the phone number called is not in service, while phone solicitors can receive a message asking that the subscriber be put on the company's do not call list.

YouMail subscribers can also control how they review voicemails that are left for them. In addition to a standard playback feature on the handset or from a separate call-in phone number, voicemail messages can be forwarded to the subscriber by email or the subscriber can review them by logging in from a computer when they are unable to use their smart phone to do so. Via a paid feature, subscribers can have voicemail messages transcribed into text which they can then access on their handset, by email or SMS text message. YouMail subscribers can also program the YouMail system to create an "extended information page" for each voicemail message they have received. The extended information page contains information such as the calling party's caller identification from YouMail's enhanced caller identification feature.

Finally, the YouMail service provides subscribers with the option of sending a reply text message, called an auto-reply, in response to a voicemail message that has been left for the subscriber by the calling party. As with YouMail's other features, auto-replies can be highly customized and personalized. First, the subscriber can choose whether to send any auto-replies or none. The subscriber can choose to send auto-replies only to some categories of callers, and to send only one auto-reply to a given caller, regardless of how many times they call. Other options allow the subscriber to establish how the subscriber's name appears in the auto-reply and to provide a special message such as indicating exactly when the subscriber will be available to return the call. Finally, the subscriber can provide a link to the extended information page for the call. This link allows the calling party to review information about the call or the subscriber, such as their website URL or email address, and to leave additional information about

3

themselves that will be helpful to the subscriber in making the return call, if they so desire. As a result of all these options, an auto-reply is only sent by text if all of the following conditions exist: (1) the subscriber has set his or her options to send a text auto-reply to some group of callers; (2) the calling party falls into that group; (3) the calling party has NOT opted out of receiving auto-replies; and (4) sufficient "caller id" information is available to send the text. All of this is determined by the YouMail subscriber; the role YouMail provides is the technology to proceed through the logic described above and carry out the subscriber's settings.

### B.    YouMail's Service Benefits Consumers Who Call YouMail Subscribers

As noted above, the calling party receives many benefits from YouMail's features. For example, the calling party can receive an appropriate and personalized greeting allowing them to be sure their call has been connected to the correct party, as opposed to having dialed a wrong number. The calling party that receives an auto-reply has further confirmation that his or her message has reached the correct party and gains additional information about the YouMail subscriber, to include when he or she will be available to return the call. In addition, calling parties can establish a limited account which, like the vast majority of YouMail's other features is free to the user, and gives the calling party certain controls whenever calling a YouMail subscriber. Specifically, a limited account can be used to create a caller profile so that when calling another YouMail subscriber, the calling party is identified to the YouMail subscriber in the manner the calling party desires, such as only giving a first name or providing a full business title. Through the limited account, the calling party can also control whether and how it receives auto-replies from YouMail subscribers who have elected to offer them. A limited account holder can affirmatively opt-out of receiving ANY auto–receipts from ANY YouMail subscriber. Or, the limited account holder can specify that auto-replies should be forwarded by email to a specific address, as well as by text. A limited account holder can also access the "extended information" page for a message that he or she has left and thus has a record of the call made and message left. Where the YouMail subscriber that was called has activated the transcription

4

function, the limited account holder can access the transcription to verify that is was correctly conveyed through the voice to text transcription process.  Given these benefits to the calling party, nearly ONE MILLION people have signed up for such limited accounts solely for the purpose of enhancing their interaction with other YouMail subscribers.

**C.     YouMail Benefits a Wide Array of Subscribers Who Use the Service in a Wide Variety of Ways**

YouMail's subscribers come from all walks of life, businesses and industries.  From its customer service contacts and attending business conventions such as the National Association of Realtors and CTIA-The Wireless Association, as well as through profile information, such as email addresses and business titles that subscribers provide at the time they sign up for the service, it is evident that YouMail subscribers include professionals such as realtors, lawyers, and loan officers, trades people such as plumbers and electricians, and individuals who have identified themselves as "mom" or "student."

YouMail subscribers come to the service in a variety of ways:

- **Large Business Users**:  Some subscribers are individual users within a large enterprise, such as Southern Care, Inc., which have made the service available and encouraged or mandated its use by employees.  Others are individual loan officers, mortgage consultants and private bankers within entities like Wells Fargo, Bank of America, and Chase.

- **Small Business Users**:  Some subscribers are small business people, such as contractors, design consultants, electricians, plumbers, landscapers, cable and satellite television installers, housekeepers, carpet cleaners, health care professionals, personal trainers, real estate agents, lawyers, and others.

- **Small Wireless Providers**:  In some cases, a wireless telephone company has selected the YouMail service to serve as a primary or preferred option for its customers and set it as the default.

- **Personal/Family Users**:  As noted, many subscribers identify themselves as "mom" or "student" and have email addresses through services such as Gmail, Hotmail, and the like.

5

The uses to which YouMail users put the service are as varied as the users themselves. Personal users take advantage of the smart greetings option to have special greetings for their family members and friends. They also share voicemails, such as sung birthday greetings among family and friends or on social media. They even use the smart greetings function to let callers know that they do not listen to voicemail and would prefer to receive text or email messages. Finally, they use the service to manage telemarketing contacts and threatening or dangerous callers. Business users use the service in many of the same ways but with a business focus.

The auto-reply feature allows subscribers to provide an even more personalized response to the called party. For example, a plumber on a job site can program an auto-reply to send a text message to a caller who has left a voicemail message and advise the caller that the plumber is on a job site and will take a break to return messages every half hour. In this way, the caller can know that their message went to the correct party and that it is not likely to simply sit unanswered until the end of the day or over a weekend while the consumer deals with the emergency. The plumber can also include in the auto-reply a link to the extended information page and ask the caller to provide additional information about their issue so that both the plumber and the caller can move quickly to the substance of the conversation when the plumber makes the return call. And, again, this feature is triggered by the recipient of the auto-reply initiating the call to the YouMail subscriber and leaving a message.

### D.   Calling Parties Benefit From YouMail's Features

A blind database search of transcribed YouMail voicemail messages, while not a comprehensive record of all messages, nevertheless shows that more than 75% of callers speak the following words: "return [my] call," "hear back," "call [me] back," or provide a specific telephone number. In fact, half of all the messages contained a telephone number. Some messages also use the term "text" or "TXT" indicating a specific desire by the caller to be contacted by text. In addition to leaving messages that indicate a desire for a response, calling parties who are offered a link to the extended information page in an auto-reply will click on it to

6

see information about the message they have left, see how their caller id information appears, verify that a message that has been transcribed was transcribed correctly, or to opt out of the receipt of future auto-replies from any YouMail user.

### E.    YouMail's Auto-reply Technology Empowers Consumers

YouMail developed the software that enables all of the YouMail functions as a "home grown" program tailored to the specific functions that the service offers.  The software runs on generic hardware according to the specific protocol of the software program and the user's settings.  When an auto-reply is sent, it is done in response to a caller having left a voicemail message for a subscriber and only when the subscriber has set its settings to do so.

To physically accomplish delivery of an auto-reply, the service must navigate a variety of paths, depending on the wireless carrier through which the recipient has his or her cellular service.  Where a wireless provider has enabled the YouMail service for its customers, YouMail's system delivers the text message to the wireless carrier, which generally delivers the message as if it came from the telephone company itself, at no charge.  Where the recipient is the customer of one of the large national carriers, YouMail must generally deliver the message to that company's "email gateway."  The carrier then forwards the auto-reply to its customer identifying the YouMail subscriber as the sending party.  Finally, other wireless carriers require YouMail to deliver the auto-reply to an SMS gateway provider.  In these cases, YouMail delivers the message to OpenMarket, which forwards it as an SMS message to the telephone company for delivery to its customer.

In these operations, You Mail acts in the role of a common carrier, simply delivering the message that was triggered by the caller leaving a message and the subscriber directing that an auto-reply be sent to the caller.  The system does not store or produce any telephone numbers randomly or sequentially, or dial them from any database or list.  It only sends a single text response, when instructed to do so by a subscriber's settings, to a single recipient who previously contacted the subscriber and initiated a conversation by leaving a voicemail message.

7

Despite the single request-single response design of YouMail's auto-reply function, the vast array of contexts in which YouMail subscribers opt to send auto-replies, the personalized content of those messages, and the myriad pathways through which an auto-reply must travel, YouMail has become the object of various class action lawsuits alleging that its service constitutes an ATDS. Moreover, despite all the indicia of consent to receive a response to their voice messages and the benefits to consumers of receiving that response, these litigants claim that YouMail auto-replies are "unsolicited." As a result, these lawsuits seek enormous damages for asserted violations of the TCPA, and the cost simply to respond to these lawsuits is crippling.

## II.   **YouMail's Auto-Reply Feature Does Not Violate the TCPA**

Congress passed the TCPA to "address a growing number of telephone marketing calls and certain telemarketing practices Congress found to be an invasion of consumer privacy."[3]  In Section 227(b)(1), Congress specifically addressed the use of some types of automated telephone equipment, providing:

> (b)      Restrictions on the use of automated telephone equipment.
>
> (1)      Prohibitions. - It shall be unlawful for any person within the United States or any person outside the United States if the recipient is within the United States--
>
> (A)      to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice
>
> (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call.[4]

---

[3]   In the Matter of the Rules and Regulation Implementing the Telephone Consumer Protection Act of 1991, Request of ACA International for Clarification and Declaratory Ruling, 23 FCC Rcd 559 (2008) at ¶ 2 [hereinafter ACA Declaratory Ruling].

[4]   47 U.S.C. §227(b)(1)(A)(iii).

8

The Commission's implementing regulations similarly restrict initiating a call using an ATDS or a pre-recorded voice to a telephone number assigned to a cellular telephone service. The FCC has interpreted the term "call" as used in this section to include text messages.[5]

As a result, class action litigants have attempted to cast the system by which YouMail's subscribers can send auto-replies in response to voicemail messages as constituting an ATDS. An ATDS is defined as: [E]quipment which has the capacity – (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers.[6]

### A.     YouMail's System Is Not An ATDS

As noted above, YouMail developed its system to provide the specific functions that it currently provides. That is, it was designed to respond <u>one time</u>, to <u>a single input</u>, and only when instructed by a user's settings to do so and when adequate caller id information is available in the system to complete the text delivery. It was <u>not</u> created to store or produce or dial telephone numbers in any random or sequential manner or even to call them from a list or database, all of which have been found to be problematic. Not surprisingly, since it was not designed to do any of these things, it does not.

In adopting its rules implementing the TCPA, the FCC recognized early on that an essential element of the definition of an ATDS was random or sequential dialing. For example, debt collectors were concerned that the Commission's provisions requiring identification of the calling party at the beginning of an automated call placed for debt collection purposes would conflict with requirements of the Fair Debt Collection Practices Act, which prohibit debt collectors from disclosing the debt collection nature of their call. The Commission responded that the identification provisions did not apply to debt collection calls because they "are not

---

[5]   <u>In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991</u>, 18 FCC Rcd 14014 (2003) at ¶ 165 [hereinafter <u>2003 TCPA Order</u>].

6   47 U.S.C. §227(a)(1).

9

autodialer calls (i.e., dialed using a random or sequential number generator)."[7]  In response to concerns about the impact of the new rules on voice messaging services, the Commission similarly stated that "the prohibitions of § 227(b)(1) clearly do not apply to functions like 'speed dialing,' 'call forwarding,' or public telephone delayed message services (PTDMS), because the numbers called are not generated in a random or sequential fashion."[8]

Later, however, in considering whether predictive dialers constitute ATDS equipment under the TCPA, the Commission noted that in most cases, predictive dialers are programmed with a list of numbers to be called.[9]  Accordingly, the FCC narrowed its focus, saying that the "statutory definition contemplates autodialing equipment that either stores or produces numbers"[10] and which "need only have the 'capacity to store or produce telephone numbers . . .'"[11] to be considered an ATDS.

Courts ruling on allegations of TCPA violations similarly focus on the equipment's capacity rather than its actual use.  For example, the Ninth Circuit in its decision in Satterfield v. Simon & Schuster, Inc.,[12] ruled that when determining whether a system is an ATDS, the relevant inquiry is to focus on whether the system has the _capacity_ to store or produce telephone numbers to be called via a random or sequential number generator.  As a result, the focus of litigants' attention has become whether a system could ever, under any circumstances, be _modified_ to undertake the activities associated with an ATDS.  This focus then devolves into a detailed factual analysis that can only be completed after long and expensive discovery and

---

[7]  In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Report and Order, 7 FCC Rcd 8752 (1992) at ¶ 39 [hereinafter 1992 TCPA Order]; see also In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Memorandum Opinion and Order, 10 FCC Rcd 12391 (1995) at ¶ 19 (Debt collection calls are not autodialed calls because they "are not directed to randomly or sequentially generated telephone numbers, but instead are directed to the specifically programmed contact numbers for debtors.")

[8]  1992 TCPA Order at ¶ 47.

[9]  2003 TCPA Order at ¶ 131.

[10]  Id. at ¶132.

[11]  Id.

[12]  569 F.3d 946 (9th Cir. 2009).

10

litigation, substantially burdening innovative service providers trying to provide beneficial and efficient products to the marketplace.[13]

Moreover, one can appreciate the endless rabbit trails associated with evaluating whether a device could be reprogrammed in the future to meet the definition of an ATDS. Much like any ordinary computer could (with a complete overhaul) be transformed into a device to launch nuclear missiles, any desktop computer or smart phone could be modified to store telephone numbers to be called by a sequential number generator and dial those numbers. However, the need for future modification, by definition, means those devices (and YouMail's system) do not meet the definition of ATDS presently. Thus, while YouMail appreciates the need to have a flexible definition of an ATDS so that the TCPA and the FCC's rules implementing it can remain current with technological developments,[14] without some guidance, the evolution of the definition of the term ATDS is limited only by class counsel's imagination, or worse yet, will come to encompass every type of telephonic device in existence, thereby preventing anyone from calling a cellular phone number without express consent or except in an emergency. Accordingly, YouMail submits that the Commission affirmatively state that only equipment that has a current capacity to store and produce telephone numbers to be called using a random or sequential number generator—and is currently being used for that purpose—should be considered an ATDS.

**B.    YouMail Does Not Initiate A Call Within The Meaning of the TCPA**

The TCPA prohibits a person from "mak[ing]" a "call" to a cell phone using an automatic telephone dialing system or an artificial or prerecorded voice.[15] The Supreme Court has employed the definition of the word "make" as "to cause to exist, appear or occur."[16] Akin to a

---

[13] In Satterfield, the court remanded the case to the lower court for a factual determination as to what the equipment in use was capable of doing.

[14] 2003 TCPA Order at ¶ 132 ("It is clear from the statutory language and legislative history that Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies.") (citation omitted).

[15] 47 U.S.C. § 227(b)(1)(A).

[16] United States v. Giles, 300 U.S. 41, 48 (1937).

11

telephone service provider (exempt from TCPA liability), which provides the infrastructure to connect the call initiated by the calling party, YouMail does not "make" calls because it does not cause the call to occur.[17] Rather, the initiating party—in this case the YouMail subscriber who has requested that an auto-reply be sent—is the party "making" the call because the subscriber causes the call to exist by setting its YouMail preferences to request auto-replies. Without the initiating party, there would be no call at all.

YouMail is a startup technology company that provides a software-based service. YouMail does not dictate whether any call is made, the time a call is made, or the telephone number to which a call is made or an auto-reply is sent. You Mail has no influence over the content of the message selected by the subscriber. The sending of an auto-reply begins with the calling party dialing the YouMail subscriber's telephone number and leaving a voice message. As shown above, such messages almost universally request a return communication from the YouMail subscriber. That request is only acted on, though, if the YouMail subscriber directs that it should be through his or her settings, AND if the intended recipient of the auto-reply has not previously opted out of receiving auto-replies. YouMail's software simply applies logic decisions upon request from the subscriber to confirm that the recipient can receive an auto-reply, and apply the message pre-selected by the subscriber. It no more "makes" a call under the TCPA than does the provider of telephone lines or cellular networks. YouMail is merely the service by which execution of the subscriber's call is arranged.

The above described mechanics of the YouMail system provide for private parties' ability to communicate with one another in an efficient and consumer-friendly manner. Congress did not intend to limit such communications or limit the telephone numbers by which they do so, and the Commission has acknowledged that liability for any violation of the TCPA would fall on the subscriber of the service used to make the calls, not carriers providing the services.[18]

---

[17] See also Black's Law Dictionary 784 (6th ed. 1990) defining "initiate" as to "commence; start; originate; introduce; inchoate."

[18] 1992 TCPA Order at n. 83 ("We emphasize that where [speed dialing, call forwarding or public telephone delayed message services] are used for the purpose of telephone solicitation in violation of our rules and the

12

### C.    Callers Consent to Receiving Responsive Texts When Leaving Voicemail Messages

Finally, it must be remembered that the entire process that leads to the sending of an auto-reply is set into motion because the calling party wanted to communicate with the YouMail subscriber. To do so, the caller secured that subscriber's telephone number, dialed it, listened through a greeting message that could alert the caller if he or she has called the wrong person, and finally left a voicemail message. As detailed above, YouMail's experience (as common sense suggests) shows that the leaving of a message almost universally signifies that the caller wishes to receive a return communication. Indeed, Congress recognized the day to day reality of such interactions and said "the called party has in essence requested the contact by providing the caller with their telephone number for use in normal business communications."[19]

The Commission also has acknowledged that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary."[20]  Based on this common sense approach, the Commission has held that debtors who provide a cellular telephone number during a transaction which gives rise to a debt provide the required "prior express consent" to receive auto-dialed and prerecorded calls from debt collectors in connection with that debt.[21]  Similarly, in its recent Soundbite decision, the Commission found that there was sufficient indicia of consent in the context of "unsubscribing" to a text service, to conclude that consumers consent to the receipt of a text message confirming their opt-out election.[22]

The auto-reply feature at issue here is no different from the confirmatory text message in Soundbite. The sending of an auto-reply is a common courtesy and smart business practice akin

---

TCPA, the users of the services, not the cariers providing the services, would be held liable, consistent with Congress' policy that carriers not be held responsible for the content of messages transmitted through the network.") (citation omitted).

19 House Report 102-317, 1st Sess., 102nd Cong. (1991) at p. 13.

20 1992 TCPA Order at ¶ 31 (citing id.).

21 See ACA Declaratory Ruling at ¶ 9.

[22] 27 FCC Rcd 15391 (2012).

13

to an out-of-office reply email message.  It is only sent in response to the caller's action of leaving a voicemail message and provides benefits to the consumer by confirming receipt of the message and providing additional information about the consumer's interaction with the called party.  Further, the sending of an auto-reply is a one-time event that occurs in close proximity to the calling party leaving a message for a You Mail subscriber.  The debt collection calls that the Commission approved in the ACA Declaratory Ruling, in contrast, may not occur until long after the debt was contracted.  In the case of a revolving credit account, the debtor may remain current on the account for a long period of time before defaulting and triggering a debt collection call.  In addition, debt collection calls may be repeated and occur over a long period of time, depending on the severity of the default.

### Conclusion

The Commission has acknowledged that "the overall intent of Section 227 is to protect consumers from unrestricted telemarketing, which can be an intrusive invasion of privacy."[23] That intention is being subverted by aggressive class action lawsuits that thwart the development of beneficial telephone communication services and products.  These technological advances, rather than unleashing an onslaught of unsolicited marketing messages that tie up phone lines and disturb consumers at home and at all hours, are facilitating more efficient one-to-one communications between parties, ultimately cutting down on the number of misdirected, fruitless, and potentially privacy endangering phone communications consumers and businesses alike endure.

Given the history of telemarketing abuses that have led to the enactment of the TCPA, establishment of the Do Not Call list, and passage of other laws at the state level, it is clear that there is great sensitivity to the potential that a system or service might bulk dial consumers and deliver an irrelevant, generic message to them.  In 2011, the Attorney Generals of all 50 states

---

[23] In the Matter of the Telephone Consumer Protection Act of 1991, Notice of Proposed Rulemaking, 7 FCC Rcd 2736 (1992) at ¶ 9.

14

and four territories implored Congress to reject H.R. 3035, which they claimed would have revised the definition of an ATDS and permit callers to contact consumers at a telephone number the consumer provided at any time and in any manner.  The results the Attorney Generals envisioned were "that a wireless subscriber could be subjected to any number of robotic 'informational' follow-up calls just because he or she visited a store or website.  Consumers will not even be able to opt-out of receiving these robo-calls under the proposed legislation."[24]  They went on to say that, since most modern equipment uses preprogrammed lists of telephone numbers, the revision to the definition of ATDS would "effectively allow telemarketers to robo-dial consumers just by avoiding already antiquated technology."[25]  However, none of the concerns raised by the Attorney Generals even come into play with the YouMail service.

YouMail auto-replies are not sent via any prohibited ATDS technology.  The system provides a one-time message, when directed to do so by the subscriber, in response to a voicemail message left for the subscriber -- which message almost universally seeks a return communication from the subscriber.[26]  The content of the auto-reply is dictated by the subscriber and can be personalized to maximize the efficiency of communication between the caller and the subscriber.  YouMail's service would have to be substantially transformed to even begin to have the capacity to fulfill the feared functions of an ATDS, such as bulk delivery of a uniform message to large numbers of unaffiliated households.  Sadly, this fact does not matter in today's litigation environment.  The devastating litigation costs involved in merely establishing what a system's capabilities are or could be have proven to be ruinous to YouMail, and, it appears, to other companies facing class action lawsuits under the TCPA as well.

Given this sorry state of affairs, the FCC, the agency with expertise in this area, should provide guidance as to how today's advanced technologies, which are so often privacy-

---

24 See Letter to Members of Congress, GC Docket 02-278 (December 7, 2011) at 2.

25 Id. at 3.

26 This is a far cry from the indiscriminate bulk dialing of numbers "without human intervention" which the FCC now considers to be the "basic function" of an ATDS.  See 2003 TCPA Order at ¶ 132.

15

enhancing, can be deployed without running afoul of the TCPA. To YouMail, the solution is simple. End the endless factual inquiry into the equipment's potential future capabilities by holding that only its current capabilities, as currently in use, matter for purposes of the definition of an ATDS in the TCPA.

Finally, the benefits of YouMail's auto-replies are at least as substantial as the benefits of the confirmatory text messages at issue in the Soundbite case. The YouMail service gives consumers and businesses more control over their telephone communications, including providing effective tools to manage the same types of abusive telemarketing calls that the TCPA seeks to protect consumers against. The service that YouMail provides is highly customizable. The auto-reply feature is an option that subscribers can choose to use or not use. YouMail has no control over how subscribers use it, but YouMail's experience, and common sense, dictate that consumers consent to receiving auto-replies from the service. As such, the Commission should apply the same common sense rationale to an auto-reply from a YouMail subscriber that it does to a confirmatory text message of the type in the Soundbite case.

16

For all the foregoing reasons, YouMail, Inc., by counsel, respectfully requests that the Commission take expedited action to issue a Declaratory Ruling establishing that (a) the YouMail auto-reply system is not an ATDS, (b) YouMail does not "initiate" the sending of auto-replies, and (c) calling parties consent to the receipt of auto-replies within the meaning of the TCPA.

Respectfully submitted,

YOUMAIL, INC.

By:

Lauren Lynch Flick
Andrew D. Bluth

Its Attorneys in this Matter

PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000

Dated:  April 19, 2013

17

DECLARATION

I, Alex Quilici, Chief Executive Officer of YouMail, Inc., hereby declare under penalty of perjury that I have reviewed the foregoing "Petition for Expedited Declaratory Ruling," and, except for (a) matters cited therein contained in the FCC's records, (b) matters for which other support is provided, and (c) matters of which the Commission may take official notice, the facts set forth therein are true and correct to the best of my personal knowledge, information and belief.

Respectfully submitted,

Alex Quilici

Dated: April 19, 2013

# **PUBLIC NOTICE**

**Federal Communications Commission**
**445 12ᵗʰ St., S.W.**
**Washington, D.C. 20554**

News Media Information 202 / 418-0500
Internet: http://www.fcc.gov
TTY: 1-888-835-5322

DA 12-1653
Released: October 16, 2012

## CONSUMER AND GOVERNMENTAL AFFAIRS BUREAU SEEKS COMMENT ON PETITION FOR DECLARATORY RULING FROM COMMUNICATION INNOVATORS

### CG Docket No. 02-278

**Comments Due:  November 15, 2012**
**Reply Comments Due:  November 30, 2012**

With this Public Notice, we seek comment on a Petition for Declaratory Ruling filed by Communication Innovators.[1]  Communication Innovators asks the Commission to clarify that predictive dialers that are not used for telemarketing purposes and do not have the current ability to generate and dial random or sequential numbers are not "automatic telephone dialing systems"[2] as defined by the Telephone Consumer Protection Act[3] and the Commission's related rules.[4]  Communication Innovators states that there are growing benefits of informational calls to wireless consumers that justify such a clarification.[5]

Pursuant to sections 1.415 and 1.419 of the Commission's rules,[6] interested parties may file comments and reply comments on or before the respective dates indicated on the first page of this Notice. Comments may be filed using the Commission's Electronic Comment Filing System (ECFS).  *See Electronic Filing of Documents in Rulemaking Proceedings*, 63 FR 24121 (1998).

- ▪ Electronic Filers:  Comments may be filed electronically using the Internet by accessing the ECFS:  http://fjallfoss.fcc.gov/ecfs2/.

- ▪ Paper Filers:  Parties who choose to file by paper must file an original and one copy of each filing.

---

[1] *See* Communication Innovators, Petition for Declaratory Ruling, CG Docket No. 02-278 (filed June 7, 2012) (*Petition*), a copy of which is attached to this Public Notice.

[2] *Petition* at 1.

[3] Codified as 47 U.S.C. § 227.

[4] 47 C.F.R. § 64.1200.

[5] *Petition.* at 5.

[6] 47 C.F.R. §§ 1.415, 1.419.

EXHIBIT A-5

- Filings can be sent by hand or messenger delivery, by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail. All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

- All hand-delivered or messenger-delivered paper filings for the Commission's Secretary must be delivered to FCC Headquarters at 445 12th St., SW, Room TW-A325, Washington, DC 20554. The filing hours are 8:00 a.m. to 7:00 p.m. All hand deliveries must be held together with rubber bands or fasteners. Any envelopes and boxes must be disposed of before entering the building.

- Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9300 East Hampton Drive, Capitol Heights, MD 20743.

- U.S. Postal Service first-class, Express, and Priority mail must be addressed to 445 12th Street, SW, Washington DC 20554.

People with Disabilities: To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice), 202-418-0432 (tty).

The proceeding this Notice initiates shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[7] Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation. If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum. Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with rule 1.1206(b). In proceedings governed by rule 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (*e.g.*, .doc, .xml, .ppt, searchable .pdf). Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

**FOR FURTHER INFORMATION CONTACT:** Karen F. Johnson, Consumer and Governmental Affairs Bureau, Federal Communications Commission, 202-418-7706, or karen.johnson@fcc.gov.

-FCC-

---

[7] *Id.* §§ 1.1200 *et seq.*

2

# FC PUBLIC NOTICE

**Federal Communications Commission**
**445 12th St., S.W.**
**Washington, D.C. 20554**

News Media Information 202 / 418-0500
Internet: http://www.fcc.gov
TTY: 1-888-835-5322

---

**DA 13-1433**
**Released:  June 25, 2013**

## CONSUMER AND GOVERNMENTAL AFFAIRS BUREAU SEEKS COMMENT ON PETITION FOR EXPEDITED DECLARATORY RULING FROM YOUMAIL, INC.

### CG Docket No. 02-278

**Comment Date:  July 25, 2013**
**Reply Comment Date:  August 9, 2013**

With this Public Notice, the Consumer and Governmental Affairs Bureau seeks comment on a Petition for Declaratory ruling filed by YouMail, Inc. (YouMail)[1] seeking clarification of three issues arising under the Telephone Consumer Protection Act (TCPA)[2] and Section 64.1200 of the Commission's rules.[3]

YouMail states that it provides a software-based service that allows smartphone users to replace default voicemail options with customizable telephone answering functions, including automated text message replies to calls.[4]  YouMail first asks the Commission to clarify that its "virtual receptionist" software is not an "automatic telephone dialing system" (ATDS) as defined by 47 U.S.C. § 227(a)(1)"[5] because the software does not have the current capacity to store, produce, or dial random or sequential telephone numbers but, instead, responds one time to a single input (a caller leaving a voicemail message) and only when instructed to do so by a user's settings and when adequate caller ID information is available.  Second, YouMail asks the Commission to clarify that YouMail does not initiate calls because it does not cause the call to occur as defined by the TCPA.[6]  Third, YouMail asks the Commission to confirm that callers provide prior consent to receive a responsive text when leaving voicemail messages for a

---

[1] *See YouMail, Inc.*, Petition for Expedited Declaratory Ruling and Clarification, CG Docket No. 02-278 (filed Apr. 19, 2013) (*Petition*) (noting that several companies including YouMail are the subject of class action lawsuits based on the TCPA's definition of autodialer and classifications of group text-based services).

[2] Codified as 47 U.S.C. § 227.

[3] 47 C.F.R. § 64.1200.

[4] Petition at 2-3.

[5] *Id.* at 9-10.

[6] *Id.* at 12.

EXHIBIT A-6

YouMail subscriber.[7]  YouMail states that these clarifications are needed to address the status of these technologies and services under the statute and implementing regulations.[8]

Pursuant to sections 1.415 and 1.419 of the Commission's rules,[9] interested parties may file comments and reply comments on or before the respective dates indicated on the first page of this Notice.  Comments may be filed using the Commission's Electronic Comment Filing System (ECFS).  *See Electronic Filing of Documents in Rulemaking Proceedings*, 63 FR 24121 (1998).

- Electronic Filers:  Comments may be filed electronically using the Internet by accessing the ECFS:  http://fjallfoss.fcc.gov/ecfs2/.

- Paper Filers:  Parties who choose to file by paper must file an original and one copy of each filing.

- Filings can be sent by hand or messenger delivery, by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail.  All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

- All hand-delivered or messenger-delivered paper filings for the Commission's Secretary must be delivered to FCC Headquarters at 445 12th St., SW, Room TW-A325, Washington, DC 20554.  The filing hours are 8:00 a.m. to 7:00 p.m.  All hand deliveries must be held together with rubber bands or fasteners.  Any envelopes and boxes must be disposed of before entering the building.

- Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9300 East Hampton Drive, Capitol Heights, MD 20743.

- U.S. Postal Service first-class, Express, and Priority mail must be addressed to 445 12th Street, SW, Washington DC 20554.

People with Disabilities:  To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice), 202-418-0432 (tty).

The proceeding this Notice initiates shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[10]  Persons making *ex parte* presentations

---

[7] *Id.* at 13-14.

[8] *Id.* at 1-2.  YouMail notes that it and several other companies are the subjects of class action lawsuits based on the TCPA's definition of autodialer and classifications of group text-based services.  *Id.* at 8, 15.

[9] 47 C.F.R. §§ 1.415, 1.419.

[10] 47 C.F.R. §§ 1.1200 *et seq.*

2

must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation. If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum. Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with rule 1.1206(b). In proceedings governed by rule 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (*e.g.*, .doc, .xml, .ppt, searchable .pdf). Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

**FOR FURTHER INFORMATION CONTACT:** B. Lynn Follansbee, Consumer and Governmental Affairs Bureau, Federal Communications Commission, 202-418-1514, and lynn.follansbee@fcc.gov.

-FCC-

3

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, DC 20554

Accepted/Filed

MAR 1 8 2014

FCC Office of the Secretary

In the Matter of                )
                                )
TextMe, Inc.                    )        CG Docket No. 02-278
                                )
Petition for Declaratory Ruling  )
                                )

## TEXTME, INC.'S PETITION FOR
## EXPEDITED DECLARATORY RULING AND CLARIFICATION

James G. Snell
Ronald W. Del Sesto, Jr
Bingham McCutchen, LLP
2020 K STREET, NW
Washington, DC 20006
Counsel for TextMe, Inc.

Dated: March 18, 2014

A/75952354

**EXHIBIT A-7**

TABLE OF CONTENTS

Page

SUMMARY.................................................................................i

I.  TEXTME'S TEXT MESSAGING SERVICES .................................................... 4

    A.  Technical Details of TextMe's Offering and Invitational Texts........................... 5

    B.  TextMe Invitational Text Messages are Non-Commercial, User-Initiated
        Speech................................................................................ 6

II. THE COMMISSION SHOULD ISSUE A DECLARATORY RULING
    CLARIFYING AND LIMITING THE SCOPE OF THE TCPA'S DEFINITION
    OF AN ATDS ............................................................................ 7

III. TEXTME'S PROPOSED DEFINITION OF CAPACITY............................................. 10

IV. THE COMMISSION SHOULD ISSUE A DECLARATORY RULING
    CLARIFYING THAT TEXTME DOES NOT MAKE CALLS  PURSUANT TO
    THE TCPA.............................................................................. 13

V.  ALTERNATIVELY, THE COMMISSION SHOULD CLARIFY THAT
    CONSENT FOR NON-COMMERCIAL, INFORMATIONAL CALLS OR
    TEXT MESSAGES MAY BE GIVEN THROUGH INTERMEDIARIES .................... 14

    CONCLUSION.............................................................................17

A/75952354

## Summary

TextMe provides a free social communications service (the "TextMe App" or "App") that enables users to send non-commercial text messages to family, friends, and other personal contacts within the United States. The App also allows for the receipt of free calls to the user, *i.e.*, TextMe does not charge users. Because the value of TextMe's service to users is enhanced if users' contacts also use TextMe, users could choose to select contacts from their devices' address books and send text messages inviting those individuals to use the service.

The Commission has determined that it has been given congressional authority to define the meaning of an automatic telephone dialing system ("ATDS") pursuant to the Telephone Consumer Protection Act ("TCPA"). Therefore, by this Petition, TextMe asks the Commission to: (1) clarify that the term "capacity" as used in the statutory definition of an ATDS under § 227(a)(1) of the TCPA encompasses only equipment that, at the time of use, could in fact perform the functions described in the TCPA without human intervention and without first being technologically altered; and (2) clarify that TextMe does not "make" calls or send text messages pursuant to the TCPA; instead, users do. Alternatively, TextMe requests that the Commission clarify that third party consent obtained through an intermediary satisfies the TCPA's "prior express consent" requirement for non-commercial, informational calls or text messages to wireless numbers.

Class action litigation under the TCPA has increased considerably in the last several years, largely due to the lack of clarity regarding the meaning of "capacity" in the statutory definition of an ATDS, as well as a lack of clarity regarding how prior express consent may be given, particularly where intermediaries are involved. Rather than discourage the abusive marketing practices that Congress and the Commission found harmful to consumers, these lawsuits

i

stifle innovation and threaten the development of novel tools for communication. Commission action is necessary to prevent the TCPA from being read so broadly as to deprive consumers of access to innovative products and services.

A/75952354

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

|  |  |  |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| TextMe, Inc. | ) | CG Docket No. 02-278 |
| | ) | |
| Petition for Declaratory Ruling | ) | |

### TEXTME, INC.'S PETITION FOR
### EXPEDITED DECLARATORY RULING AND CLARIFICATION

TextMe, Inc. ("TextMe"), through its counsel, and pursuant to Section 1.2 of the Federal Communications Commission's ("Commission" or "FCC") rules, respectfully requests that the Commission issue an expedited declaratory ruling and clarification regarding certain provisions of the Telephone Consumer Protection Act ("TCPA").[1] In particular, TextMe requests a ruling clarifying and limiting the scope of the term "capacity" as used to define the phrase "automatic telephone dialing system" ("ATDS") under 47 U.S.C. § 227(a)(1). TextMe also respectfully requests that the Commission clarify that TextMe does not "make" calls or send text messages pursuant to the TCPA; instead, users do. Alternatively, TextMe requests that the Commission clarify that third party consent obtained through an intermediary satisfies the TCPA's "prior express consent" requirement for non-commercial, informational calls or text messages to wireless numbers. These issues require clarification because they are dispositive of state court

---

[1] Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991) (current version at 47 U.S.C. § 227 (2010)); 47 C.F.R. § 1200.

claims pending against TextMe, and the Commission has primary jurisdiction over issues left unresolved in the *2012 TCPA Order*.[2]

Communication by text message is becoming increasingly prevalent, if not ubiquitous, among cell phone users. This trend has inspired a number of innovative technologies, including the TextMe App, that enable users to conduct personal, social communications more efficiently and without the cost often associated with traditional telephone carriers. However, due to a lack of clarity regarding the meaning of "capacity" in the statutory definition of an ATDS, as well as a lack of clarity regarding how prior express consent may be given, this innovation threatens to be stifled as these technologies face a growing wave of class action litigation under the TCPA.[3]

This proliferation in litigation is evidenced, in part, by the fact that TextMe has been sued in a putative class action alleging a TCPA violation in relation to invitational text messages sent by users of TextMe. In particular, plaintiff Omar Atebar claims that TextMe sent (or caused to be sent) an unsolicited and un-consented to text message and that, as a result, he and other members of the putative class are entitled to statutory damages under the TCPA, as well as attorneys' fees and costs.

---

[2] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, 27 FCC Rcd 1830 (2012) ("*2012 TCPA Order*").

[3] Courts have acknowledged increased use of TCPA class actions as devices "for the solicitation of litigation," and have observed that class counsel often stand to benefit substantially, with little benefit to class members. *See, e.g., West Concord 5-10-1.00 Store, Inc. v. Interstate Mat Corp.*, No. 2010-00356, 31 Mass. L. Rep. 58 (Mass. Super. Ct. Mar. 5, 2013) (rejecting use of TCPA "as a device for the solicitation of litigation" and "as a device to generate legal fees in cases in which the attorneys have a far greater interest and stake in certification of a class than the putative class members"); *Saunders v. NCO Fin. Sys., Inc.*, 910 F. Supp. 2d 464, 465 (E.D.N.Y. 2012) (granting summary judgment in TCPA case and ordering plaintiff to show cause as to why sanctions should not be imposed, noting that "remedial laws can themselves be abused and perverted into money-making vehicles for individuals and lawyers").

A/75952354

Other putative class action lawsuits under the TCPA similarly stem from the lack of clarity as to the meaning of the term ATDS and whether consent has been obtained. Rather than discourage the abusive marketing practices that the TCPA was meant to target, these lawsuits stifle innovation and threaten the development of novel tools for communications. Clarifying the TCPA as advocated here would provide valuable guidance to courts handling an ever-increasing volume of TCPA-related lawsuits.

By this Petition, TextMe respectfully requests that the Commission: (1) clarify that the term "capacity" as used in the statutory definition of an ATDS under § 227(a)(1) of the TCPA encompasses only equipment that, at the time of use, could in fact perform the functions described in the TCPA without human intervention and without first being technologically altered; and (2) clarify that TextMe does not "make" calls or send text messages pursuant to the TCPA; instead, users are the parties responsible for initiating such calls or text messages.[4] In the alternative, TextMe requests that the Commission clarify that third party consent obtained through an intermediary satisfies the "prior express consent" requirement for non-commercial informational calls and text messages to wireless numbers.

---

[4] Other parties have sought similar clarification. *See, e.g., Petition for Rulemaking of ACA International*, CG Docket No. 02-278 (filed Jan. 31, 2014); *Glide Talk, LTD Petition for Expedited Declaratory Ruling*, CG Docket No. 02-278 (filed Oct. 28, 2013) ("Glide Talk Petition"); *Professional Association for Customer Engagement Petition for Expedited Declaratory Ruling or, in the Alternative, Petition for Expedited Rulemaking*, CG Docket No. 02-278 (filed Oct. 18, 2013) ("PACE Petition"); *YouMail, Inc. Petition for Expedited Declaratory Ruling and Clarification*, CG Docket No. 02-278 (filed Apr. 19, 2013) ("YouMail Petition"); *Communication Innovators Petition for Declaratory Ruling*, CG Docket No. 02-278 (filed June 7, 2012); *GroupMe, Inc.'s Petition for Expedited Declaratory Ruling and Clarification*, CG Docket No. 02-278 (filed Mar. 1, 2012) ("GroupMe Petition").

## I.      TEXTME'S TEXT MESSAGING SERVICES

TextMe, founded in March 2011, is a young, innovative, self-funded company that offers users free instant messaging, text messaging, and voice and video calling. TextMe provides a free mobile application (the "TextMe App" or "App") that enables its users to send non-commercial calls and text messages, and offers users the ability to invite friends to join the TextMe App via invitational text messages. TextMe's unified platform is device-agnostic and can turn any smartphone or any tablet, using the Apple iOS or the Android operating system, into a communication device rivaling classic communications alternatives.

TextMe offers the App for free and allows free inbound and outbound U.S. domestic text messaging over subscribers' existing mobile data service or other broadband connection, like Wi-Fi, as well as free user-generated content sharing capability via SMS text message to any number in the United States. There are no charges imposed by TextMe for any messages of any sort exchanged between two TextMe users. Also, TextMe does not charge for out-of-network text messages to U.S. numbers or for any inbound calls, no matter where they originate.[5] The App also permits outbound voice calls, however, users are not required to purchase an outbound calling functionality. To the extent users wish to make outbound voice calls or send text messages to telephone numbers associated with international destinations, they can do so through a platform that allows users to earn calling credits in a number of ways, including by watching videos or completing promotional offers. Users can also purchase TextMe credits and use these credits to place outbound calls or send text messages internationally to recipients that are not App users.

---

[5] TextMe does not charge any fee for individuals to receive invitational text messages.

A/75952354

### A.   Technical Details of TextMe's Offering and Invitational Texts

TextMe users use the service for text messaging or for voice calls. As is true of any social network, the appeal of the TextMe App to users is related to its number of users and its functionality. TextMe issues every user a free personal E.164 telephone number, so that each user can automatically send and receive text messages from any mobile device, and can place or receive calls from any phone, whether or not the recipient is a TextMe user.

To facilitate users' ability to communicate for free, TextMe allows its users to select contacts from their device address books and invite those individuals to use the App themselves. Users may invite friends to use the App by sharing a message about TextMe via third party social networks or by email. Users were also able to invite friends via text message by engaging in a multi-step process in which users had to make a number of affirmative choices throughout the invite process.[6]

For users in the United States, the text message invite function – which is currently disabled but is the basis for the lawsuit – was accessed through an invite screen by tapping a button that reads "INVITE YOUR FRIENDS." To send an invitational text message, users would then choose whether to invite friends by email or text messages. After selecting the option "Invite your friends by Text," users were presented with the option to invite all their friends or could individually select contacts. Finally, users would have to make another affirmative choice to send the invitational text message by selecting another button. The entire process would require a user to make three, separate, affirmative choices in order for the user to send an invitational text. In addition, it should be noted that when a user signed up for the service, she was

---

[6] TextMe has since disabled the text messaging invite functionality until such time as the FCC clarifies that sending text messages as described herein is consistent with the TCPA and the FCC's rules.

5

asked to grant access to her device address book.[7] This constitutes another prior, affirmative choice without which the user would not be able to send an invitational text. Moreover, at any time during this multi-step process, users could cancel by selecting a "Cancel" button. The invitational text message included users' TextMe handle and invited the recipient to install the App so the user and the contact invited by the user could call and text for free.

**B.    TextMe Invitational Text Messages are Non-Commercial, User-Initiated Speech**

The services provided by the TextMe App are not marketing tools, and TextMe prohibits commercial use of its services. By using the TextMe App and thereby agreeing to TextMe's Terms and Conditions, each user agrees to use the App "only for [herself] and for lawful non-commercial purposes" and agrees not to "[g]enerate, download, upload or transmit any kind of advertisement or solicitations of commercial activities."[8] Each user also agrees not to use the TextMe App to generate bulk mail, spam, or similar content, or to engage in certain activities impacting TextMe users "without their consent."[9] Users accept sole responsibility for any content they generate or transmit through the TextMe App,[10] and agree that their use of the App may be unilaterally suspended for "excessive use."[11] TextMe does not send any text messages to

---

[7] TextMe provided users the opportunity to elect whether to allow the App to access the contact information stored on the mobile device when users set up the App on their device.

[8] *See, e.g.,* TextMe Terms and Conditions, "Limitations of Use," *available at* http://go-text.me/assets/rtf/tc_v11.rtf. Users also agree "to comply with any United States law or regulation and any law or regulation [he or she] may be subject to in the use of the phone number allocated . . . by TextMe."

[9] *Id.* ("You will not use the TextMe contents, products and services to . . . [g]enerate and distribute bulk mail, spam, chain linked messages or any similar content[, e]ngage into activities leading to, or intending to (a) data collection on other TextMe users, without their consent").

[10] *Id.*

[11] *Id.*, "Short Message Service (SMS), Multimedia Message Service (MMS), volume limitations."

6

non-users. Recipients of the invitational text messages initiated by TextMe users are all contacts of TextMe users.

## II.   THE COMMISSION SHOULD ISSUE A DECLARATORY RULING CLARIFY-ING AND LIMITING THE SCOPE OF THE TCPA'S DEFINITION OF AN ATDS

The TCPA makes it unlawful to make a call to a cellular telephone, using an ATDS, without the prior express consent of the called party.[12] Congress defined the term ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers.[13] The Commission has determined that it has been given congressional authority to further define the term ATDS under the TCPA.[14] However, the Commission has not clarified the meaning of "capacity" for purposes of defining an ATDS, except to note in its *2003 TCPA Report and Order* that the definition of an ATDS covers any equipment that has the capacity to generate and dial numbers without human intervention.[15] As a result, some courts have construed "capacity" broadly to encompass equipment that is capable of automatically dialing random or sequential numbers, *even if it does not actually do so*, or *even if it must be altered* to make it capable of doing so.[16]

The unintended result of this seemingly limitless theory of "capacity" is that the definition now threatens to impact tens of millions of devices. In its *2012 TCPA Order*, the Commission recognized that wireless subscribers rely on wireless services for a variety of

---

[12] *See* 47 U.S.C. § 227(b)(1)(A).

[13] § 227(a)(1).

[14] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd. 14014, 14092 (2003) ("*2003 TCPA Report and Order*").

[15] *Id.*

[16] *See, e.g., Satterfield v. Simon & Schuster, Inc., et al.*, 569 F.3d 946, 951 (9th Cir. 2009) (as construed by subsequent opinions).

7

communications that were not available when the TCPA was enacted.[17] Whereas the capacity to store or produce telephone numbers using a random or sequential number generator was once a rare phenomenon, wireless services have become ubiquitous, and this capacity, as broadly defined, is now commonplace.[18] Nearly any modern-day smartphone could arguably have "capacity" to dial numbers randomly or sequentially, as these devices are typically programmable and users can easily install applications that add or alter device functionality.[19] The Commission should reject an interpretation that would subject even ordinary wireless subscribers to statutory damages where the communications require human intervention but the device arguably has the "capacity" to dial numbers randomly or sequentially.

Although some courts have rejected such broad interpretations of "capacity,"[20] this expansive approach has caused a swelling tide of litigation. Putative class action claims are now frequently filed on the theory that virtually any modern computerized equipment with the ability to dial phone numbers may constitute an ATDS, leaving countless businesses and even individual consumers subject to claimed violations of the TCPA. Even if a court were to find such claims frivolous in nature, courts have shown reluctance to dismiss claims at an early stage given the expansive interpretations of capacity, meaning parties often endure costly discovery and motion practice, despite ultimately prevailing.[21]

---

[17] See 2012 TCPA Order, 27 FCC Rcd 1830, 1841–42 ("we employ the flexibility Congress afforded to address new and existing technologies and thereby limit the prior express written consent requirement to autodialed or prerecorded *telemarketing* calls") (emphasis supplied).

[18] See, e.g., GroupMe Petition, at 10.

[19] See id. at 10–11 (explaining how a new iPhone may qualify as an ATDS).

[20] See *infra* discussion, Section IV.

[21] See GroupMe Petition, at 11 ("Faced with appellate decisions that seemingly embrace this expansive definition of capacity, district courts are reluctant to dismiss even absurd cases like these without allowing expensive discovery followed by summary judgment motions or trial.").

A/75952354

The language of the TCPA, on its face, does not support a claim that the term ATDS includes a device that could be technologically altered or re-configured to have the capacity to "store or produce telephone numbers to be called, using a random or sequential number generator," *even if* it lacked such capacity at the time the relevant calls were placed, and no random or sequential number generator was employed. Congress expressly limited the term to include only "equipment which has the capacity" to store or produce such numbers, and Congress' reference to present capacity ("has") as opposed to potential capacity ("has or could have") makes clear its intent that to constitute an ATDS, a device must be able to store or produce numbers using a random or sequential number generator *at the time a call is placed.*[22] An interpretation that includes within the scope of an ATDS a system that is not currently able to store or produce sequential or randomized numbers contravenes legislative intent apparent in the statutory language.[23]

The harms that Congress sought to prevent in enacting the TCPA are not implicated by TextMe or the TextMe App. As explained above, neither TextMe nor its users engage in mass unsolicited commercial text messaging, and the App is not capable of sending text messages to randomly generated or sequential telephone numbers. Rather, users supply telephone numbers for the personal contacts they wish to invite to use the App, and initiate invitational text messag-

---

[22] 47 U.S.C. § 227(a)(1).

[23] *See, e.g.*, GlideTalk Petition, at 11–12 (noting congressional and executive concern with "actual use of sequential or random-number calling by telemarketers, not with the transmission of calls using devices that could be, but were not, programmed to place such calls"). "Signing the bill into law, President George H.W. Bush expressed concern that, notwithstanding its merits, the TCPA 'could also lead to unnecessary regulation or curtailment of legitimate business activities,' emphasizing that he had signed it only 'because it gives the [FCC] ample authority to preserve legitimate business practices.'" *Id.* (citing George Bush: "Statement on Signing the Telephone Consumer Protection Act of 1991," December 20, 1991, *available at* http://www.presidency.ucsb.edu/ws/?pid=20384).

9

es to those personal contacts. These messages are standard text messages, can be delivered during a recipient's call without interrupting the call in progress, and the recipient does not lose the ability to place a call when a text message is received. A user's ability to communicate personally with her contacts in her social network is a key feature of the TextMe App, and these communications are far from the uninvited and intrusive commercial communications intended to be prohibited by the TCPA.

## III.   TEXTME'S PROPOSED DEFINITION OF CAPACITY

To avoid a result that is irrational, inconsistent with statutory language, and subjects companies such as TextMe to unnecessary litigation, TextMe requests that the Commission clarify that the term "capacity" as used in the statutory definition of an ATDS encompasses only equipment that, at the time of use, could in fact perform the functions described in the TCPA, without human intervention and without first being technologically altered.

The invitational text messages sent by users via the TextMe App should not fall within the definition of an ATDS because the system simply does not and cannot send text messages without human intervention. The only numbers that the TextMe App is able to access or contact are those contained in a user's device address book or numbers manually entered by the user via a dial pad (*i.e.*, contacts). To use the invite mechanism, a TextMe user (who has agreed to TextMe's terms of use) must first enter numbers into her device address book. These contacts, by virtue of being listed in the address book, are necessarily individuals with whom the user has a prior relationship, demonstrating that they expect and intend to receive messages from the user regardless of the technology used to contact them. TextMe's mechanisms are not capable of storing or generating sequential or random telephone numbers at the time an invitational text message is sent; they utilize only the specific telephone numbers provided from the user's contacts, and are sent only upon initiation by the TextMe user. TextMe's requested clarification

10

is consistent with statutory language and legislative intent, and would resolve illogical interpretations of the law. Such clarification would not exclude from the TCPA's definition the ability to dial numbers "without human intervention,"[24] and would not undermine the Commission's rulings regarding predictive dialers.[25]

Courts have rejected broad interpretations of the term "capacity." In *Hunt v. 21st Mortgage*,[26] plaintiff claimed an ATDS was used even where defendant dialed calls manually, because the system could be capable of automatic dialing if certain software were installed. The Northern District of Alabama rejected this interpretation, observing that the system was "in its present state incapable of automatic dialing," and a defendant "cannot be held liable if substantial modification or alteration of the system would be required to achieve that capability."[27]

Most recently, in *Gragg v. Orange Cab Company, Inc.*,[28] the Western District of Washington granted summary judgment for defendants where plaintiff claimed he received an unsolicited text message inviting him to download a smartphone app after he arranged for a cab. Defendants argued the texts were not sent using an ATDS, as the app is only capable of generat-

---

[24] *2003 TCPA Report and Order*, 18 FCC Rcd. 14014, 14092.

[25] Those rulings found predictive dialers to fall within the scope of an ATDS because they permit a caller to initiate and dial numbers from a "database of existing telephone numbers" or "customer lists" without human intervention. *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling, 23 FCC Rcd. 559, 566–67 (2008) ("*2008 Declaratory Ruling*"); *2003 TCPA Report and Order*, 18 FCC Rcd at 14022, 14091–96.

[26] 2013 WL 5230061 (N.D. Ala. Sept. 17, 2013) (order on motion to compel).

[27] Thereafter, in *Stockwell v. Credit Management LP*, a California trial court granted summary judgment for defendant in a TCPA action, holding that because the system at issue did not have a number generator and no contrary evidence was presented, the system did not meet the requirements of an ATDS. Case No. 30-2012-00596110 (Cal. Super. Ct. Oct. 2, 2013) (order on motion for summary judgment).

[28] Case No. C–12–0576, 2014 WL 494862 (W.D. Wash. Feb. 7, 2014) (order on motion for summary judgment).

11

ing and sending text messages in response to a driver's acceptance of an individualized customer request. The court agreed, rejecting plaintiff's argument that the modem used to operate the app is an ATDS because it has the ability to store multiple phone numbers and transmit mass text messages to those numbers. The court acknowledged that a predictive dialer is an ATDS pursuant to the Commission's past rulings, but found the app was not a predictive dialer because no text could be sent without a human clicking a button.[29] The court subsequently declined to reconsider its ruling on the issue of capacity, rejecting plaintiff's request for discovery regarding modifications that could be made to make defendant's system function as an ATDS, or how difficult it would be to make such modification.[30] "The mere fact that defendants' modem could, if paired with different software, develop the requisite capability is not enough under the TCPA or *Satterfield*. To hold otherwise would subject almost all sophisticated computers and cell phones to TCPA liability, a result Congress surely did not intend."[31]

TextMe cannot be liable under the TCPA for precisely the same reason defendants in *Orange Cab* could not be liable: human invention is required for the alleged texts to be sent. No invitational text can be sent without a live TextMe user loading her contacts into the App and affirmatively authorizing an invitation to be sent to a given contact. The TCPA is a privacy statute meant to prohibit communications that consumers find intrusive – not personal communications that consumers desire. Clarifying the TCPA as requested by TextMe would provide valuable guidance to courts facing an ever-increasing volume of TCPA-related lawsuits, which

---

[29] *Id.* ("The system is able to dial and transmit the dispatch notification only after the driver has physically pressed 'accept': human intervention is essential … The court therefore finds that the TaxiMagic program is not a predictive dialer.")

[30] *Gragg v. Orange Cab Company, Inc., et al*, Case No. C–12–0576, 2014 WL 801305 (W.D. Wash. Feb. 28, 2014) (order on motion for reconsideration).

[31] *Id.* at *7.

12

stifle innovation and threaten the development of novel tools for communications.

## IV.   THE COMMISSION SHOULD ISSUE A DECLARATORY RULING CLARIFY-ING THAT TEXTME DOES NOT MAKE CALLS PURSUANT TO THE TCPA

The TCPA prohibits parties from "mak[ing] any call . . . using any [ATDS] ...."[32] The Commission has made clear that the rules it promulgated under the TCPA apply to users of services and not the underlying carriers that transmit the calls.[33] As described herein, TextMe does not send invitational text messages to users' contacts.[34] Instead, users select contacts from their mobile device and initiate text messages to such parties.[35] As such, the invitational text message is the start of a private conversation to which TextMe is not a party. TextMe provides software services allowing users to transmit text messages to whom they choose. The purposes of invitational text messages that users send is to create personal networks and to ease communications among those invited to join.

The increasing use of social network applications for these types of communications and their reliance on invitational text messages is well known to the Commission.  Numerous parties face lawsuits for similar types of text messages, even though it is users that are responsible for initiating such communications, and are seeking relief from the Commission.[36] Moreover, since such services rely on the users' contacts, users send the communications that they believe the recipients desire. In passing the TCPA, Congress sought to regulate the use of telephones as an

---

[32] 47 U.S.C. § 227(b)(1).

[33] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 7 FCC Rcd 8752, 8776 n.83 (1992).

[34] *See supra* Section I.A.

[35] As noted *supra* in Section I.A., the text messaging functionality is currently disabled. But when it was available, users were required to complete three affirmative steps in order to send an invitational text message to their family, friends and other contacts. *See id.*

[36] *See, e.g.,* Glide Talk Petition, at 14-15; YouMail Petition, at 11-12.

13

A:75952384

instrument of mass, commercial speech that citizens found annoying and disruptive.[37] But Congress also found that citizens do not react to the same way when the communication received is non-commercial or personal rather than generic, commercial speech.[38] Simply put, non-commercial, informational communications are not subject to the TCPA as recipients desire to receive such communications. Moreover, when a software developer provides a tool to users requiring *voluntary and affirmative* interaction, enabling users to initiate communications to *their* contacts, it is the user and not the software developer making the call or sending the text message pursuant to the TCPA.

## V.    ALTERNATIVELY, THE COMMISSION SHOULD CLARIFY THAT CONSENT FOR NON-COMMERCIAL, INFORMATIONAL CALLS OR TEXT MESSAGES MAY BE GIVEN THROUGH INTERMEDIARIES

The TCPA makes it unlawful to make a call (or text) to a cellular telephone, using an ATDS, without the prior express consent of the called party.[39] But obtaining consent from the recipient of a text message is not always possible, even if the recipient would like to receive the text message. Therefore, and in the alternative, to the extent that an app provider is considered a "make[r]" of a call (which it is not), the Commission should clarify that for non-commercial, informational calls or text messages to wireless numbers, which can permissibly be made using an ATDS with the called party's prior express consent, the caller can rely on a representation

---

[37] *See* H.R. REP. NO. 102-317 at 8 (1991) (highlighting the efficiency gains that marketers obtain when there is no human intervention as well as the one-way, uniform nature of the commercial speech that ATDS enabled); *see also Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 18 FCC Rcd. 14014, 14092 (July 3, 2003) (finding that use of an ATDS allows for calling thousands of people every day).

[38] *See,* H.R. Rep. No. 102-317, at 16 (1991) (finding that user expectations with respect to non-commercial communications are different than when such calls concern commercial matters).

[39] *See* 47 U.S.C. § 227(b)(1)(A).

14

from an intermediary that he or she has obtained the requisite consent from the called party.

The Commission has recognized that intermediary consent is the basis for communications recipients would like to receive. In its *2012 TCPA Order*, the Commission found that "requiring prior written express consent . . . would unnecessarily restrict consumer access to information communicated through purely informational calls."[40] The Commission underscored a variety of non-commercial, administrative, or informational communications in which requiring written consent from the recipients would not promote the public interest, and found indirect consent to be a permissible alternative for certain non-telemarketing messages, including package delivery notifications, banking and credit fraud alerts, and school closing information.[41] Other petitions have sought exemption from TCPA liability for particular types of communications, however, the rise in abusive litigation requires broader Commission action. The absence of direct consent is not informative of the recipient's desire to receive such communications, particularly given that a personal contact is well-positioned to serve as an intermediary for the recipient and to represent that the recipient consents to receive non-commercial messages on a wireless device.

As explained above, an invitational text message sent via the TextMe App is neither an advertisement (it is a personal invitation from a user) nor unsolicited (the user requests the invitation as an agent of the recipient). Users employ the invite mechanism to enhance the value of the App to them, introducing their contacts to the App and thereby communicating for free with a broader group of individuals. Use of the software tool is completely voluntary, such that use of the tool demonstrates that users find it valuable and efficient. Users have prior, personal

---

[40] *2012 TCPA Order*, 27 FCC Rcd 1830, 1838.

[41] *Id.* ¶ 21.

relationships with the contacts listed in their address books, and those contacts may be presumed to consent to receive social calls and text messages from the user, therefore prior express consent should be presumed for calls or messages "made" by users to such contacts.[42] TextMe users decide when to send an invitation, how, and to whom. This type of non-commercial, informational, social communication does not implicate the consumer protection issues that Congress or the Commission sought to resolve through the TCPA and its implementing regulations.

The TCPA was enacted to address particular types of commercial communications, and the ATDS restriction was intended to target a specific type of technology used in connection with such communications.[43] Given the growing number of mobile calls and text messages,[44] coupled with increasing litigation stemming from an excessively broad interpretation of "capacity," the Commission should clarify the TCPA as proposed by TextMe. The uncertainty surrounding interpretation of the TCPA must be resolved in order to ensure that mobile app developers and other industry players can continue to innovate. Limiting the clarification to only non-commercial, informational text messages where the recipient has a personal relationship with the

---

[42] *See also Petition for Declaratory Ruling of Club Texting, Inc.*, CG Docket No. 02-278, at 1 (filed Aug. 25, 2009) ("Text broadcasters act neither as the sender or recipient of text messages, but rather as an intermediary and conduit operating a platform that enables message delivery.").

[43] *See, e.g.. 2012 TCPA Order*, 27 FCC Rcd 1830, 1839 (2012) (finding that Congress' purpose in enacting the TCPA was to address invasion of privacy and public safety) (SoundBite Order); H.R. REP. NO. 102-317, at 11 (Nov. 15, 1991) (finding an ATDS can "seize" a recipient's telephone line and not release it even after the called party hangs up).

[44] Approximately 2.19 trillion text messages were sent over the course of 2012. *See* Summary of Year-End U.S. Figures from CTIA's Wireless Industry Summary Report, Year-End 2012 Results, 2013, *available at* http://www.ctia.org/your-wireless-life/how-wireless-works/wireless-quick-facts. U.S. wireless users sent and received an average of 6 billion text messages per day, or 69,635 text messages every second. *See* CTIA's Wireless Industry Indices: Semi-Annual Data Survey Results, A Comprehensive Report from CTIA Analyzing the U.S. Wireless Industry, Year-End 2012 Results, 2013, cited at http://www.ctia.org/resource-library/facts-and-infographics/archive/us-text-messages-sms.

16

intermediary will not cause consumers to be inundated with unwanted telemarketing messages, as such communications would continue to be prohibited by the Commission's rules.[45]

Courts determining liability under the ATDS provision have frequently examined the totality of the communications, users' expectations, and policy underlying the TCPA.[46] These courts have made clear that to be actionable, a call or text must be the type of intrusive communication "that Congress sought to prohibit in enacting the TCPA."[47] Courts have also considered consumer expectations in evaluating TCPA claims and have found that providing a telephone number to another may constitute "prior express consent."[48]

---

[45] *See GroupMe, Inc.'s Comments in Response to the Glide Talk, LTD Petition for Expedited Declaratory Ruling*, CG Docket No. 02-278, at 5 (filed Jan. 3, 2014).

[46] *See, e.g., Ibey v. Taco Bell Corp.*, No. 12–CV–0583, 2012 WL 2401972, at *3 (S.D. Cal. 2012) (concluding that a single confirmatory opt-out text following plaintiff's completion of a survey and subsequent opt-out request "did not constitute unsolicited telemarketing; Plaintiff had initiated contact with Defendant"); *Ryabyschuck v. Citibank (S.D.) N.A.*, No. 11-CV-1236, 2012 WL 5379143, at *3 (S.D. Cal. Oct. 30, 2012) (emphasis supplied) (finding a confirmatory opt-out text not actionable as the opt-out text was "plaintiff-initiated contact," which "[could] hardly be termed an invasion of plaintiff's privacy under the TCPA").

[47] *Emanuel v. The Los Angeles Lakers, Inc.*, No. CV–12–9936, 2013 WL 1719035, *3 (C.D. Cal. 2013) (quoting Mims v. Arrow Fin. Servs., LLC, _U.S._, 132 S. Ct. 740, 745 (2012)).

[48] *See, e.g., id.* (finding plaintiff invited informational text message by initiating communication); *Pinkard v. Wal-Mart Stores, Inc.*, 2012 WL 5511039, at *5 (N.D. Ala. Nov. 9, 2012) (holding "prior express consent" is given when voluntarily providing a telephone number).

17

## CONCLUSION

For the foregoing reasons, TextMe respectfully requests that the Commission issue a ruling on two issues. First, the Commission should clarify that the term "capacity" as used in the statutory definition of an ATDS under § 227(a)(1) of the TCPA encompasses only equipment that, at the time of use, could in fact perform the functions described in the TCPA without human intervention and without first being technologically altered. Second, the Commission should clarify that TextMe users, and not TextMe, are the parties making calls or sending text messages for purposes of the TCPA. In the alternative, the Commission should clarify that third party consent obtained through an intermediary satisfies the TCPA's "prior express consent" requirement for non-commercial, informational calls or text messages to wireless numbers.

Respectfully submitted,

TextMe, Inc.

By: */s/ Ronald W. Del Sesto, Jr.*

James G. Snell
Ronald W. Del Sesto, Jr.
Bingham McCutchen, LLP
2020 K STREET, NW
Washington, DC 20006

Counsel for TextMe, Inc.

Dated: March 18, 2014

18

A/75952354



# PUBLIC NOTICE

**Federal Communications Commission**
**445 12ᵗʰ St., S.W.**
**Washington, D.C. 20554**

News Media Information 202 / 418-0500
Internet: http://www.fcc.gov
TTY: 1-888-835-5322

---

DA 14-468
Released:  April 7, 2014

## CONSUMER AND GOVERNMENTAL AFFAIRS BUREAU SEEKS COMMENT ON PETITION FOR EXPEDITED DECLARATORY RULING FILED BY TEXTME, INC.

### CG Docket No. 02-278

**Comment Date: May 7, 2014**
**Reply Comment Date: May 22, 2014**

On March 18, 2014, TextMe, Inc. (TextMe) filed a petition for declaratory ruling and clarification requesting that the Commission clarify certain aspects of the Telephone Consumer Protection Act (TCPA).[1]  First, TextMe asks the Commission to clarify the meaning of the term "capacity" as used in the TCPA's definition of "automatic telephone dialing system."[2]  Second, TextMe asks the Commission to clarify that users of TextMe's service, instead of TextMe itself, make or send calls or text messages for purposes of the TCPA.[3]  In the alternative, TextMe requests that the Commission clarify that third party consent obtained through an intermediary satisfies the TCPA's "prior express consent" requirement for calls and texts to wireless numbers.[4]  We seek comment on the issues raised in the *Petition*.

TextMe states that it provides a free mobile telephone application ("TextMe App") that, through TextMe's social communications service, enables users to send and receive non-commercial texts messages to or from personal contacts in the United States, and allows the receipt of free texts and voice calls by TextMe users.[5]  According to TextMe, the app also allows users to make voice calls, but users are not required to purchase an outbound calling functionality.[6]  TextMe states that a currently-disabled function allows users to invite friends to use the TextMe App by sharing a message about TextMe via third-party social networks, by email, or by text message.[7]

---

[1] *TextMe, Inc.'s Petition for Expedited Declaratory Ruling and Clarification*, CG Docket No. 02-278, filed by TextMe, Inc. on Mar. 18, 2014 (*Petition*).  The TCPA is codified at 47 U.S.C. § 227.

[2] *Petition* at 3 (citing 47 U.S.C. § 227(a)(1)).

[3] *Id.*

[4] *Id.*

[5] *Id.* at 4-6.

[6] *Id.*

[7] *Id.* at 5

EXHIBIT A-8

Pursuant to sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments and reply comments on or before the dates indicated on the first page of this document. Comments may be filed using the Commission's Electronic Comment Filing System (ECFS). See Electronic Filing of Documents in Rulemaking Proceedings, 63 FR 24121 (1998).

- Electronic Filers:  Comments may be filed electronically using the Internet by accessing the ECFS:  http://fjallfoss.fcc.gov/ecfs2/.
- Paper Filers:  Parties who choose to file by paper must file an original and one copy of each filing.
- Filings can be sent by hand or messenger delivery, by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail.  All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.
- All hand-delivered or messenger-delivered paper filings for the Commission's Secretary must be delivered to FCC Headquarters at 445 12th St., SW, Room TW-A325, Washington, DC 20554.  The filing hours are 8:00 a.m. to 7:00 p.m.  All hand deliveries must be held together with rubber bands or fasteners.  Any envelopes and boxes must be disposed of before entering the building.
- Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9300 East Hampton Drive, Capitol Heights, MD  20743.
- U.S. Postal Service first-class, Express, and Priority mail must be addressed to 445 12th Street, SW, Washington DC  20554.

People with Disabilities:  To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice), 202-418-0432 (tty).

The proceeding this Notice initiates shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[8]  Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation.  If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum.  Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with rule 1.1206(b).  In proceedings governed by rule 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (*e.g.*, .doc, .xml, .ppt,

---

[8] 47 C.F.R. §§ 1.1200 *et seq.*

searchable .pdf).  Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

**FOR FURTHER INFORMATION CONTACT:**  B. Lynn Follansbee, Consumer and Governmental Affairs Bureau, Federal Communications Commission, (202) 418-1514; lynn.follansbee@fcc.gov.

**-FCC-**