IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

FILED
U.S. District Court
District of Kansas
NOV 02 2015
Clerk, U.S. District Court
By MAW Deputy Clerk

LEON E. LEE
*Plaintiff,*

vs

LOANDEPOT.COM, LLC
*Defendant.*

Case No. 6:14-cv-01084-MLB-KMH

**PLAINTIFF LEON E. LEE'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

Plaintiff Leon E. Lee herein submits his Motion for Summary Judgment and Brief in support of his Motion. Plaintiff brought this consumer protection action under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA" or "Act"), and the Kansas Consumer Protection Act K.S.A. § 50-623 *et. seq.* ("KCPA"). Plaintiff now seeks summary judgment as to his claims under both the TCPA and KCPA.

## I. INTRODUCTION

Defendant loanDepot is in the business of selling loan services to consumers including those in Kansas. loanDepot is a corporation that in large part employs telemarketing as a means to nationally solicit business originating and refinancing mortgage and other types of loans to consumers. On March 13 and 14 of 2013 loanDepot placed a total of 10 calls to Mr. Lee's wireless phone number 316-680-2833 from 949-465-8454. Mr. Lee had not made any inquiry in regard to financing or refinancing of any mortgage with loanDepot or any other person or entity in the previous 10 years and had no interest in any loan services. Mr. Lee had his phone number

for years before receiving the calls at issue in this lawsuit. His number was registered on the National Do Not Call Registry on April 14, 2012 long before he received the calls from loanDepot. In the initial call to Mr. Lee's wireless number loanDepot left a prerecorded message on his voicemail without his express consent that was not for an emergency purpose. Mr. Lee received a second call and when he answered there was no live person on the line. On the third call to his wireless phone from loanDepot Mr. Lee answered and after a several second delay a live person came on the line who began a solicitation to provide loan services. Mr. Lee told the caller they had reached a wrong number. After being told they had reached a wrong number the agent instead of terminating the call continued with the solicitation to sell loan services to Mr. Lee. The call lasted 63 seconds before Mr. Lee finally terminated it because the agent would not listen to him. Two minutes later he received a fourth call from loanDepot. He was again solicited for the sale of loan services by a different agent who came on the call after a delay of a few seconds from the time he answered. He once again informed the caller that they had reached a wrong number. Once again the caller continued with the *solicitation for loan services to Mr. Lee* in spite of having been told previously they had reached a wrong number. That call lasted 33 seconds before Mr. Lee finally terminated it. Over the course of approximately the next 6 minutes Mr. Lee received 5 more back to back calls from loanDepot. He answered each call saying "hello" repeatedly and upon doing so found there was no live person on the line or any automated message being played. Those calls lasted from 14 to 17 seconds each before he terminated them as there was nobody on the line. Most of the calls were received in the presence of 3 persons including Mr. Lee's wife Marilyn and two house guests. The following day Mr. Lee received a tenth call from loanDepot. He again answered the phone and was immediately solicited for loan services by a third different person coming on the line a few seconds after he

answered. He again informed the caller that they had reached a wrong number but as had occurred previously, *the caller continued with the solicitation for loan services to Mr. Lee* and he again terminated the call after 29 seconds. Mr. Lee received 10 unsolicited telemarketing calls from loanDepot to his wireless phone without his express consent. There was no live person on the line or a recorded message played in 6 of the 10 calls he received and answered. Defendant used a prerecorded message on one call clearly indicating use of ATDS equipment with the number calling. After being told by Mr. Lee that they had a wrong number **twice**, additional calls were received in an *accelerated* and abusive manner with no person on the line. loanDepot *could have* stopped the calls to Mr. Lee **if** it had established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations. It was only after having been told 3 times over a period of 2 days by an angry and exasperated Mr. Lee that loanDepot finally discontinued the calls. Mr. Lee has assumed his proper role of Private Attorney General as envisioned by Congress and the Kansas Legislature to bring this action against loanDepot for relief and for damages under both federal and state statutes rather than burdening government agencies to enforce those statutes on his behalf.

## II. UNDISPUTED STATEMENT OF FACTS

1. Defendant placed all calls to Plaintiff set forth in this action using a **predictive dialer.** Defendant clearly states in its Declaration provided by Director of the Contact Center Operations for loanDepot.com, Saeed Ghasemzadeh[1], submitted in support of its motion for stay [Doc. 9-2] that the calls alleged in this action were made to the Plaintiff and were made with a predictive dialer. The Declaration also states "those leads are uploaded into loanDepot's system and then predictively dialed."

[1] Exhibit 1 - Declaration of Saeed Ghasemzadeh

2. Predictive dialers have been determined by the Federal Communications Commission (FCC) **in multiple FCC Rulings, including the most recent July 10, 2015 Omnibus Declaratory Ruling and Order,**[2] to be an automatic telephone dialing system (ATDS).

3. Defendant knows it uses an ATDS and openly states it does so in its operations as evidenced in a screenshot of Defendant's website where it states it uses an automatic telephone dialing system to reach consumers.[3] Defendant also posted on a help wanted website seeking to hire a person *specifically* to maintain its ATDS equipment as further proof of its use of ATDS.[4] More recently Defendant states on October 9, 2015 in its S-1 filing with the Securities and Exchange Commission (SEC) that it uses ATDS equipment to make marketing calls.[5]

4. All calls made by Defendant to Plaintiff's wireless phone were made without consent of any kind having been given or a request made by Plaintiff to be contacted.[6]

5. It is undisputed that the calls made to Plaintiff's wireless number 316-380-2833 were not made for an emergency purpose.[7]

6. All calls to Plaintiff's wireless number were made to market property, goods or services, in that Defendant was calling to sell loan services.[8]

7. It is undisputed that Defendant used a prerecorded message in conjunction with the calls to Plaintiff's wireless phone on at least one occasion.[9]

---

[2] TCPA Omnibus Declaratory Ruling and Order ¶ 10 available at: https://www.fcc.gov/document/tcpa-omnibus-declaratory-ruling-and-order

[3] Exhibit 3 - Screenshot of loanDepot.com webpage

[4] Exhibit 4 - Screenshot of help wanted listing by loanDepot for ATDS maintenance personnel

[5] Exhibit 10 – SEC S-1 filing Pg. 146-147 Found at http://www.sec.gov/Archives/edgar/data/1651502/000119312515340417/d53727ds1.htm

[6] Exhibit 2 ¶ 2 - Plaintiff's Affidavit

[7] Exhibit 2 ¶ 5 - Plaintiff's Affidavit -- Also see Exhibit 5 Pg. 1 - Correspondence from Ryan Stocking loanDepot Corporate Counsel

[8] Exhibit 2 ¶ 5 - Plaintiff's Affidavit - Also see Exhibit 5 Pg. 1 - Correspondence from Ryan Stocking, loanDepot Corporate Counsel

[9] Exhibit 2 ¶ 3 - Plaintiff's Affidavit -- Also see Exhibit 5 Pg. 2-3 - Call records provided to Plaintiff via email by Ryan Stocking loanDepot Corporate Counsel indicating on first call "recording played to machine"

8. Plaintiff's wireless phone number 316-680-2833 has been registered on the National Do Not Call Registry[10] and the Kansas no-call list[11] since April 14, 2012.

9. Defendant ignored Plaintiff's registration on the National Do Not Call Registry and the Kansas no-call List. Defendant procured the alleged lead from LeadPoint at 1:40 P.M. (PST) and began placing calls to Plaintiff's wireless phone immediately at 1:41 P.M. (PST).[12]

10. Defendant was informed by Plaintiff it had reached the wrong number on every call where a live person was eventually on the line beginning with the third call received giving a "negative response" as defined in Kansas Statutes Annotated (K.S.A.) § 50-670(6).[13]

11. Defendant made numerous additional calls after receiving the first negative response from Plaintiff on the third call made March 13, 2013 at 6:05 PM.[14]

12. When Mr. Lee received calls 3 through 9 he was in the presence of his wife Marilyn Lee and guests Terry and Cynthia Owens[15] who witnessed his receipt of the calls from the Defendant.

13. Defendant made more than one unsolicited telemarketing call within a 12 month period to Plaintiff at his phone number 316-680-2833 that was on the National Do Not Call Registry and the Kansas no-call list.[16]

14. Each call made by Defendant to Plaintiff was an "unsolicited consumer telephone call" as defined in K.S.A. § 50-670(3).[17]

15. It is undisputed that Defendant had no prior business relationship with Plaintiff and he had not contacted it for any reason or at any prior time.[18]

---

[10] Exhibit 2 ¶ 11 - Plaintiff's Affidavit -- Also see Exhibit 6 - Copy of email verification of registration on National Do Not Call Registry

[11] K.S.A. § 50-670a(l) "The national no-call list established and maintained by the federal trade commission shall be designated as the Kansas no-call list."

[12] Exhibit 5 Pg. 1 - Correspondence from Ryan Stocking loanDepot Corporate Counsel

[13] Exhibit 2 ¶ 4 - Plaintiff's Affidavit

[14] Exhibit 2 ¶¶ 4, 8 - Plaintiff's Affidavit

[15] Exhibit 7 [Doc. 12] – Affidavits of Terry Owens, Cynthia Owens and Marilyn Lee

[16] Exhibit 2 ¶¶ 1, 11 - Plaintiff's Affidavit

[17] Exhibit 2 ¶ 2 - Plaintiff's Affidavit

16. Any violation of K.S.A. § 50-670 and/or K.S.A. § 50-670a is an unconscionable act or practice under the Kansas Consumer Protection Act[19].

## III. APPLICABLE LAW

The TCPA and Kansas Consumer Protection Act hold parties strictly liable for misuse of regulated autodialing and prerecorded voice technology. In passing the TCPA, Congress acted to "protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile machines and automatic dialers." S.Rep. No. 102-178, at 1 (1991) as reprinted in 1991 U.S.C.C.A.N. 1968. As the Ninth Circuit explained in *Satterfield vs Simon & Schuster,* infra

> The TCPA was enacted in response to an increasing number of consumer complaints arising from the increased number of telemarketing calls. The consumers complained that such calls are a "nuisance and an invasion of privacy." The purpose and history of the TCPA indicate that Congress was trying to prohibit the use of ATDS's to communicate with consumers by telephone in a manner that would be an invasion of privacy. We hold that a voice message or a text message are not distinguishable in terms of being an invasion of privacy.

*Satterfield vs Simon & Schuster* 569 F.3d 946, 954 (9th Cir. 2009)(citations omitted).

Specifically the TCPA prohibits the use of an autodialer or prerecorded voice in a call to a cellular telephone unless the caller has obtained the "express consent" of the called party beforehand:

> (1) it shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States-
>
> (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice-

[18] Exhibit 2 ¶ 12 - Plaintiff's Affidavit
[19] K.S.A. § 50-670(g), K.S.A. § 50-670a(g) respectively

(iii) to any telephone number assigned to a paging service, cellular phone service,
specialized mobile radio service, or other radio common carrier service, or any service
for which the called party is charged for the call. 47 U.S.C. § 227(b)(1)(A)(iii).

In order to advance a valid claim, the plaintiff must show (1) a call was placed to a cell or
wireless telephone, (2) by the use of an automatic dialing system and/or leaving an artificial or
prerecorded message, and without prior consent of the recipient. *Pugliese vs Professional
Recovery Services, Inc.*, 2010 WL 2632562 (E. D. Mich., 2010) (Edmunds). The TCPA
prohibits making "any call (other than a call made for emergency purposes or made with the
prior express consent of the called party) using any automatic telephone dialing system or an
artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone
service." 47 U.S.C. § 227(b)(1)(A)(iii). "The TCPA is essentially a strict liability statute" that
"does not require any intent for liability except when awarding treble damages." *Alea London
Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 776 (11th Cir. 2011).

The TCPA specifically provides a private right of action based on violations of subsection
(b), or the regulations prescribed under that subsection, to recover either the actual monetary
loss from such violations or statutory damages of $500 for each violation, whichever is greater.
47 U.S.C. § 227(b)(3) Courts may treble the amount of damages awarded if the court finds that
the defendant's violations were committed "willfully or knowingly". *Id.*

(2) Private right of action

A person or entity may, if otherwise permitted by the laws or rules of a court of a
state, bring in an appropriate court of that state—
   (A) an action based on a violation of this subsection or the regulations prescribed
       under this subsection to enjoin such violations,
   (B) an action to recover for actual monetary loss from such violation, or to receive
       $500 in damages for each violation, whichever is greater, or
   (C) both such actions.
If the court finds that the defendant willfully or knowingly violated this subsection or the
regulations prescribed under this subsection, the court may, in its discretion, increase the
amount of the award to an amount equal to not more than three times the amount available
under paragraph (B) of this paragraph.

47 U.S.C. § 227 (b)(3). See also *Charvat vs NMP, LLC*,--- F.3d---, 2011 WL 3805618 (6th Cir. 2011).

The TCPA also specifically provides a private right of action based on violations of subsection (c), of the regulations prescribed under that subsection, to recover either the actual monetary loss from such violations or statutory damages of up to $500 for each violation, whichever is greater. 47 U.S.C. § 227(c)(5) Courts may treble the amount of damages awarded if the court finds that the defendant's violations were committed "willfully or knowingly". *Id*

> (5) Private right of action
> A person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may, if otherwise permitted by the laws or rules of court of a State bring in an appropriate court of that State—
> (A) an action based on a violation of the regulations prescribed under this subsection to enjoin such violation,
> (B) an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater, or
> (C) both such actions.
> It shall be an affirmative defense in any action brought under this paragraph that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection. If the court finds that the defendant willfully or knowingly violated the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

47 U.S.C. § 227(c)(5).

The Kansas Consumer Protection Act (KCPA) K.S.A. § 60-623 *et seq.* provides protection for consumers from unconscionable acts and practices among other things. The KCPA reflects the Legislature's recognition of the "merit of encouraging consumers to pursue their rights" to enforce the act. *Alexander v. Certified Master Builders Corp.*, 268 Kan. 812, 822 (2000); Kansas Comment to K.S.A. § 50-636 ("The purpose of this provision is to encourage enforcement of the act by a consumer acting as his own 'private attorney general.'"). In

*Alexander*, the Kansas Supreme Court explained that private lawsuits serve not only to redress an individual consumer's damages, but also to stop deceptive acts and practices by suppliers. *Id.* at 823.

The Court further explained the importance of civil penalties as a tool for restitution and deterrence. Sometimes, the consumer suffers damages which may be difficult to quantify monetarily, as when an elderly consumer is harassed by incessant, deceptive and/or threatening calls from an aggressive debt collector. In other circumstances, the amount of actual damages that might be proven would be insufficient to completely compensate the consumer for the burdens suffered or the inconvenience of prosecuting the lawsuit to enforce the Act. To remedy these situations, the KCPA provides for a civil penalty as an alternative to actual damages. In that regard, the Legislature allowed a consumer aggrieved under the KCPA to recover either damages or a civil penalty, whichever is greater.

Over the past 41 years, the Legislature has repeatedly and consistently found it necessary to broaden the reach of the KCPA and to enhance the protection it affords to Kansas consumers such as Mr. Lee who is a lifelong resident of Kansas. For example, when the KCPA was first enacted, a district court could award a consumer up to $2,000 as a civil penalty where a violation was established. **To deter misconduct, the Legislature strengthened the Act by increasing the maximum penalty to $5,000 in 1991, and to $10,000 in 2001**. <u>The Legislature has also amended the Act on several occasions to make it possible for consumers to enforce it regardless that they have not suffered a distinct monetary loss</u>. For example, in 1974, K.S.A 50-634(b) was amended to confirm that a consumer aggrieved by a violation of the Act may sue to enforce it whether or not he or she has suffered a monetary loss. The claims brought in the instant lawsuit are based in part on the Kansas No-Call Act which is similar in many respects to the TCPA.

K.S.A. §§ 50-670 and 50-670a comprise the relevant parts of the KCPA where violations are

alleged by Mr. Lee.

50-670. Kansas no-call act; definitions; requirements and prohibitions; remedies. (a) As used in this section and K.S.A. 50-670a, and amendments thereto:

(1)    "Consumer telephone call" means a call made by a telephone solicitor to the residence or mobile telephone number of a consumer for the purpose of soliciting a sale of any property or services to the person called, or for the purpose of soliciting an extension of credit for property or services to the person called, or for the purpose of obtaining information that will or may be used for the direct solicitation of a sale of property or services to the person called or an extension of credit for such purposes.

(2)    "Mobile telephone number" means a telephone number associated with a wireless telecommunications service as defined in K.S.A. 2014 Supp. 12-5363, and amendments thereto.

(3)    "Unsolicited consumer telephone call" means a consumer telephone call other than a call made:

(A)    In response to an express request or with the express written agreement of the person called;

(B)    primarily in connection with an existing debt or contract, payment or performance of which has not been completed at the time of such call; or

(C)    to any person with whom the telephone solicitor or the telephone solicitor's predecessor in interest has an established business relationship, unless the consumer has objected to such consumer telephone calls and requested that the telephone solicitor cease making consumer telephone calls. The telephone solicitor shall honor any such request for five years from the date of such request.

(4)    "Telephone solicitor" means any natural person, firm, organization, partnership, association or corporation who makes or causes to be made a consumer telephone call, including, but not limited to, calls made by use of automatic dialing-announcing device.

(5)    "Automatic dialing-announcing device" means any user terminal equipment which:

(A)    When connected to a telephone line can dial, with or without manual assistance, telephone numbers which have been stored or programmed in the device or are produced or selected by a random or sequential number generator; or

(B)    when connected to a telephone line can disseminate a recorded message to the telephone number called, either with or without manual assistance.

(6)    "Negative response" means a statement from a consumer indicating the consumer does not wish to listen to the sales presentation or participate in the solicitation presented in the consumer telephone call.

(7)    "Established business relationship" means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and consumer with or without an exchange of consideration, on a basis of an application, purchase or transaction by the consumer, within the 18 months immediately preceding the date of the consumer telephone call, regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party.

(b)    Any telephone solicitor who makes an unsolicited consumer telephone call shall:

(1)    Identify themselves;

(2)   identify the business on whose behalf such person is soliciting;

(3)   identify the purpose of the call immediately upon making contact by telephone with the person who is the object of the telephone solicitation;

(4)   promptly discontinue the solicitation if the person being solicited gives a negative response at any time during the consumer telephone call;

(5)   hang up the phone, or in the case of an automatic dialing-announcing device operator, disconnect the automatic dialing-announcing device from the telephone line within 25 seconds of the termination of the call by the person being called; and

(6)   a live operator or an automated dialing-announcing device shall answer the line within five seconds of the beginning of the call. If answered by automated dialing-announcing device, the message provided shall include only the information required in subsection (b)(1) and (2), but shall not contain any unsolicited advertisement.

(c)   A telephone solicitor shall not withhold the display of the telephone solicitor's telephone number from a caller identification service when that number is being used for telemarketing purposes.

(d)   A telephone solicitor shall not transmit any written information by facsimile machine or computer to a consumer after the consumer requests orally or in writing that such transmissions cease.

(e)   A telephone solicitor shall not obtain by use of any professional delivery, courier or other pickup service receipt or possession of a consumer's payment unless the goods are delivered with the opportunity to inspect before any payment is collected.

(f)   Local exchange carriers and telecommunications carriers shall not be responsible for the enforcement of the provisions of this section.

(g)   Any violation of this section is an unconscionable act or practice under the Kansas consumer protection act.

(h)   This section shall be part of and supplemental to the Kansas consumer protection act.

K.S.A. 50-670

50-670a.   Same; no-call list; prohibitions; remedies; attorney general, powers and duties. (a) Prior to making unsolicited consumer telephone calls in this state and not less frequently than every 30 days thereafter, a telephone solicitor shall consult the no-call list provided for by this act, and shall delete from such telephone solicitor's calling list all telephone numbers of consumers appearing on such list. The attorney general shall direct consumers desiring to register their telephone number on the no-call list to contact the federal trade commission to register on the national no-call list.

(b)   Telephone solicitors shall have a period of not more than 30 days from the time of registration of a consumer's telephone number on the no-call list to remove that telephone number from the telephone solicitor's calling lists.

(c)   No telephone solicitor may make or cause to be made any unsolicited consumer telephone calls to any consumer if the consumer's telephone number or numbers appear on the no-call list. A telephone solicitor shall not use the no-call list for any other purpose than to remove consumers' telephone numbers from calling lists.

(d)   A telephone solicitor shall be liable for violations of subsections (b) and (c) if such telephone solicitor makes or causes to be made an unsolicited telephone call to a

consumer whose telephone number appears on the no-call list or uses the list for any unauthorized purpose.

(e)  It shall be an affirmative defense to a violation of this section if the telephone solicitor can demonstrate, by clear and convincing evidence, that: (1) The telephone solicitor at the time of the alleged violation had: (A) Obtained a copy of the updated no-call list; (B) established and implemented, with due care, reasonable practices and procedures to effectively prevent unsolicited consumer telephone calls in violation of this section; (C) trained the telephone solicitor's personnel in the requirements of this section; and (D) maintained records demonstrating compliance with this section; and (2) the unsolicited consumer telephone call was the result of an error. Such defense shall not be exercised by a telephone solicitor more than once within the state of Kansas in any 12-month period. A telephone solicitor shall be deemed to have exercised such defense if asserted in response to any consumer complaint about a violation of this section, regardless of whether litigation has been initiated.

(f)  It shall be an affirmative defense to a violation of this section if the telephone solicitor can demonstrate by clear and convincing evidence that: (1) The consumer affirmatively listed or held out to the public such consumer's residential or mobile telephone number as a business number; (2) the telephone solicitor had knowledge of and relied upon such consumer's actions as provided in subsection (f)(1) at the time of the telephone solicitor's alleged violation; and (3) the purpose of the call was directly related to the consumer's business.

(g)  Any violation of this section is an unconscionable act or practice under the Kansas consumer protection act.

(h)  The attorney general may request information from the federal trade commission for the purpose of enforcing the provisions of this section and may comply with requirements of the federal trade commission to receive such information.

(i)  Penalties and fees recovered from prosecutions of violations of this section shall be paid to the attorney general to investigate and prosecute violations of this section.

(j)  The attorney general may convene a meeting or meetings with consumer advocacy groups to collectively develop a method or methods to notify the consumer advocacy group's membership and educate and promote to consumers generally the availability of the no-call list, and of a telephone solicitor's obligations under this section.

(k)  On or before the first day of each regular legislative session, the attorney general shall report to the standing committees of the house and senate which hear and act on legislation relating to telecommunications issues on the status of implementation of the provisions of this section, including, but not limited to, the number of consumers who have given notice of objection, the number of requests for the data base, state revenues received from the respective sources of revenue under this section, the number of complaints received alleging violations of this section and actions taken to enforce the provisions of this section.

(l)  The national no-call list established and maintained by the federal trade commission shall be designated as the Kansas no-call list.

(m)  The attorney general may promulgate rules and regulations to carry out the provisions of the Kansas no-call act. The attorney general is authorized to promulgate state rules and regulations adopting provisions of federal trade commission regulations implementing the national do not call law, including, but not limited to, the telemarketing

> sales rule, 16 C.F.R. part 310. Any violation of rules and regulations promulgated pursuant to this section shall be considered a violation of this section.
> (n) The provisions of this section shall be a part of and supplemental to the Kansas consumer protection act.
> (o) The provisions of this section and K.S.A. 50-670, and amendments thereto, shall be known and may be cited as the Kansas no-call act.

K.S.A. 50-670a

## **Summary Judgment Standard**

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[20] For the purpose of reviewing a summary judgment motion, a factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."[21] A "genuine" issue of fact exists where "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[22] The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.[23] To meet this standard, the moving party does not need to negate the claims of the non-movant; instead, the moving party can simply point out the absence of evidence for the non-moving party on an essential element of that party's claim.[24] Once the moving party satisfies this initial burden in a properly supported motion, the burden shifts to the non-moving party to show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."[25] The non-moving party may not rest on mere allegations or denials in its response in opposition to summary judgment,

---

[20] Fed. R. Civ. P. 56(c).
[21] *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986)
[22] *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)
[23] *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). *See also Doebele v. Sprint Corp.*, 157 F. Supp. 2d 1191, 1195 (D. Kan. 2001); and *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991).
[24] *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).
[25] *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.* 912 F.2d 1238, 1241 (10th Cir. 1990).

but "must set forth specific facts showing that there is a genuine issue for trial."[26] Therefore, the mere existence of some alleged factual dispute between the parties will not defeat a properly supported motion for summary judgment.[27] The court must consider the record in the light most favorable to the non-moving party.[28] However, in a response to a motion for summary judgment, "a non-moving party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment on the mere hope that something will turn up at trial."[29] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant."[30] To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[31] Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[32] The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts or speculation.[33] Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[34]

---

[26] *Liberty Lobby*, 477 U.S. at 256

[27] *Id.*

[28] *See Doebele*, 157 F. Supp. 2d at 1195. *See also Deepwater Invs. Ltd. V. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir. 1991)

[29] *Zapata v. IBM, Inc.*, 1998 U.S. Dist. LEXIS 21702 *17 (D. Kan. September 29, 1998)(citing *Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir. 1988).

[30] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

[31] *Adams*, 233 F.3d at 1246.

[32] Fed. R. Civ. P. 56(c)(4).

[33] *Argo v. Blue Cross & Blue Shield of Kan., Inc.* 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[34] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)(quoting Fed. R. Civ. P. 1)

## IV. ARGUMENT

**A. loanDepot Used a "Predictive Dialer" (an ATDS) to Place All 10 Calls to Mr. Lee's Wireless Phone Number 316-680-2833** - loanDepot admits it placed all 10 calls to Mr. Lee's wireless phone number in a span of 2 days from March 13, 2013 to March 14, 2013, using its "Predictive Dialer."[35] The Defendant makes no argument and has no evidence that it was not Mr. Lee's wireless phone number that it called on March 13 and 14, 2013. One very revealing statement loanDepot makes in regard to its use of a predictive dialer is in Mr. Ghasemzadeh's Declaration wherein it states "The telephone system used by loanDepot to call the number allegedly owned by the Plaintiff is a 'predictive dialer,' in that the dialing system is premised off leads obtained from online applications and then those leads are uploaded into loanDepot's system and then predictively dialed. It only dials numbers that are programmed into it from loanDepot's database; it does not randomly dial numbers."[36] There is conspicuously no mention of the numbers being scrubbed for cell phones or a screen being conducted as to whether a number is on the National Do Not Call Registry or any state no-call List.

The Defendant readily admits that 316-680-2833 (Mr. Lee's number) was intentionally "uploaded" and "programmed" into loanDepot's "**database**" where it was **stored** to place calls. Its admission to doing so shows that the equipment used by loanDepot to call Mr. Lee had the **capacity to store** a list of numbers to be called including Mr. Lee's number. The Declaration of Saeed Ghasemzadeh unambiguously states that the equipment used to call Mr. Lee made calls to him from a list of numbers that was purposely uploaded and programmed into, and **stored** in, loanDepot's **database** for use with its predictive dialer. The Defendant's only defense regarding its predictive dialer not being an ATDS is that the calls were not dialed randomly or

[35] Exhibit 1 ¶ 2 - Declaration of Saeed Ghasemzadeh – Also see Exhibit 5 – Email correspondence and attached call records provided by Ryan Stocking loanDepot Corporate Counsel

[36] Exhibit 1 ¶ 2 Declaration of Saeed Ghasemzadeh

sequentially[37] but were dialed from a list of numbers programmed into a **database**. That defense is shown to be fatally flawed when one simply looks at the law.

The FCC issued its TCPA Omnibus Declaratory Ruling and Order on July 10, 2015[38] wherein it stated in paragraph 10 regarding autodialers:

> We **reaffirm our previous statements** that dialing equipment generally has the **capacity to store** or produce, and dial random or sequential numbers (and thus meets the TCPA's definition of "autodialer") even if it is not presently used for that purpose, **including when the caller is calling a set list of consumers**. We also reiterate that predictive dialers, as previously described by the Commission, FN 39[39] satisfy the TCPA's definition of "autodialer" for the same reason. We also find that callers cannot avoid obtaining consent by dividing ownership of pieces of dialing equipment that work in concert among multiple entities. (emphasis added)

The Commission went on to further state in paragraph 12:

> The TCPA defines "automatic telephone dialing system" as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." In the *2003 TCPA Order*, the Commission found that, in order to be considered an "automatic telephone dialing system," the "equipment need only have the '***capacity to store*** or produce telephone numbers.'" FN 47[40] **The Commission stated that, even when dialing a fixed set of numbers, equipment may nevertheless meet the autodialer definition**. FN 48[41] (emphasis added)

---

[37] Exhibit 1 ¶¶ 2-3 - Declaration of Saeed Ghasemzadeh

[38] https://www.fcc.gov/document/tcpa-omnibus-declaratory-ruling-and-order

[39] In its 2003 Declaratory Ruling, the Commission mentioned certain characteristics that, it was argued, removed equipment having those characteristics from the scope of the statutory autodialer definition. The Commission described a predictive dialer as "equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, **has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers**." *2003 TCPA Order*, 18 FCC Rcd at 14091, para. 131. The Commission also noted that the "principal feature of predictive dialing software is a timing function, not number storage or generation." *Id.* After discussing the TCPA's definition of "autodialer" and Congress' intent in creating the TCPA, **the Commission found that "a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress.**" *Id.* at 14091-92, paras. 132-33. The Commission's finding that predictive dialers fall within the statutory autodialer definition thus **focuses on whether equipment has the requisite "capacity,"** and therefore is not limited to any specific piece of equipment and is without regard to the name given the equipment for marketing purposes. (emphasis added)

[40] *2003 TCPA Order*, 18 FCC Rcd at 14092, para. 132 (emphasis in original).

[41] *Id.* at para. 133.

The FCC made it crystal clear in its 2015 TCPA Omnibus Declaratory Ruling and Order that its finding that a predictive dialer is an ATDS is still the same as it has been for the last 12 years and there is nothing new under the sun in that respect.

In addition K.S.A. § 50-670 states in part regarding telephone solicitors and the use of autodialers:

> (4) "Telephone solicitor" means any natural person, firm, organization, partnership, association or corporation who makes or causes to be made a consumer telephone call, including, but not limited to, calls made by use of automatic dialing-announcing device.
> (5) "Automatic dialing-announcing device" means any user terminal equipment which:
> (A) When connected to a telephone line can dial, with or without manual assistance, telephone numbers which have been **stored or programmed** in the device **or** are produced or selected by a random or sequential number generator (emphasis added)

**B. Defendant Did Not Have Plaintiff's Express Consent to Call His Wireless Phone** – The Defendant does not argue that it had Mr. Lee's express written consent to call his wireless phone number. Defendant states in the letter to Mr. Lee[42] that loanDepot was allegedly trying to reach someone named Alan Borton so there is no violation as he was the "intended recipient." The Third Circuit just clarified on October 14, 2015 and in doing so cited the FCC's TCPA Omnibus Declaratory Ruling and Order on whether "intended recipient" is the same as the "called party," ruling it is not. Its opinion along with the Ruling of the FCC shows there is no basis in law for the defense proffered by loanDepot. It succinctly clarified this issue in a precedential decision in *Leyse v Bank of America N.A.*[43] where it stated in part:

> There are good reasons to doubt the equation of "intended recipient" with "called party".... In its finding in support of the Act, Congress appears to equate the "called Party" with the "receiving party." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(12), 105 Stat. 2394 (note following 47 U.S.C. § 227). Subsection

[42] Exhibit 5 - Email Correspondence from Ryan Stocking loanDepot Corporate Counsel

[43] *Mark Leyse, et al. v. Bank of America National Association*, No. 14-4073, 3rd Cir.; 2015 U.S. App. LEXIS 17840)

> 227(b)(1) by itself suggests that the "called party" is the actual "recipient." 47 U.S.C. § 227(b)(1). Indeed, we referred to it as the "recipient" in another case construing the act. *See Gager*, 727 F.3d at 269. The Seventh and Eleventh Circuits have concluded from the act's text and structure that the term "called party" refers to "the person subscribing to the called number at the time the call is made," rather than the intended recipient of the call. *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 643 (7th Cir. 2012); *see also Osorio*, 746 F.3d at 1251-52. Their reasoning also suggests, however, that the "person who answers the call" may qualify as well. *Soppet*, 679 F.3d at 640. Perhaps most significantly, however, the FCC recently issued a declaratory ruling defining "called party" as the "the subscriber, *i.e.,* the consumer assigned the telephone number dialed and billed for the call, or the non-subscriber customary user of a telephone number included in a family or business calling plan." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act. Of 1991*, CG Docket No. 02-278, WC Docket No. 07-135, FCC 15-72, 2015 WL 4387780, at *26 ¶ 73 (F.C.C. July 10, 2015) (Declaratory Ruling and Order); *see also id.* at *26-27 ¶¶ 72-77, *28 ¶ 78 (rejecting "proposals that we interpret 'called party' to be the 'intended recipient' or 'intended called party'").

Defendant also inexplicably states in its letter from Ryan Stocking that loanDepot has no control over having called a wrong number (Mr. Lee's) 10 times. Mr. Stocking's statement belies the fact that the Defendant failed to implement with due care reasonable practices and procedures to effectively prevent solicitations in violation of the regulations. **If** Defendant had done so it possibly could have been a viable affirmative defense but in this case when looking at the totality of the facts on the record such a defense has no merit whatsoever. Also very telling is where loanDepot states that the "lead" was received from Leadpoint which is not a lead generator specific to loanDepot. It is a company that brings buyers and sellers of leads together in an auction type process.[44] It is obvious that a lead that loanDepot would have received through Leadpoint from a seller would have been up for **auction to any number of potential buyers** and not have **name specific** express consent given to any person/entity such as loanDepot. loanDepot would not have the "express written consent" of the alleged target to be contacted by it. The target would not in any way know who that lead might be sold to so it could give that **name specific** express written consent. The target could not have given anything other than

[44] Exhibit 11 – Screenshot of Leadpoint webpage - Available at http://www.leadpoint.com/marketplaceA.php

general consent to be contacted. Any number of potential buyers could purchase the lead information through Leadpoint and then call the target which is hardly giving express written consent to a specific entity or person to call. Mr. Lee did in fact receive a substantial number of calls from other companies offering loan services just like loanDepot was offering very near the same time as he received the loanDepot calls. He had not given any of them express written consent to call him either. Black's Law Dictionary 6th Ed. defines *express* as "Clear; definite; explicit; plain; direct; unmistakable; not dubious or ambiguous." Express written consent is just that, "express" meaning it is **name specific** as to *exactly* who may call the person giving consent as explained in the third question and the answer given by a Federal Trade Commission (FTC) attorney on the FTC business blog.[45] Any such blanket consent rather than ***actual*** express written consent would negate the Do Not Call Registry intent and protections if it was recognized by the court as a legitimate defense. If the court were to recognize the defense "it was an error because we *intended* to call someone else" it would open a loophole in the entire Do Not Call process and protections as big as the state of Kansas. Every telemarketer or other caller that found itself facing claims for call violations could then simply plead that defense and escape liability which is nonsensical.

**C. Plaintiff Did Not Have a Prior or Established Business Relationship with Defendant** – The Defendant does not argue that it had any prior or established business relationship with Plaintiff. In fact, Mr. Lee did not even know of the existence of loanDepot before he received the calls to his wireless phone from it and investigated the source of the calls.[46] There is no evidence on the record to the contrary.

---

[45] Exhibit 12 - Available at - https://www.ftc.gov/news-events/blogs/business-blog/2015/04/questionable-calls
[46] Exhibit 2 ¶ 12 – Plaintiff's Affidavit

**D. Defendant Made More than One Unsolicited Telemarketing Call within a 12 Month Period to Plaintiff's Telephone Number Which was on the National Do Not Call Registry and the Kansas no-call list** - Defendant admits it made the 10 calls at issue in the instant lawsuit to Mr. Lee's wireless phone number 316-680-2833. It provided call records to Plaintiff via email sent by Ryan Stocking loanDepot Corporate Counsel showing the precise date, time and manner in which the calls were made to Mr. Lee[47] and the information provided comports 100% with Mr. Lee's records and allegations of the calls received. The Declaration of Saeed Ghasemzadeh again confirms that the calls were made to Mr. Lee's wireless phone number.[48] Defendant also admits that its intended purpose of the calls was to sell loan services.[49] Mr. Lee states in his affidavit that he never gave his consent to be called or provided any invitation for loanDepot to call him for any purpose including the sale of loan services in the past 10 years.[50]

**E. Defendant Made Numerous Calls to Plaintiff's Wireless Phone after Receiving a Negative Response from Plaintiff Stating Defendant had the Wrong Number** – Plaintiff told the live agents that he was able to speak with on calls received from the Defendant (calls 3, 4 and 10) that they had a wrong number[51] and in so doing gave a negative response to the call as defined in K.S.A. § 50-670(6).[52] In each case the caller was a different agent and ignored Mr. Lee's statements and aggressively continued the solicitation in violation of K.S.A. § 50-670(7)(b)(4) so he terminated the call.[53] The call records provided by loanDepot clearly support Mr. Lee's statements in that the calls where Mr. Lee answered and was able to speak with a live

---

[47] Exhibit 5 Pgs 2-3 – Call records from Ryan Stocking loanDepot Corporate Counsel
[48] Exhibit 2 – Declaration of Saeed Ghasemzadeh
[49] Exhibit 5 – Email Correspondence from Ryan Stocking loanDepot Corporate Counsel
[50] Exhibit 2 ¶ 7 – Plaintiff's Affidavit
[51] Exhibit 2 ¶ 4 – Plaintiff's Affidavit
[52] K.S.A. § 50-670(6) "Negative response" means a statement from a consumer indicating the consumer does not wish to listen to the sales presentation or participate in the solicitation presented in the consumer telephone call.
[53] Exhibit 2 ¶ 4 – Plaintiff's Affidavit

agent (3,4, and 10) were longer (29 to 63 seconds) because the agent continued the solicitation. Those calls where he answered and there was no person on the line only lasted 13 to 17 seconds as shown by loanDepot's own records. There is no evidence on the record to the contrary.

**F. Defendant Used a Prerecorded Message with the Calls to Plaintiff's Wireless Phone on at Least One Occasion** – The first call made by the Defendant to Mr. Lee's wireless phone was not answered by him and a prerecorded voicemail message was left.[54] This is confirmed by the call records provided via email to Mr. Lee by Ryan Stocking loanDepot Corporate Counsel where it states in the "finishcode" column "Recording played to Machine" with the call lasting 85 seconds.[55] There is no evidence on the record which disputes a prerecorded message was left on the first call made to Mr. Lee's wireless number. There is no issue of material fact as to whether there was a prerecorded message used on at least one occasion in calls made by the Defendant to Mr. Lee in violation of 47 U.S.C. § 227(b)(A)(iii).

**G. All Calls to Plaintiff Were Made to Market Property, Goods or Services** – Defendant is in the business of marketing mortgage and other loans to consumers.[56] Defendant states in the email correspondence received by Mr. Lee in response to his notice of intent to sue that all calls were made for the purpose of marketing a mortgage loan to the recipient. On the three occasions when Mr. Lee answered calls and was able to speak with a live person he was immediately solicited for loan services and after informing the agents that they had the wrong number the solicitations continued unabated until he terminated the calls. Mr. Lee has made no inquiries or requests for information to anyone regarding a mortgage loan in the last 10 years as his home is paid for and he is not interested in purchasing any further property.[57] There is no evidence in the

[54] Exhibit 2 ¶ 3 – Plaintiff's Affidavit
[55] Exhibit 5 Pg. 2 – Email correspondence from Ryan Stocking loanDepot Corporate Counsel
[56] Exhibit 5 – Email correspondence from Ryan Stocking loanDepot Corporate Counsel
[57] Exhibit 2 ¶ 7 –Plaintiff's Affidavit

record to the contrary. All calls made to Plaintiff by Defendant were "consumer telephone calls" as defined in K.S.A. § 50-670(1) and Mr. Lee is a consumer as defined in K.S.A. 50-624(b) and has lived in Kansas his entire life of 60 years.

**H. Defendant Did Not Implement Reasonable and Effective Practices and Procedures to Effectively Prevent Unsolicited Consumer Phone Calls in Violation of the Regulations –**

Defendant has not demonstrated in any form or provided any evidence that it took due care to implement effective practices and procedures to prevent unsolicited calls and in fact states in its very recent S-1 filing "We use automatic telephone dialing equipment to place marketing calls and ***generally rely on third party lead generators to obtain appropriate consent*** from the called parties."[58] loanDepot obviously delegates **its** responsibility to implement effective practices and procedures to avoid making unsolicited calls to lead generators and possibly others which is anything but taking due care in implementing practices and procedures on its own as required by the TCPA and KCPA to have an affirmative defense to unsolicited calls. Black's Law Dictionary 6th Ed. defines due care as:

"Just, proper, and sufficient care, so far as the circumstances demand; the absence of negligence. That degree of care that a reasonable person can be expected to exercise to avoid harm reasonably foreseeable if such care is not taken. That care which an ordinarily prudent person would have exercised under the same or similar circumstances. 'Due care' is care proportioned to any given situation, its surroundings, peculiarities, and hazards. It may and often does require extraordinary care." (emphasis added)

One other fact that takes away any notion of a defense that it was just a single agent who did not follow alleged established practices and procedures is that on every occasion that Mr. Lee spoke with someone it was a **different agent** (according to loanDepot's own call records – spender, kkiekenapp, and lleconte).[59] After telling each agent they had the wrong number, they ignored

[58] Exhibit10 Pg. 147 ¶ 2 S-1 Filing with SEC Available at http://www.sec.gov/Archives/edgar/data/1651502/000119312515340417/d53727ds1.htm
[59] Exhibit 5 Pgs 2-3 – Call records from Ryan Stocking loanDepot Corporate Counsel

his statements and aggressively continued to solicit business from him until he terminated the calls. The first two agents failed to take any action to remove the number from the calling list once apprised of the error which is prima facie evidence that there was no established and effective practice or procedure to avoid making unsolicited calls in violation of both state and federal law.

There is no bona-fide error defense available under the TCPA for errors that cause violations of the statute. The TCPA has been interpreted to be a strict liability statute. *CE Design Ltd. v. Prism Business Media, Inc.*, Civ. No. 07-5838, 2009 WL 2496568, at *3 (N.D. Ill. 2009) ("The TCPA is a *strict liability* statute, but the court has discretion to award treble damages for a willful or knowing violation of 47 U.S.C. 227(b)") (emphasis added); *see also Penzer v. Transportation Ins. Co.*, 545 F.3d 1303, 1311 (11th Cir. 2008) (holding that liability under the TCPA does not require intent, except as to treble damages) (citing cases). Moreover, the "$500 figure is a mandatory fixed sum" for each unlawful telephone call. *See Fillichio v. M.R.S. Assoc., Inc.*, Civ. No. 09-61629, 2010 WL 4261442, at *5 (S.D. Fla. Oct. 19, 2010) (granting summary judgment to consumer plaintiff against debt collector on TCPA claim involving 157 unlawful calls) (citing cases). The TCPA is a strict liability statute. *Park Univ. Enters., Inc. v. American Cas. Co.*, 314 F. Supp. 2d 1094 (D. Kansas 2004). There is no evidence on the record that shows that Mr. Lee ever gave consent to call *his* phone number to loanDepot. It is clear that Mr. Lee informed the Defendant in all calls that he received when he was able to speak with a live agent that they were calling a wrong number.[60] In spite of the Defendant being given the wrong number information **twice** early on, the calls not only continued but instead **accelerated in frequency** occurring with machine gun style rapidity at a

[60] Exhibit 2 ¶ 4 – Plaintiff's Affidavit

call a minute with no live person on the line when Mr. Lee repeatedly answered.[61] The 6

unsolicited calls that lasted from 13 to 17 seconds (according to loanDepot's own records) where

Mr. Lee answered and no live operator came on the call and no message was played were

violations of K.S.A. § 50-670(7)(b)(6) which states in part "a live operator or an automated

dialing-announcing device shall answer the line within five seconds of the beginning of the call."

There are virtually NO practices and procedures implemented by the Defendant so that when an

error is discovered it is immediately rectified and not repeated unlike the case with Mr. Lee when

violations were repetitive, aggravating and inexcusable.

**I. Mr. Lee's Experiences With loanDepot are Not an Isolated Incident** – There are a number

of public message boards such as 800notes.com, Whocallsme.com and others where a plethora of

complaints have been posted about unsolicited, abusive and repetitive calls being received from

loanDepot by numerous individuals[62] similar to those received by Mr. Lee. The Court should

take note of the dates of the various postings in Exhibit 13 where the complaints range from

2010 to as recent as mid October 2015. This is an obvious indication that loanDepot has not

implemented or improved any effective practices and procedures to avoid making unsolicited

calls from day one. Given that usually a small percentage of people unhappy with something

will take the initiative to find and post on public complaint boards about it, one can easily see

from the sheer number of postings on just a few pages of Exhibit 13 there must be a horrendous

number of people being adversely affected by its violative calling tactics. It is painfully obvious

from the complaints with great similarity to Mr. Lee's that loanDepot has NO effective practices

or procedures to prevent violation of consumer's rights or violations of the law. It very much

appears like their calling practices, procedures and tactics are like something straight out of the

---

[61] Exhibit 2 ¶ 8 – Plaintiff's Affidavit – Also see Exhibit 7 – Affidavits of Terry and Cynthia Owens and
Marilyn Lee
[62] Exhibit 13 – Postings from public complaint boards on loanDepot calls

old Wild Wild West. There is also a lawsuit in Florida against loanDepot with allegations eerily similar to those made by Mr. Lee. The plaintiff was undergoing a serious medical procedure and received numerous calls within a short period of time with the frequency increasing after loanDepot was told to stop calling. As was the case with Mr. Lee, no live person was on the line in those rapid fire calls.[63] For loanDepot to even attempt to raise the defense that it has effective practices and procedures in place to prevent unsolicited calls would be ludicrous at best given the evidence before the Court.

**Plaintiff Should Be Awarded Treble Damages Under the TCPA and Maximum Penalties Under the KCPA Because of the Egregious Nature of the Violations**

"If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, at its discretion, increase the amount of the award to an amount equal to no more than 3 times the amount available under subparagraph (B) of this paragraph.": 47 U.S.C. § 227(b)(3). The same exact language is found in 47 U.S.C. § 227(c)(5). The term willful within the TCPA "when used with reference to the commission or omission of any act, means the conscious and deliberate commission or omission of such act, irrespective of any intent to violate any provision of this chapter or any rule or regulation of the Commission authorized by this chapter or by a treaty ratified by the United States." 47 U.S.C. § 312(f)(1).[64] This court can and should make the inference, based on the

[63] Exhibit 9 ¶¶ 24-34 - Florida class action complaint Doc. 1 (6:15-cv-00336-CEM-KRS (M.D. Fla.))

[64] Courts construing the TCPA have applied this definition of "willful" found later within Chapter 5, Title 47, of the federal communications acts, relating to wire and radio communications, since the definition indicates that it applies to "any provision *of this chapter* or any rule or regulation of the Commission authorized *by this chapter*."*Sengenberger v. Credit Control Services, Inc.*, Civ. No. 09-2796, 2010 WL 1791270, at *6 (N.D. Ill. May 5, 2010) (awarding treble damages for willul violations); *see also Pricom Asphalt Sealcoating, Inc. v. Furnas*, Civ. No. 08-2854, 2009 WL 1655031, at *1 (Ohio App. 11th Dist. June 12, 2009); *A Fast Sign Co., Inc. v. Amer. Home Servs., Inc.*, Civ. No. 03-77276 (Ga. Super. Ct., Fulton Cty. Mar. 25, 2010). Similarly, the FCC has found that a willful violation of the TCPA is one where the "violator knew that he was doing the act in question . . . [and that the] violator need not know that his action or inaction constitutes a violation; ignorance of the law is not a defense . . . ." *In re Dynasty Mortg., LLC*, 22 F.C.C. Rcd. 9453, 9470 n.86 (2007).

facts established in the record, that the Defendant failed to establish and implement, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations. As stated in its S-1 filing of October 9, 2015[65] they "generally rely on third party lead generators to obtain appropriate consent from the called parties" which is by no stretch of the imagination taking due care to establish and implement reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations. It is merely handing off that responsibility to a third party and hoping they do a good job on getting proper written express consent and nothing more.

The simple fact that Mr. Lee got **any** phone calls from loanDepot shows that there were no practices and procedures in place to make sure that leads it acquired were from persons who actually had given express written consent to loanDepot **specifically.** It also shows that loanDepot failed to consult the Do Not Call Registry and the Kansas no-call List to see if he was registered there, which he was. The fact that Mr. Lee got 10 calls and that three different agents continued to solicit him even after being told they had a wrong number is prima facie evidence that the policy of loanDepot is to solicit any person they can get on the telephone rather than to operate within the confines of the telemarking statutes, both state and federal. The facts show it does not have established practices and procedures in place to avoid placing violative unsolicited calls or for that matter following the law in any manner in its telemarketing operations. Additional evidence of the lack of any practices and procedures in place to prevent unsolicited calls is shown in numerous postings about loanDepot on the public telephone call complaint boards such as 800notes.com, whocallsme.com and others as previously mentioned. Complaints about the same type of calling that Mr. Lee was subjected to are stated time after time on a

[65] Exhibit10 Pg. 147 ¶ 2 S-1 Filing with SEC Available at http://www.sec.gov/Archives/edgar/data/1651502/000119312515340417/d53727ds1.htm

variety of telephone numbers used by the Defendant in addition to the number that called Mr. Lee.[66] Also there are the allegations made in the Florida TCPA class action complaint that are almost identical to the allegations made by Mr. Lee with the frequency of continuing calls accelerating after loanDepot was told to stop calling.[67]

The TCPA is designed to protect the privacy interests of consumers by prohibiting vexatious and intrusive robo-dialed commercial telephone calls from interrupting the privacy of consumers in their own homes. The privacy interests protected by the TCPA have been summarized as follows:

> the shrill and imperious ring of the telephone demands immediate attention. Unlike the unsolicited bulk mail advertisement found in the mail collected at a resident's leisure, the ring of the telephone mandates a prompt response, interrupting a meal, a restful soak in the bathtub, even intruding on the intimacy of the bedroom.

*State of Minnesota v. Casino Marketing Group, Inc.*, 491 N.W.2d 882, 888 (Minn. 1992) (*cert denied* 507 U.S. 1006 (1993)).

The facts show that loanDepot has a complete and utter disregard for those persons it calls who have no interest in its services or products and wish to only have peace and privacy in their lives. Mr. Lee knows all too well of the shrill and imperious ring of loanDepot's calls. When loanDepot receives a negative response from an *actual called party,* as in the case with Mr. Lee, its modus operandi is to continue to solicit whoever it has on the line rather than discontinuing the call which is a clear violation of K.S.A § 50-670(7)(4). Such behavior is prima facie evidence that in reality it did not necessarily want to reach a different "intended recipient" as claimed as a defense but instead to speak with any warm body that answers the phone to solicit business. When looking at the many postings on public forums as well as the allegations made in this and the Florida case it is abundantly clear that there is no regard for the desire for privacy

---

[66] Exhibit 13 - Postings from public complaint boards on loanDepot calls

[67] Exhibit 9 ¶¶ 24-34 - Florida class action complaint Doc. 1 (6:15-cv-00336-CEM-KRS (M.D. Fla.))

of the ACTUAL called party and compliance with the law by loanDepot, but instead the goal is
to *make a sale to someone/anyone* that answers the phone if possible, the privacy of those called
and the law be damned.

## V. CONCLUSION

Plaintiff would remind this Honorable Court that as mentioned earlier, the penalty for
violations under the KCPA was increased twice in the last 41 years to $10,000 per violation by
the Kansas Legislature. It must have been obvious to the Legislature that the lesser penalties
were not creating the desired deterrent to violative behavior. This Court, although it has the
discretionary power to do so, should not diminish the penalties against the Defendant in this
matter from the maximum of $10,000 per violation under the KCPA because to do so would fly
in the face of the intent of the Kansas Legislature. It was obviously their intent to provide a
significant enough penalty against violators to create a sufficient deterrent to future violations of
consumer's rights. Mr. Lee cherishes his privacy like most people and should never have been
subjected to the harassing and abusive violations of his right to privacy by loanDepot and he
should be fairly compensated according to the law for his claims. loanDepot doesn't understand
the right to privacy but it does understand money. It would likely understand money even more
if it were to have to pay a substantial sum for its blindness of and callous disregard for the rights
of others and the law. loanDepot should be assessed a significant enough enhanced penalty
under the TCPA and KCPA to act as an incentive for it to *finally* do what it should have already
done, **but hasn't**, to prevent these violations. loanDepot should not just get a slap on the wrist
for its violations and thereby be encouraged to operate in the same manner where the costs it

might incur through litigation are shrugged off and considered nothing more than a cost of doing business. A substantial penalty to create a real incentive to comply with the law is not only warranted but a necessity to incentivize loanDepot to *finally* use due care and implement effective practices and procedures to prevent violations of the regulations. It is necessary so that other consumers are protected from such things as the "predictive dialer from hell" that obviously runs amok on a regular basis at loanDepot. It is also justified to hopefully curb other violative practices such as not listening to what the called party says when they are not interested in the services being solicited for and do not want to receive any further calls.

WHEREFORE, Plaintiff Leon Lee having shown there are no issues of material fact before the court as to his claims respectfully requests this Honorable Court grant his Motion for Summary Judgment in its entirety and assess enhanced penalties according to law it deems just and proper. The Court should do so to not only compensate Mr. Lee for the violations of his right to privacy but to also incentivize loanDepot to *finally* take action to implement practices and procedures to bring it into compliance with both federal and state law to protect consumers throughout the nation.

Respectfully Submitted,

Leon E. Lee
1314 Dunsworth
Wichita, Kansas 67212
316-680-2833

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of Plaintiffs Motion for Summary Judgment was mailed to the below named party on the date stated below by USPS First Class Mail.

Done this 2nd day of November, 2015 by USPS certified mail # 7014 0510 0000 0679 9063

Joshua C. Dickinson
12925 W. Dodge Rd. Suite 107
Omaha, NE 68154

Leon Lee

Leon E. Lee